1

2

3

4

5

6

7       UNITED STATES DISTRICT COURT, WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

9   KAMIE KAHLO and DANIEL KAHLO, on
behalf of themselves and all others similarly

10   situated,                                       No.

11                            Plaintiffs,     **CLASS ACTION COMPLAINT**

12      v.                               JURY TRIAL DEMANDED

13   BANK OF AMERICA, N.A. and BAC
HOME LOANS SERVICING, LP,

14

15                      Defendants.

16

17

18

19

20

21

22

23

24

25

26

CLASS ACTION COMPLAINT



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

# TABLE OF CONTENTS

**PAGE**

I.  INTRODUCTION ...................................................................................1

II.  JURISDICTION ....................................................................................5

III.  PARTIES .................................................................................................6

IV.  FACTUAL BACKGROUND ....................................................................6

    A.  The Foreclosure Crisis .................................................................6

    B.  Creation of the Home Affordable Modification Program.........................7

    C.  Duties of a Participating Servicer Under HAMP.....................................9

    D.  Plaintiffs' Effort to Obtain a Loan Modification Under HAMP..........................14

    E.  Class Allegations ..........................................................................17

COUNT I:  BREACH OF CONTRACT / BREACH OF DUTY OF GOOD FAITH
AND FAIR DEALING .........................................................................20

COUNT II:  PROMISSORY ESTOPPEL, IN THE ALTERNATIVE .........................................22

COUNT III:  VIOLATION OF CONSUMER PROTECTION ACT,
RCW 19.86.010 *et seq.* .........................................................................22

COUNT IV:  UNJUST ENRICHMENT ......................................................................23

PRAYER FOR RELIEF .........................................................................................23

JURY TRIAL DEMANDED....................................................................................24

CLASS ACTION COMPLAINT - i



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

010174-11 359827 V1

## I.    INTRODUCTION

1.    In October 2008, Bank of America accepted $15 billion in funds from the United States Government as part of the Troubled Asset Relief Program ("TARP"), 12 U.S.C. § 5211. In January 2009, in connection with its acquisition of Merrill Lynch, Bank of America accepted another $10 billion in TARP funds along with a partial guarantee against losses on $118 billion in mortgage-related assets.  By accepting this payment, Bank of America agreed that it would participate in one or more programs that TARP authorized the Secretary of the Treasury to establish necessary to minimize foreclosures.

2.    Consistent with the TARP mandate, the Treasury Department implemented the Home Affordable Modification Program ("HAMP") – a detailed program designed to stem the foreclosure crisis by providing affordable mortgage loan modifications and other alternatives to foreclosure to eligible borrowers.  Companies that accepted money under the TARP are subject to mandatory inclusion in HAMP as are certain classes of loans, namely those held by Federal National Mortgage Association ("Fannie Mae") and Federal Home Loan Mortgage Corporation ("Freddie Mac").

3.    Bank of America signed a contract with the U.S. Treasury on April 17, 2009 (attached as Exhibit 1 and included by reference) agreeing to comply with the HAMP requirements and to perform loan modification and other foreclosure prevention services described in the program guidelines.  The guidelines issued by the Treasury Department set forth a detailed process whereby a participating servicer such as Bank of America, acting through its subsidiary BAC Home Loans Servicing, must:

- identify loans that are subject to modification under the HAMP program, both through its own review and in response to requests for modification from individual homeowners;

CLASS ACTION COMPLAINT - 1



- collect financial and other personal information from the homeowners to evaluate whether the homeowner is eligible for a loan modification under HAMP;

- institute a modified loan with a reduced payment amount as per a mandated formula, that is effective for a three-month trial period for borrowers that are eligible for a modification; and

- provide a permanently modified loan to those homeowners who comply with the requirements during the trial period. Whether the homeowner qualifies for a modification or not, participating servicers are also required to provide written notices to every mortgage borrower that has been evaluated for a loan modification, whether or not the borrower has been found eligible.

4.     HAMP and its associated directives also set prohibitions against certain conduct *including demanding upfront payments in order to be evaluated for a loan modification*, instituting or continuing foreclosures while a borrower is being evaluated for a loan modification, and restrictions on the way a servicer may report the borrower to credit reporting agencies.

5.     Though Bank of America accepted $25 billion in TARP funds and entered into a contract obligating itself to comply with the HAMP directives and to extend loan modifications for the benefit of distressed homeowners, Bank of America has systematically failed to comply with the terms of the HAMP directives and has regularly and repeatedly violated several of its prohibitions.

6.     Under HAMP, the federal government incentivizes participating servicers to make adjustments to existing mortgage obligations in order to make the monthly payments more affordable. Servicers receive $1,000.00 for each HAMP modification. However, this incentive is countered by a number of financial factors that make it more profitable for a mortgage servicer such as Bank of America to avoid modification and to continue to keep a mortgage in a state of

CLASS ACTION COMPLAINT - 2



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

default or distress and to push loans toward foreclosure. This is especially true in cases where the mortgage is owned by a third-party investor and is merely serviced by the servicer such as Bank of America. On information and belief, Bank of America does not own a significant majority of the loans on which it functions as a servicer.

7.      Economic factors that discourage Bank of America from meeting its contractual obligations under HAMP by facilitating loan modifications include the following: [1]

- Bank of America may be required to repurchase loans from the investor in order to permanently modify the loan. This presents a substantial cost and loss of revenue that can be avoided by keeping the loan in a state of temporary modification or lingering default.

- The monthly service fee that Bank of America, as the servicer collects as to each loan it services in a pool of loans, is calculated as a fixed percentage of the unpaid principal balance of the loans in the pool. Consequently, modifying a loan to reduce the principal balance results in a lower monthly fee to the servicer.

- Fees that Bank of America charges borrowers that are in default constitute a significant source of revenue to the servicer. Aside from income Bank of America directly receives, late fees and "process management fees" are often added to the principal loan amount thereby increasing the unpaid balance in a pool of loans and increasing the amount of the servicer's monthly service fee.

- Entering into a permanent modification will often delay a servicer's ability to recover advances it is required to make to investors of the unpaid principal and interest payment of a non-performing loan. The servicer's right to

---

[1] *See* Thompson, Diane E., *Why Servicers Foreclose When They Should Modify and Other Puzzles of Servicer Behavior*, National Consumer Law Center (October 2009).

CLASS ACTION COMPLAINT - 3



1918 Eighth Avenue, Suite 3300 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

010174-11 359827 V1

recover expenses from an investor in a loan modification, rather than a foreclosure, is often less clear and less generous.

- Fixed overhead costs involved in successfully performing loan modifications involve up-front cost to the servicer for additional staffing, physical infrastructure, and expenses such as property valuation, credit reports and financing costs.

8.      Rather than allocating adequate resources and working diligently to reduce the number of loans in danger of default by establishing permanent modifications, Bank of America has serially strung out, delayed, and otherwise hindered the modification processes that it contractually undertook to facilitate when it accepted billions of dollars from the United States. Bank of America's delay and obstruction tactics have taken various forms with the common result that homeowners with loans serviced by Bank of America, who are eligible for permanent loan modifications, and who have met the requirements for participation in the HAMP program, have not received permanent loan modifications to which they are entitled.

9.      In addition to its obligations based on its contract with the Treasury Department, Bank of America has entered into written agreements with individual homeowners, including Plaintiffs, for temporary loan modifications that must be converted to permanent loan modifications.  Plaintiffs and a similar class of borrowers have complied with the agreements by submitting the documentation asked of them and, when requested, by making payments, *i.e.*, an illegal $1,400 upfront payment to Bank of America in order to even be considered for loan modification.  Despite Plaintiffs' efforts, Bank of America has ignored its contractual obligation to modify their loans permanently.

10.      Because Bank of America is not meeting its contractual obligations, at least hundreds of Washington homeowners are wrongfully being deprived of an opportunity to cure their delinquencies, pay their mortgage loans and save their homes.  By failing to live up to its obligations under the terms of the agreement it entered into with the Department of the Treasury,



and the terms of the contracts it formed with individual homeowners, Bank of America has left thousands of borrowers in a state of limbo – often worse off than they were before they sought a modification from Bank of America.  Defendants' actions violate their contractual obligations, thwart the purpose of HAMP, and are illegal under Washington law.

11.     Daniel Kahlo and Kamie Kahlo bring this suit on behalf of themselves and a Class of similarly situated Washington residents ("Plaintiffs") to challenge the failure of Defendant Bank of America Bank, N.A. and its subsidiary BAC Home Loans Servicing, LP (collectively referred to as "Defendants" or "Bank of America") to honor the terms of their agreement with the United States Treasury for the intended benefit of homeowners, their failure to honor agreements directly with individual homeowners to modify mortgages to a point that they are affordable and sustainable, and to recover any illegally collected upfront fees.

## II.     JURISDICTION

12.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d)(2) in that the matter is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and members of the Class are citizens of a State different from the Defendants.

13.     This Court also has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1367 in that the Plaintiffs are intended, third-party beneficiaries to a contract between Bank of America and the U.S. Treasury that was entered into pursuant to and under the direction of TARP.  12 U.S.C. § 5201 *et seq*.

14.     This Court has personal jurisdiction over the parties in this action by the fact that Defendants are corporations that are licensed to do business in the state of Washington or otherwise conduct business in the state of Washington.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) inasmuch as the unlawful practices are alleged to have been committed in this District, Defendants regularly conduct business in this District, and the named Plaintiffs reside in this District.



1918 Eighth Avenue, Suite 3300 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

### III.   PARTIES

16.     Plaintiffs Daniel Kahlo and Kamie Kahlo are a married couple residing in Seattle, Washington.

17.     Defendant Bank of America, N.A. is a mortgage lender headquartered in Charlotte, NC.  Defendant BAC Home Loans Servicing, LP is a subsidiary of Bank of America, N.A., and is located in Calabasas, CA.  Defendants are collectively referred to as "Bank of America" and are currently doing business and maintaining office branches in Seattle and throughout the state of Washington.

### IV.   FACTUAL BACKGROUND

**A.    The Foreclosure Crisis**

18.     Over the last three years, the United States has been in a foreclosure crisis.  A congressional oversight panel has recently noted that one in eight U.S. mortgages is currently in foreclosure or default.[2]

19.     Washington has been no exception.  The number of Washington properties with foreclosure filings in 2008 was 72% higher than in 2007 and 117% higher than in 2006 – more than double the number of filings in the span of two years.  In 2008, foreclosure filings were initiated on more than 26,000 homes in Washington State.  More than 9,200 foreclosure filings were initiated in 2008 in the Seattle area alone (more than an 84% increase over the previous year).[3]

20.     According to 2009 data, the numbers continue to rise.  In the third quarter of 2009, foreclosures were filed on 10,375 Washington properties, a 33% increase over the same

---

[2] Congressional Oversight Panel, Oct. 9, 2009 report at 3.  Available at http://cop.senate.gov/reports/library/report100909-cop.cfin.

[3] RealtyTrac Staff, *Foreclosure Activity Increases 81 Percent in 2008* (Jan. 15, 2009).  Available at http://www.realtytrac.com/contentmanagement/pressrelease.aspx?channelid=9&accnt=0&itemid=5 681.



CLASS ACTION COMPLAINT - 6

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

period of 2008.[4]  Overall in 2009, over 36,000 individual properties in Washington had foreclosure filings against them which, while slightly less than 2008, still constitutes an increase of over 100% from 2007 levels and an increase of more than 400% over 2004.[5]

21.     Economists predict that interest rate resets on the riskiest of lending products will not reach their zenith until sometime in 2011.  *See* Eric Tymoigne, *Securitization, Deregulation, Economic Stability, and Financial Crisis*, Working Paper No. 573.2 at 9, Figure 30, available at http://papers.ssrn.com/so13/papers.cfm?abstract_id=1458413 (citing a Credit Suisse study showing monthly mortgage rate resets).

**B.     Creation of the Home Affordable Modification Program**

22.     Congress passed the Emergency Economic Stabilization Act of 2008 on October 3, 2008 and amended it with the American Recovery and Reinvestment Act of 2009 on February 17, 2009 (together, the "Act").  12 U.S.C.A § 5201 *et seq.* (2009)

23.     The purpose of the Act is to grant the Secretary of the Treasury the authority to restore liquidity and stability to the financial system, and ensure that such authority is used in a manner that "protects home values" and "preserves homeownership."  *Id.*

24.     The Act grants the Secretary of the Treasury the authority to establish the Troubled Asset Relief Program, or TARP.  12 U.S.C. § 5211.  Under TARP, the Secretary may purchase or make commitments to purchase troubled assets from financial institutions.  *Id.*

25.     Congress allocated up to $700 billion to the United States Department of the Treasury for TARP.  12 U.S.C. § 5225.

---

[4] RealtyTrac Staff, *U.S. Foreclosure Activity Increases 5 Percent in Q3* (Oct. 15, 2009).  Available at http://www.realtytrac.com/contentmanagement/pressrelease.aspx?channelid=9&accnt=0&itemid=77 06.

[5] RealtyTrac Staff, *RealtyTrac Year End Report Shows Record 2.8 Million U.S. Properties with Foreclosure Filings in 2009* (Jan. 14, 2010).  Available at http://www.realtytrac.com/contentmanagement/pressrelease.aspx?channelid=9&itemid=8333



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

26.     In exercising its authority to administer TARP, the Act mandates that the Secretary "shall" take into consideration the "need to help families keep their homes and to stabilize communities."  12 U.S.C. § 5213(3).

27.     The Act further mandates, with regard to any assets acquired by the Secretary that are backed by residential real estate, that the Secretary "shall implement a plan that seeks to maximize assistance for homeowners" and use the Secretary's authority over servicers to encourage them to take advantage of programs to "minimize foreclosures."  12 U.S.C. § 5219. The Act grants authority to the Secretary of the Treasury to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures."  *Id*.

28.     The Act imposes parallel mandates to implement plans to maximize assistance to homeowners and to minimize foreclosures.  12 U.S.C. § 5220.

29.     On February 18, 2009, pursuant to their authority under the Act, the Treasury Secretary and the Director of the Federal Housing Finance Agency announced the Making Home Affordable program.

30.     The Making Home Affordable program consists of two subprograms.  The first sub-program relates to the creation of refinancing products for individuals with minimal or negative equity in their home, and is now known as the Home Affordable Refinance Program, or HARP.

31.     The second sub-program relates to the creation and implementation of a uniform loan modification protocol, and is now known as the Home Affordable Modification Program, or HAMP.  It is this subprogram that is at issue in this case.

32.     HAMP is funded by the federal government, primarily with TARP funds.  The Treasury Department has allocated at least $75 billion to HAMP, of which at least $50 billion is TARP money.



CLASS ACTION COMPLAINT - 8

1918 Eighth Avenue, Suite 3300 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

010174-11  359827 V1

**C.      Duties of a Participating Servicer Under HAMP**

33.      Because Bank of America accepted $25 billion in federal funds and additional loan guarantees, it was required to participate in HAMP for the loans on which it functions as a loan "servicer."  On April 17, 2009, Steve R. Bailey, of Bank of America, N.A., executed a Servicer Participation Agreement ("SPA") with the federal government.  A copy of this SPA is attached hereto as Exhibit 1.

34.      The SPA executed by Mr. Bailey incorporates all "guidelines," "procedures," and "supplemental documentation, instructions, bulletins, frequently asked questions, letters, directives, or other communications," referred to as "Supplemental Directives" issued by the Treasury, Fannie Mae or Freddie Mac in connection with the duties of Participating Servicers.  These documents together are known as the "Program Documentation" (SPA I.A.), and are incorporated by reference herein.  The SPA mandates that a Participating Servicer "shall perform" the activities described in the Program Documentation "for all mortgage loans it services."  SPA I.A., 2.A.[6]

35.      The first Supplemental Directive ("SD") was issued on April 6, 2009, and states that the national mortgage modification program was "aimed at helping 3 to 4 million at-risk homeowners – both those who are in default and those who are at imminent risk of default – by reducing monthly payments to sustainable levels."  SD 09-01at p. 1.  This directive and the directives to follow were issued to provide guidance for adoption and implementation of HAMP "to provide a borrower with sustainable monthly payments."  *Id.*

36.      The Program Documentation requires Participating Servicers to evaluate *all loans* which are 60 or more days delinquent or appear to be in imminent default (as defined by the

---

[6] The Program Documentation also includes Supplemental Directive 09-01 ("SD 09-01," attached hereto as Exhibit 2), Home Affordable Modification Program; Base Net Present Value (NPV) Model Specifications ("NPV Overview," attached hereto as Exhibit 3) and Supplemental Documentation-Frequently Asked Questions ("HAMPF AQS," attached hereto as Exhibit 4) and Supplemental Directive 09-08 ("SD 09-08," attached hereto as Exhibit 5).  These documents together describe the basic activities required under HAMP and are incorporated by reference in both of the TPP Agreements signed by Plaintiffs as well as herein.



CLASS ACTION COMPLAINT - 9

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Program Documentation), to determine which loans meet the HAMP eligibility criteria.  SD 09-01 p. 4.  In addition, if a borrower contacts a Participating Servicer regarding a HAMP modification, the Participating Servicer must collect income and hardship information to determine if the borrower is eligible for a HAMP modification.  *Id*. at pp. 3-4.

37.     A HAMP Modification consists of two stages.  First, a Participating Servicer is required to gather information and, if appropriate, offer the homeowner a Trial Period Plan ("TPP").  Second, upon successful completion of the TPP, the Servicer must offer the homeowner a permanent modification.[7]

38.     A Mortgage is eligible for the HAMP if criteria enumerated in the Program Documentation are met.  Aside from criteria that require that the loan be a first lien mortgage originated before 2009, that the property be occupied, and that it be the borrower's principal residence, the most salient conditions are that the loan is delinquent or default is reasonably foreseeable; that the borrower documents a financial hardship (as defined in the Program Documentation); and that the "borrower has a monthly mortgage payment ratio of greater than 31 percent" of the borrower's monthly income.

39.     The servicer must "provide a borrower with clear and understandable written information about the material terms, costs, and risks of the modified mortgage loan in a timely manner to enable borrowers to make informed decisions."  SD 9-01 at p. 13.

40.     Once the participating servicer has determined a mortgage borrower's eligibility in the HAMP, the servicer must apply the modification steps enumerated in the Program Documentation, in the stated order of succession until the borrower's monthly mortgage payment ratio is reduced to 31 percent of the borrower's monthly income.  These steps include capitalizing accrued interest and escrow advances, reducing the interest rate, extending the term

---

[7] The eligibility criteria for HAMP, as well as the formula used to calculate monthly mortgage payments under the modification, are explained in detail in SD 09-01, attached hereto as Exhibit 2.  Generally speaking, the goal of a HAMP modification is for owner-occupants to receive a modification of a first-lien loan by which the monthly mortgage payment is reduced to 31% of their monthly income for the next five years.

CLASS ACTION COMPLAINT - 10



HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1    and re-amortizing the loan (if necessary), and providing a principal forbearance (if necessary).

2    *See* SD 09-01 pp. 8-10; *see also* Ex. 3 at p. 2.

3         41.    After applying the enumerated modification steps to calculate the modified

4    payment amount, a servicer must offer the borrower a TPP.  The TPP consists of a three-month

5    period in which the homeowner makes mortgage payments based on the modification formula

6    stated in the Program Documentation.  Bank of America uses a standard form agreement to offer

7    TPPs to eligible homeowners.  This agreement describes the homeowner's duties and obligations

8    under the plan and promises a permanent HAMP modification for those homeowners that

9    execute the agreement and fulfill the documentation and payment requirements.

10        42.    If the homeowner executes the TPP Agreement, complies with all documentation

11   requirements and makes all three TPP monthly payments, the second stage of the HAMP process

12   is triggered, in which the homeowner must be offered a permanent modification.  The payment

13   amount and interest rate in the modified loan are fixed for five years and equal to the payment

14   amount and interest rate in the TPP.  Thereafter, the rate may escalate annually by up to one

15   percent until it reaches an interest cap which is the lesser of:  (i) the fully indexed and fully

16   amortizing contract rate or (ii) the Freddie Mac Primary Mortgage market Survey rate for 30-

17   year fixed rate mortgage loans on the date the modification is prepared.  Once capped, the rate is

18   fixed for the remainder of the term.  *See* SD 09-01 p. 9.

19        43.    HAMP prohibits a participating servicer from taking several actions including the

20   following:

21       •    Proceeding with a foreclosure sale.  Any foreclosure sale must be suspended and

22          no new foreclosure action may be initiated during the trial period, and until the

23          borrower has been considered and found ineligible for other available foreclosure

24          prevention options.  *See* Ex. 4 at Q63; *see also* SD 09-01 (Ex. 2) at p. 14.

25       •    Requiring a borrower to make an initial contribution payment pending the

26          processing of the trial period plan before the plan starts.  Ex. 4 at Q. 83.



CLASS ACTION COMPLAINT - 11

1918 Eighth Avenue, Suite 3300 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

- Soliciting borrowers to opt out of consideration for HAMP during the temporary review period.  Ex. 8 at Q1230-02.

- Reporting borrowers as delinquent to credit reporting bureaus without explanation.  For borrowers who are current when they enter a trial period, the servicer should report the borrower current but on modified payment if the borrower makes timely payments during the trial period.  For borrowers who are delinquent when they enter the trial period, the servicer should report in such a manner that accurately reflects the borrower's current workout status.  SD 09-01 (Ex. 2) at p. 22.

- Assessing prepayment penalties for full or partial prepayment as part of the modification.  Ex. 4 at Q. 25.

44.    The HAMP requires a participating servicer to send a Borrower Notice to every borrower that has been evaluated for HAMP but is not offered a Trial Period Plan, is not offered an official HAMP modification, or is at risk of losing eligibility for HAMP because they have failed to provide required financial documentation.  SD 09-08 (Ex. 5) at p. 1.

45.    The HAMP presumes that final modifications will be extended and finalized upon completion of a TPP or shortly thereafter.  HAMP Supplemental Documentation dated December 22, 2009 addresses situations in which the borrower has completed the TPP but has not yet received a permanent modification.

> In situations where an eligible borrower successfully completed the trial period and should have been converted to a permanent modification, but for reasons beyond their control were not timely evaluated for a permanent modification, the servicer must promptly make a determination as to whether the borrower is eligible for a permanent HAMP modification.  If the borrower is eligible, then the servicer must offer the borrower a permanent HAMP modification as soon as possible, but in no event later than sixty days after discovering the error.

Ex. 8 at Q1222-01.



HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

46.     By entering into the SPA, Bank of America covenanted that all services will be performed in compliance with all applicable Federal, state and local laws, specifically including state laws designed to prevent unfair, discriminatory or predatory lending practices.  SPA, Ex. 1 at ¶ 5(b).

47.     Under the SPA, Bank of America also covenanted that it would perform the services required under the Program Documentation and the Agreement in accordance with the practices, high professional standards of care, and degree of attention used in a well managed operation, and no less than which Bank of America exercises for itself under similar circumstances, and that Bank of America would use qualified individuals with suitable training, education, experience and skills to perform the Services.  *Id.* at ¶ 5(d).

48.     Bank of America has routinely failed to meet its obligations under the Program Directive.  Mortgage borrowers who request to be evaluated for a modification under HAMP routinely face unexplained delays and go weeks or months with no communication from Bank of America after providing the requested information.  Borrowers who attempt to contact Bank of America by telephone face long periods of time on hold and are transferred between service representatives in a deliberate effort to cause the borrower to give up and to terminate the call.  Bank of America regularly falsely informs borrowers that it did not receive requested information and demands that documents be re-sent.

49.     Bank of America has routinely failed to live up to its end of the TPP Agreement and offer permanent modifications to homeowners.  In January 2010, the U.S. Treasury reported that Bank of America had 1,066,025 HAMP-eligible loans in its portfolio.  Trial periods have been started on only 237,766 of these loans.  Of those, just 12,761 resulted in permanent modifications (only 5% of the started Trial modifications and just over 1% of the eligible pool) even though many more homeowners had made the payments and submitted the documentation required by the TPP Agreement.  The Treasury Report is attached hereto as Exhibit 6.



CLASS ACTION COMPLAINT - 13

50.      By failing to live up to the TPP Agreement and convert TPPs into permanent modifications, Bank of America is leaving homeowners in limbo, wondering if their home can be saved and preventing homeowners from pursuing other avenues of resolution, including using the money they are putting toward TPP payments to fund bankruptcy plans, relocation costs, short sales or other means of curing their default.

**D.      Plaintiffs' Effort to Obtain a Loan Modification Under HAMP**

51.      Plaintiffs Daniel and Kamie Kahlo purchased their home in 1999.  In or about 2001, they refinanced their mortgage with Bank of America.  The mortgage required monthly principal and interest payments of $1,460.

52.      Mr. and Mrs. Kahlo made the regularly scheduled payments on their loan for several years and remained current until 2008.  Plaintiffs own and operate a small, independent construction and design business.  In 2008, as a result of the economic downturn, their income had dropped to approximately $20,000 per year and they were having difficulty paying their monthly mortgage payments.  Plaintiffs contacted Bank of America to inform them of their difficulty and to inquire as to a possible workout arrangement.  Bank of America informed them that it would not consider any workout arrangement or other forbearance agreement unless and until they were delinquent on their mortgage and advised Plaintiffs to become delinquent on their mortgage.

53.      Mr. and Mrs. Kahlo followed Bank of America's advice and fell behind on their mortgage payments in approximately the autumn of 2008.  In early 2009, the Kahlos began an effort to obtain a loan modification through Defendant Bank of America.

54.      Over several months, Mr. and Mrs. Kahlo submitted financial information and applications to Bank of America in an effort to obtain a modification or forbearance agreement.  Though they provided all information that Bank of America asked of them, their efforts were unsuccessful.



CLASS ACTION COMPLAINT - 14

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

55.     In or about June 2009, Mr. and Mrs. Kahlo heard about the possibility of obtaining a loan modification through the HAMP program.  On July 15, 2009, Plaintiffs sent a letter to Bank of America requesting to be considered for a loan modification through the HAMP program.  Plaintiffs followed up with a telephone call a week later.  Bank of America claimed not to have received the letter.  Plaintiffs requested and received instructions as to the information and documents Bank of America required to consider Plaintiffs for a loan modification under HAMP.

56.     On July 28, 2009, Plaintiffs sent all information requested of them to Bank of America via fax.  The documents Plaintiffs faxed included a signed HAMP Hardship Affidavit on a form provided by Bank of America, bank statements, tax returns, and statements showing their property tax account and homeowner's insurance policy.  Bank of America acknowledged receipt of Plaintiffs' documents and *demanded one full-month payment of $1,400 in order to be considered for a HAMP loan modification*.

57.     On August 11, 2009, Plaintiffs sent Bank of America a full payment in the amount of $1,460.

58.     On August 20, 2009, Plaintiffs received a call from a Bank of America representative, Ms. Hartung, who acknowledged receipt of Plaintiffs' payment and summarized the terms of the HAMP modification that Bank of America would offer.  The representative stated that she would send out the offer letter but that Plaintiffs would need to send an additional late fee payment of $289.12 in certified funds.

59.     On August 30, 2009, Mr. and Mrs. Kahlo received a Terms and Conditions Agreement from Bank of America summarizing the terms and conditions of the loan modification.  The Agreement was accompanied by a cover letter dated August 21, 2009 stating, "[t]his letter constitutes our offer to modify the Mortgage identified above, subject to the terms and conditions agreement.  When signed by you, this letter will also constitute your acceptance



010174-11  359827 V1

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

1   and agreement to these terms and conditions." A copy of this letter and the accompanying

2   agreement are attached hereto as Exhibit 9.

3         60.    The Terms and Conditions Agreement states that the principal balance will be

4   $209,854.22 and requires Plaintiffs to make Principal and Interest payments of $781.79

5   beginning November 1, 2009. This amount and corresponding interest rate of 3.25% would

6   remain effective for five years and would rise to 5.55%, with a corresponding principal and

7   interest payment of $1,058.82 effective until maturity. No additional summary of interest rate,

8   payment terms, costs or fees accompanied the Terms and Conditions Agreement.

9         61.    Mr. and Mrs. Kahlo signed the Terms and Conditions Agreement the day they

10   received it and returned it the following day thereby acknowledging their acceptance of Bank of

11   America's offer. They further tendered payment of $289.12. On September 2, 2009, Plaintiffs

12   received an email from Ms. Hartung acknowledging receipt of their payment and stating that

13   they were "good to go." The representative further stated that Plaintiffs would receive "final"

14   modification documents at the time their first payment is due.

15         62.    Plaintiffs tendered their first payment of $781.79 to Bank of America on

16   October 30, 2009. Bank of America accepted this payment.

17         63.    In late October, Plaintiffs received a letter stating that their Bank of America loan

18   would be serviced by Bank of America Home Loan Servicing, LP.

19         64.    Plaintiffs did not receive the final modification documents they were told to

20   expect. They made numerous calls and sent emails to Bank of America. On November 30,

21   2009, they are assured that they are indeed on a trial modification plan and told that they should

22   continue making their payments. On December 1, 2009 and each month thereafter, Plaintiffs

23   have sent a payment of the amount required under the Terms and Conditions Agreement. Bank

24   of America has accepted each of these payments.

25         65.    On December 5, 2009, Plaintiffs received a notice from BAC Home Loans stating

26   that their loan was in default and claiming a principal balance of $211,567.88 as of



CLASS ACTION COMPLAINT - 16

1    November 22, 2009.  Plaintiffs called the number listed on the notice and were told that the

2    notice was in error and that their loan had been modified.

3          66.    In February 2010, Plaintiffs still had not received the final documents they were

4    told to expect.  After several inquiries, including requests that they re-send a copy of the Terms

5    and Conditions Agreement because part of it had been "lost," Bank of America informed

6    Plaintiffs via email that the Terms and Conditions Agreement was merely an "offer" but that the

7    modification has not been approved.  Bank of America claimed that Plaintiffs' loan had not been

8    permanently modified.

9          67.    Despite their compliance with the Terms and Conditions Agreement, and all their

10   responsibilities under the terms of the HAMP program directives, Mr. and Mrs. Kahlo have not

11   been provided a Loan Modification Agreement under the HAMP Program guidelines to date.

12         68.    Like hundreds or even thousands of Washington residents, Mr. and Mrs. Kahlo

13   have been living in limbo, without any assurances that their home will not be foreclosed, despite

14   their compliance with HAMP requirements and their continued monthly payments under the

15   Agreement provided by Bank of America.  They have invested their limited resources in

16   modified payments based on the promise that doing so would result in a permanent loan

17   modification.

18   **E.    Class Allegations**

19         69.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

20         70.    Plaintiffs bring this action under Rule 23 of the Federal Rules of Civil Procedure,

21   on behalf of themselves and a Class consisting of:

22              All Washington homeowners whose loans have been serviced by
                one or both Defendants and who, since April 13, 2009, have
23              requested or been otherwise eligible for a TPP under the terms of
                HAMP Program Documentation and who have not received a
24              permanent loan modification ether because they have not been
                offered a TPP by Bank of America or because they did not receive
25              a permanent loan modification after they complied with their
                obligations under HAMP as conveyed to them by Bank of
26              America, as required by HAMP.



CLASS ACTION COMPLAINT - 17

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

010174-11  359827 V1

> All Washington homeowners who paid Bank of America an
> upfront fee in order to be evaluated for loan modification.

71.     Excluded from the Class are governmental entities, Defendants, their affiliates and subsidiaries, Defendants' current or former employees, officers, directors, agents, representatives, their family members, the members of this Court and its staff.

72.     Plaintiffs do not know the exact size or identities of the members of the proposed class, since such information is in the exclusive control of Defendants.  Plaintiffs believe that the Class encompasses many hundreds and perhaps thousands of individuals whose identities can be readily ascertained from Defendants' books and records.  Therefore, the proposed Class is so numerous that joinder of all members is impracticable.

73.     Based on the size of the modifications at issue, Plaintiffs believe the amount in controversy exceeds $5 million.

74.     All members of the Class have been subject to and affected by the same conduct. The claims are based on the terms of a single unifying contract between Bank of America and Fannie Mae, acting as agent for the United States Treasury, and on form contracts and uniform loan modification processing requirements.  There are questions of law and fact that are common to the class, and predominate over any questions affecting only individual members of the Class. These questions include, but are not limited to the following:

a.     The nature, scope and operation of Bank of America's obligations to homeowners under HAMP;

b.     Whether Bank of America breached its duties under HAMP that were intended for the benefit of Class members;

c.     Whether the manner in which Bank of America has executed the duties it undertook as part of the HAMP program violates its duty of good faith and fair dealing;

d.     Whether Bank of America's receipt of an executed TPP Agreement, along with supporting documentation and three monthly payments, creates a

CLASS ACTION COMPLAINT - 18



HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

binding contract or otherwise legally obligates Bank of America to offer
Class members a permanent HAMP modification;

e. Whether Bank of America's failure to provide permanent HAMP modifications in these circumstances amounts to a breach of contract and/or a breach of the covenant of good faith and fair dealing;

f. Whether Bank of America demanded and collected initial payments from eligible homeowners in violation of HAMP provisions;

g. Whether Bank of America's written representations to homeowners stating that they would receive permanent loan modifications upon successful completion of the trial period and then failing to deliver such permanent modification constitutes an unfair or deceptive practice under the Washington Consumer Protection Act ("CPA");

h. Whether the above practices were acts within trade or commerce within the meaning of the CPA;

i. Whether the above practices affect the public interest within the meaning of the CPA;

j. Whether the above practices caused Class members to suffer injury; and

k. The proper measure of damages and the appropriate injunctive relief.

75. The claims of the individual named Plaintiffs are typical of the claims of the Class and do not conflict with the interests of any other members of the Class in that both the Plaintiffs and the other members of the Class were subject to the same conduct, were subject to the terms of the same agreement and were met with the same absence of a permanent modification.

76. The individual named Plaintiffs will fairly and adequately represent the interests of the Class. They are committed to the vigorous prosecution of the Class's claims and have retained attorneys who are qualified to pursue this litigation and have experience in class actions – in particular, consumer protection actions.



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

77.     A class action is superior to other methods for the fast and efficient adjudication of this controversy.  A class action regarding the issues in this case does not create any problems of manageability.

78.     This putative class action meets the requirements of Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. 23(b)(3).

79.     Bank of America has acted or refused to act on grounds that apply generally to the Class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

## COUNT I

### BREACH OF CONTRACT / BREACH OF DUTY
### OF GOOD FAITH AND FAIR DEALING

80.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

81.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

82.     The SPA and the explicitly incorporated Program Documentation constitute a contract for which Plaintiffs and the Class are intended beneficiaries, and under which Bank of America has undertaken duties to act for the benefit of Plaintiffs and the Class.

83.     By entering into the SPA and accepting valuable consideration including $25 billion in funds from the U.S. Treasury, Bank of America covenanted, on behalf of itself and its subsidiaries, to administer its contractual obligations with principles of good faith and fair dealing.

84.     Bank of America has breached its contractual duties by failing to provide eligible borrowers with the opportunity to accept permanent loan modifications and by wrongfully collecting introductory payments.

85.     In addition to duties to Plaintiffs based on their status as third-party beneficiaries of the SPA, Bank of America entered into individual contracts directly with Plaintiffs.

86.     The Agreement sent by Bank of America to Plaintiffs constitutes a valid offer.

CLASS ACTION COMPLAINT - 20



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

010174-11  359827 V1

87.     By executing the Agreement and returning it to Bank of America, along with the supporting documentation, Plaintiffs accepted Bank of America's offer.

88.     Alternatively, Plaintiffs' return of the Agreement constitutes an offer.  Acceptance of this offer occurred when Bank of America accepted Plaintiffs' TPP payments.

89.     Plaintiffs' TPP payments to Bank of America constitute consideration.  By making those payments, Plaintiffs gave up the ability to pursue other means of saving their home.

90.     Plaintiffs and Bank of America thereby formed valid contracts.

91.     To the extent that the contracts were subject to a condition subsequently providing Bank of America an opportunity to review the documentation submitted by Plaintiffs when they returned the signed TPP, this condition was waived by Bank of America and/or it is estopped to assert it as a defense to Plaintiffs' claims.

92.     By failing to offer Plaintiffs permanent HAMP modifications, and by collecting upfront fees, Bank of America breached those contracts.

93.     Bank of America routinely and regularly breach its duties under both the SPA and their contract with individual Plaintiffs by failing to retain, employ, and supervise adequately trained staff; instituting and/or continuing with foreclosure proceedings against borrowers in a trial program; failing to provide written notices required by HAMP; and by deliberately acting to delay and otherwise frustrate loan modification processes; routinely demanding information already in its files; making inaccurate calculations and determinations of Plaintiffs' eligibility for HAMP; and failing to follow through on written and implied promises.

94.     Plaintiffs remain ready, willing and able to perform under the contracts by continuing to make TPP payments and provide documentation.

95.     Plaintiffs have suffered harm and are threatened with additional harm from Bank of America's breach.  By making TPP payments both during and after the TPP, Plaintiffs forego other remedies that might be pursued to save their homes, such as restructuring their debt under



1918 Eighth Avenue, Suite 3300 • Seattle, WA  98101
(206) 623-7292 • FAX (206) 623-0594

1   the bankruptcy code, or pursuing other strategies to deal with their default, such as selling their

2   home.  On information and belief, some putative Class members have suffered additional harm

3   in the form of foreclosure activity against their homes.

<strong>COUNT II</strong>

<strong>PROMISSORY ESTOPPEL, IN THE ALTERNATIVE</strong>

6   96.   Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

7   97.   Plaintiffs bring this claim on their own behalf and on behalf of each member of

8   the Class described above.

9   98.   Bank of America, by way of its TPP Agreements, made a representation to

10  Plaintiffs that if they returned the TPP Agreement executed and with supporting documentation,

11  and made their TPP payments, they would receive a permanent HAMP modification.

12  99.   Bank of America's TPP Agreement was intended to induce Plaintiffs to rely on it

13  and make monthly TPP payments.

14  100.   Plaintiffs did indeed rely on Bank of America's representation, by submitting TPP

15  payments.

16  101.   Given the language in the TPP Agreement, Plaintiffs' reliance was reasonable.

17  102.   Plaintiffs' reliance was to their detriment.  Plaintiffs have yet to receive

18  permanent HAMP modifications and have lost the opportunity to fund other strategies to deal

19  with their default and avoid foreclosure.

<strong>COUNT III</strong>

<strong>VIOLATION OF CONSUMER PROTECTION ACT, RCW 19.86.010 ET SEQ.</strong>

22  103.   Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

23  104.   Plaintiffs bring this claim on their own behalf and on behalf of each member of

24  the Class described above.

25  105.   The conduct of Bank of America as set forth herein constitutes unfair or deceptive

26  acts or practices, including its practice of leading borrowers to believe that it will permanently



CLASS ACTION COMPLAINT - 22

1   modify their mortgage loans upon successful completion of a trial program; and due to the illegal

2   collection of upfront fees.

3       106.    Bank of America's conduct as set forth herein occurred in the course of trade or

4   commerce.

5       107.    Bank of America's conduct as set forth herein affects the public interest because it

6   was part of a generalized course of conduct affecting numerous customers in this State.

7       108.    Bank of America's conduct as set forth herein proximately caused injury in fact to

8   the business or property of Plaintiffs and Class members.

9       109.    Bank of America is liable to Plaintiffs and Class members for damages in an

10  amount to be determined at trial, including attorneys' fees, costs and statutory treble damages,

11  and should be enjoined from continuing to engage in these unlawful, deceptive, unreasonable

12  and unlawful practices as alleged herein.

**COUNT IV**

**UNJUST ENRICHMENT**

15      110.    Plaintiffs repeat and reallege every allegation above as if fully set forth herein.

16      111.    To the extent no breach of contract claim is sustained, this Count is pled in the

17  alternative.

18      112.    Bank of America collected an upfront fee from Plaintiffs and members of the

19  Class in violation of law and without performing a loan modification.  As such, Bank of America

20  has been unjustly enriched.

**PRAYER FOR RELIEF**

22      WHEREFORE, the Plaintiffs respectfully request the following relief:

23      A.      Certify this case as a class action and appoint the named Plaintiffs to be Class

24  representatives and their counsel to be Class counsel;

25      B.      Enter a judgment declaring the acts and practices of Bank of America complained

26  of herein to constitute a breach of contract and a breach of the covenant of good faith and fair

CLASS ACTION COMPLAINT - 23



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

dealing, as well as a declaration that they are required by the doctrine of promissory estoppel to offer permanent modifications to Class members;

C.      Grant a permanent or final injunction enjoining Bank of America's agents and employees, affiliates and subsidiaries, from continuing to harm Plaintiffs and the members of the Class;

D.      Order Bank of America to adopt and enforce a policy that requires appropriate training of their employees and agents regarding their duties under HAMP;

E.      Order specific performance of Bank of America's contractual obligations together with other relief required by contract and law;

F.      Award actual and statutory damages to the Plaintiffs and the Class in amounts to be proven at trial;

G.      Award Plaintiffs the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees; and

H.      Grant Plaintiffs and the Class such other and further relief as this Court finds necessary and proper.

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury on all issues so triable.

DATED:  March 22, 2010

HAGENS BERMAN SOBOL SHAPIRO LLP

By:___s/ Steve W. Berman_____
   Steve W. Berman, WSBA #12536
   Ari Y. Brown, WSBA #29570
  HAGENS BERMAN SOBOL SHAPIRO LLP
  1918 Eighth Avenue, Suite 3300
  Seattle, Washington 98101
  (206) 623-7292
  steve@hbsslaw.com
  ari@hbsslaw.com



HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594