# Exhibit 1

**COMMITMENT TO PURCHASE FINANCIAL INSTRUMENT**
**and**
**SERVICER PARTICIPATION AGREEMENT**
**for the**
**HOME AFFORDABLE MODIFICATION PROGRAM**
**under the**
**EMERGENCY ECONOMIC STABILIZATION ACT OF 2008**

This Commitment to Purchase Financial Instrument and Servicer Participation Agreement (the "Commitment") is entered into as of the Effective Date, by and between Federal National Mortgage Association, a federally chartered corporation, as financial agent of the United States ("Fannie Mae"), and the undersigned party ("Servicer"). Capitalized terms used, but not defined contextually, shall have the meanings ascribed to them in Section 12 below.

**Recitals**

WHEREAS, the U.S. Department of the Treasury (the "Treasury") has established a Home Affordable Modification Program (the "Program") pursuant to section 101 and 109 of the Emergency Economic Stabilization Act of 2008 (the "Act"), as section 109 of the Act has been amended by section 7002 of the American Recovery and Reinvestment Act of 2009;

WHEREAS, the Program includes loan modification and other foreclosure prevention services;

WHEREAS, Fannie Mae has been designated by the Treasury as a financial agent of the United States in connection with the implementation of the Program;

WHEREAS, Fannie Mae will, in its capacity as a financial agent of the United States, fulfill the roles of administrator, record keeper and paying agent for the Program, and in conjunction therewith must standardize certain mortgage modification and foreclosure prevention practices and procedures as they relate to the Program, consistent with the Act and in accordance with the directives of, and guidance provided by, the Treasury;

WHEREAS, Federal Home Loan Mortgage Corporation ("Freddie Mac") has been designated by the Treasury as a financial agent of the United States and will, in its capacity as a financial agent of the United States, fulfill a compliance role in connection with the Program; all references to Freddie Mac in the Agreement shall be in its capacity as compliance agent of the Program;

WHEREAS, all Fannie Mae and Freddie Mac approved servicers are being directed through their respective servicing guides and bulletins to implement the Program with respect to mortgage loans owned, securitized, or guaranteed by Fannie Mae or Freddie Mac (the "GSE Loans"); accordingly, this Agreement does not apply to the GSE Loans;

WHEREAS, all other servicers, as well as Fannie Mae and Freddie Mac approved servicers, that wish to participate in the Program with respect to loans that are not GSE Loans (collectively, "Participating Servicers") must agree to certain terms and conditions relating to the respective roles and responsibilities of Program participants and other financial agents of the government; and

WHEREAS, Servicer wishes to participate in the Program as a Participating Servicer on the terms and subject to the conditions set forth herein.

Accordingly, in consideration of the representations, warranties, and mutual agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Fannie Mae and Servicer agree as follows.

**Agreement**

## 1. Services

A.      Subject to Section 10.C., Servicer shall perform the loan modification and other foreclosure prevention services (collectively, the "Services") described in (i) the Financial Instrument attached hereto as Exhibit A (the "Financial Instrument"); (ii) the Program guidelines and procedures issued by the Treasury, including, without limitation, the net present value assessment requirements of the Program (the "Program Guidelines"); and (iii) any supplemental documentation, instructions, bulletins, letters, directives, or other communications, including, but not limited to, business continuity requirements, compliance requirements, performance requirements and related remedies, issued by the Treasury, Fannie Mae, or Freddie Mac in order to change, or further describe or clarify the scope of, the rights and duties of the Participating Servicers in connection with the Program (the "Supplemental Directives" and, together with the Program Guidelines, the "Program Documentation"). The Program Documentation will be available to all Participating Servicers at www.financialstability.gov. The Program Documentation, as the same may be modified or amended from time to time in accordance with Section 10 below, is hereby incorporated into the Commitment by this reference.

B.      Servicer's representations and warranties, and acknowledgement of and agreement to fulfill or satisfy certain duties and obligations, with respect to its participation in the Program and under the Agreement are set forth in the Financial Instrument. Servicer's certification as to its continuing compliance with, and the truth and accuracy of, the representations and warranties set forth in the Financial Instrument will be provided annually in the form attached hereto as Exhibit B (the "Annual Certification"), beginning on June 1, 2010 and again on June 1 of each year thereafter during the Term (as defined below).

C.      The recitals set forth above are hereby incorporated herein by this reference.

## 2. Authority and Agreement to Participate in Program

A.      Servicer shall perform the Services for all mortgage loans its services, whether it services such mortgage loans for its own account or for the account of another party, including any holders of mortgage-backed securities (each such other party, an "Investor"). Servicer shall use reasonable efforts to remove all prohibitions or impediments to its authority, and use reasonable efforts to obtain all third party consents and waivers that are required, by contract or law, in order to effectuate any modification of a mortgage loan under the Program.

B.      Notwithstanding subsection A., if (x) Servicer is unable to obtain all necessary consents and waivers for modifying a mortgage loan, or (y) the pooling and servicing agreement or other similar servicing contract governing Servicer's servicing of a mortgage loan prohibits Servicer from performing the Services for that mortgage loan, Servicer shall not be required to perform the Services with respect to that mortgage loan and shall not receive all or any portion of the Purchase Price (as defined below) otherwise payable with respect to such loan.

C.      Notwithstanding anything to the contrary contained herein, the Agreement does not apply to GSE Loans. Servicers are directed to the servicing guides and bulletins issued by Fannie Mae and Freddie Mac, respectively, concerning the Program as applied to GSE Loans.

D.      Servicer's performance of the Services and implementation of the Program shall be subject to review by Freddie Mac and its agents and designees as more fully set forth in the Agreement.

## 3. Set Up; Prerequisite to Payment

Servicer will provide to Fannie Mae: (a) the set up information required by the Program Documentation and any ancillary or administrative information requested by Fannie Mae in order to process Servicer's participation in the Program as a Participating Servicer on or before the Effective Date of the Commitment; and (b) the data elements for each mortgage eligible for the Program

as and when described in the Program Documentation and the Financial Instrument. Purchase Price payments will not be remitted pursuant to Section 4 with respect to any modified mortgage for which the required data elements have not been provided.

4. **Agreement to Purchase Financial Instrument; Payment of Purchase Price**

A. Fannie Mae, in its capacity as a financial agent of the United States, agrees to purchase, and Servicer agrees to sell to Fannie Mae, in such capacity, the Financial Instrument that is executed and delivered by Servicer to Fannie Mae in the form attached hereto as Exhibit A, in consideration for the payment by Fannie Mae, as agent, of the Purchase Price (defined below). The conditions precedent to the payment by Fannie Mae of the Purchase Price are: (a) the execution and delivery of the Commitment and the Financial Instrument by Servicer to Fannie Mae; (b) the execution and delivery by Fannie Mae of the Commitment to Servicer; (c) the delivery of copies of the fully executed Commitment and Financial Instrument to Treasury on the Effective Date; (d) the performance by Servicer of the Services described in the Agreement, in accordance with the terms and conditions thereof, to the reasonable satisfaction of Fannie Mae and Freddie Mac; and (e) the satisfaction by Servicer of such other obligations as are set forth in the Agreement.

B. Solely in its capacity as the financial agent of the United States, and subject to subsection C. below, Fannie Mae shall: (i) remit compensation payments to Servicer; (ii) remit incentive payments to Servicer for the account of Servicer and for the credit of borrowers under their respective mortgage loan obligations; and (iii) remit payments to Servicer for the account of Investors, in each case in accordance with the Program Documentation (all such payments, collectively, the "Purchase Price"); all payments remitted to Servicer for the credit of borrowers or for the account of Investors under the Program Documentation shall be applied by Servicer to the borrowers' respective mortgage loan obligations, or remitted by Servicer to Investors, as required by the Program Documentation. Fannie Mae shall have no liability to Servicer with respect to the payment of the Purchase Price, unless and until: (a) Servicer and all other interested parties have satisfied all pre-requisites set forth herein and in the Program Documentation relating to the Program payment structure, including, but not limited to, the delivery of all data elements required by Section 3 of this Commitment; and (b) the Treasury has provided funds to Fannie Mae for remittance to Servicer, together with written direction to remit the funds to Servicer in accordance with the Program Documentation.

C. The Purchase Price will be paid to Servicer by Fannie Mae as the financial agent of the United States as and when described herein and in the Program Documentation in consideration for the execution and delivery of the Financial Instrument by Servicer on or before the Effective Date of the Agreement, upon the satisfaction of the conditions precedent to payment described in subsections A. and B. above.

D. The value of the Agreement is limited to $798,900,000 (the "Program Participation Cap"). Accordingly, the aggregate Purchase Price payable to Servicer under the Agreement may not exceed the amount of the Program Participation Cap. For each loan modification that becomes effective, the aggregate remaining Purchase Price available to be paid to Servicer under the Agreement will be reduced by the maximum Purchase Price potentially payable with respect to that loan modification. In the event the Purchase Price actually paid with respect to that loan modification is less than the maximum Purchase Price potentially payable, the aggregate remaining Purchase Price available to be paid to Servicer under the Agreement will be increased by the difference between such amounts. Notwithstanding the foregoing, no agreements with borrowers intended to result in new loan modifications will be effected under the Agreement, and no payments will be made with respect to any new loan modifications from and after the date on which the aggregate Purchase Price paid or payable to Servicer under the Agreement equals the Program Participation Cap. Treasury may, from time to time in its sole discretion, adjust the amount of the Program Participation Cap. Servicer will be notified of all adjustments to the Program Participation Cap in writing by Fannie Mae.

E. Servicer shall maintain complete and accurate records of, and supporting documentation for, the borrower payment, including, but not limited to, PITIA (principal, interest, taxes, insurance (including homeowner's insurance and hazard and flood insurance) and homeowner's association and/or condo fees), and delinquency information and data provided to Fannie Mae regarding each agreement relating to a trial modification period and each loan modification agreement executed under the Program, which will be relied upon by Fannie Mae when calculating, as financial agent for the United States, the Purchase Price to be paid by the Treasury through Fannie Mae or any other financial agent. Servicer agrees to provide Fannie Mae and Freddie Mac with documentation and

- 3 -

other information with respect to any amounts paid by the Treasury as may be reasonably requested by such parties. In the event of a discrepancy or error in the amount of the Purchase Price paid hereunder, at Fannie Mae's election, (x) Servicer shall remit to Fannie Mae the amount of any overpayment within thirty (30) days of receiving a refund request from Fannie Mae, or (y) Fannie Mae may immediately offset the amount of the overpayment against other amounts due and payable to Servicer by Fannie Mae, as financial agent of the United States, upon written notice to Servicer. Servicer shall still be obligated to credit to the respective mortgage loan obligations of borrowers, and to the respective accounts of Investors, any portion of the Purchase Price to which they are entitled (if any) notwithstanding such offset unless otherwise directed by Fannie Mae.

F.  At the election and upon the direction of the Treasury and with prior written notice to Servicer, Fannie Mae may deduct from any amount to be paid to Servicer any amount that Servicer, Investor, or borrower is obligated to reimburse or pay to the United States government, provided, however, that any amount withheld under this subsection F. will be withheld only from the amounts payable to, or for the account or credit of, the party which is liable for the obligation to the United States government.

G.  In the event that the Agreement expires or is terminated pursuant to Section 5 or Section 6, and subject to Fannie Mae's rights under Section 6, Fannie Mae shall, solely in its capacity as the financial agent of the United States, continue to remit all amounts that are properly payable pursuant to subsection A. above to Servicer in accordance with the Program Documentation until paid in full, provided, however, that Purchase Price payments will be made only with respect to qualifying mortgage loan modifications that were submitted by Servicer and accepted by Fannie Mae for inclusion in the Program in accordance with the Program Documentation prior to the date of expiration or termination and that do not exceed the Program Participation Cap.

H.  Notwithstanding anything to the contrary contained in subsection G. above, in the event that the Agreement is terminated pursuant to Section 6 B. in connection with an Event of Default by Servicer under Section 6 A., no compensation with respect to any loan will be paid to Servicer for the account of the Servicer subsequent to termination; subject to Fannie Mae's rights under Section 6, Fannie Mae's only continuing obligations as financial agent of the United States subsequent to termination will be to remit payments to Servicer (or, at Fannie Mae's discretion, an alternative provider) for the account of borrowers and Investors, as provided in the Agreement.

I.  Notwithstanding anything to the contrary contained in subsection F. above, in the event that the Agreement is terminated pursuant to Section 6 C. in connection with an Event of Default by an Investor or a borrower under Section 6 A., no compensation with respect to any loan will be paid to Servicer for the credit or account of the defaulting party subsequent to termination; subject to Fannie Mae's rights under Section 6, Fannie Mae's only continuing obligations as financial agent of the United States subsequent to termination will be to remit payments to Servicer for the credit or account of non-defaulting parties as described in the Program Documentation.

J.  Notwithstanding anything to the contrary contained herein, Fannie Mae, in its capacity as the financial agent of the United States, may reduce the amounts payable to Servicer under Section 4.B., or obtain repayment of prior payments made under Section 4.B., in connection with an Event of Default by Servicer or in connection with an evaluation of performance that includes any specific findings by Freddie Mac that Servicer's performance under any performance criteria established pursuant to the Program Documentation is materially insufficient; provided, however, Fannie Mae will seek to obtain repayment of prior payments made under Section 4.B. only with respect to loan modifications that are determined by Fannie Mae or Freddie Mac to have been impacted by, or that Fannie Mae or Freddie Mac believes may have been, or may be, impacted, by the Event of Default or findings giving rise to this remedy. These remedies are not exclusive; they are available in addition to, and not in lieu of, any other remedies available to Fannie Mae at law or in equity.

K.  Notwithstanding anything to the contrary contained herein, Fannie Mae, in its capacity as the financial agent of the United States, may reduce the amounts payable to Servicer for the credit or account of an Investor or a borrower under Section 4.B., or obtain repayment of prior payments made for the credit or account of such parties under Section 4.B., in connection with an Event of Default by an Investor or a borrower. Servicer will reasonably cooperate with, and provide reasonable support and assistance to, Fannie Mae and Freddie Mac in connection with their respective roles and, in Fannie Mae's case, in connection with its efforts to obtain repayment of prior payments made to Investors and borrowers as provided in this subsection. These remedies are not

exclusive; they are available in addition to, and not in lieu of, any other remedies available to Fannie Mae at law or in equity.

**5.  Term**

A.  Qualifying mortgage loans may be submitted by Servicer and accepted by Fannie Mae as described in the Financial Instrument and the Program Documentation from and after the Effective Date until December 31, 2012 (the "Initial Term"), subject to Program extensions by the Treasury or earlier termination of the Agreement by Fannie Mae pursuant to the provisions hereof or suspension or termination of the Program by the Treasury, provided, however, no new qualifying mortgage loans may be submitted by Servicer or accepted by Fannie Mae from and after the date on which the Program Participation Cap is reached.

B.  Servicer shall perform the Services described in the Program Documentation in accordance with the terms and conditions of the Agreement during the Initial Term and any extensions thereof (the Initial Term, together with all extensions thereof, if any, the "Term"), and during such additional period as may be necessary to: (i) comply with all data collection, retention and reporting requirements specified in the Program Documentation during and for the periods set forth therein; and (ii) complete all Services that were initiated by Servicer, including, but not limited to, mortgage modifications and the completion of all documentation relating thereto, during the Term.  Servicer agrees that it will work diligently to complete all Services as soon as reasonably possible after the end of the Term or earlier termination.

C.  The Agreement may be terminated by Fannie Mae or Servicer prior to the end of the Term pursuant to Section 6 below.

**6.  Defaults and Early Termination**

A.  The following constitute events of default under the Agreement (each, an "Event of Default" and, collectively, "Events of Default"):

(1) Servicer fails to perform or comply with any of its material obligations under the Agreement, including, but not limited to, circumstances in which Servicer fails to ensure that all eligibility criteria and other conditions precedent to modification specified in the Program Documentation are satisfied prior to effectuating modifications under the Program.

(2) Servicer: (a) ceases to do business as a going concern; (b) makes a general assignment for the benefit of, or enters into any arrangement with creditors in lieu thereof; (c) admits in writing its inability to pay its debts as they become due; (d) files a voluntary petition under any bankruptcy or insolvency law or files a voluntary petition under the reorganization or arrangement provisions of the laws of the United States or any other jurisdiction; (e) authorizes, applies for or consents to the appointment of a trustee or liquidator of all or substantially all of its assets; (f) has any substantial part of its property subjected to a levy, seizure, assignment or sale for or by any creditor or governmental agency; or (g) enters into an agreement or resolution to take any of the foregoing actions.

(3) Servicer, any employee or contractor of Servicer, or any employee or contractor of Servicers' contractors, or any Investor or borrower, commits a grossly negligent, willful or intentional, or reckless act (including, but not limited to, fraud) in connection with the Program or the Agreement.

(4) Any representation, warranty, or covenant made by Servicer in the Agreement or any Annual Certification is or becomes materially false, misleading, incorrect, or incomplete.

(5) An evaluation of performance that includes any specific findings by Freddie Mac, in its sole discretion, that Servicer's performance under any performance criteria established pursuant to the Program Documentation is materially insufficient, or any failure by Servicer to comply with any

directive issued by Fannie Mae or Freddie Mac with respect to documents or data requested, findings made, or remedies established, by Fannie Mae and/or Freddie Mac in conjunction with such performance criteria or other Program requirements.

B. Fannie Mae may take any, all, or none of the following actions upon an <u>Event of Default by Servicer</u> under the Agreement:

(1) Fannie Mae may: (i) withhold some or all of the Servicer's portion of the Purchase Price until, in Fannie Mae's determination, Servicer has cured the default; and (ii) choose to utilize alternative means of paying any portion of the Purchase Price for the credit or account of borrowers and Investors and delay paying such portion pending adoption of such alternative means.

(2) Fannie Mae may: (i) reduce the amounts payable to Servicer under Section 4.B; and/or (ii) require repayment of prior payments made to Servicer under Section 4.B, provided, however, Fannie Mae will seek to obtain repayment of prior payments made under Section 4.B. only with respect to loan modifications that are determined by Fannie Mae or Freddie Mac to have been impacted, or that Fannie Mae or Freddie Mac believes may have been, or may be, impacted, by the Event of Default giving rise to the remedy.

(3) Fannie Mae may require Servicer to submit to additional Program administrator oversight, including, but not limited to, additional compliance controls and quality control reviews.

(4) Fannie Mae may terminate the Agreement and cease its performance hereunder as to some or all of the mortgage loans subject to the Agreement.

(5) Fannie Mae may require Servicer to submit to information and reporting with respect to its financial condition and ability to continue to meet its obligations under the Agreement.

C. Fannie Mae may take any, all, or none of the following actions upon an <u>Event of Default involving an Investor or a borrower</u> in connection with the Program:

(1) Fannie Mae may withhold all or any portion of the Purchase Price payable to, or for the credit or account of, the defaulting party until, in Fannie Mae's determination, the default has been cured or otherwise remedied to Fannie Mae's satisfaction.

(2) Fannie Mae may: (i) reduce the amounts payable to Servicer for the credit, or account of, the defaulting party under Section 4.B; and/or (ii) require repayment of prior payments made to the defaulting party under Section 4.B. Servicer will reasonably cooperate with, and provide reasonable support and assistance to, Fannie Mae and Freddie Mae in connection with their respective roles and, in Fannie Mae's case, in connection with its efforts to obtain repayment of prior payments made to Investors and borrowers as provided in this subsection.

(3) Fannie Mae may require Servicer to submit to additional Program administrator oversight, including, but not limited to, additional compliance controls and quality control reviews.

(4) Fannie Mae may cease its performance hereunder as to some or all of the mortgage loans subject to the Agreement that relate to the defaulting Investor or borrower.

D. In addition to the termination rights set forth above, Fannie Mae may terminate the Agreement immediately upon written notice to Servicer:

- 6 -

(1) at the direction of the Treasury;

(2) in the event of a merger, acquisition, or other change of control of Servicer;

(3) in the event that a receiver, liquidator, trustee, or other custodian is appointed for the Servicer; or

(4) in the event that a material term of the Agreement is determined to be prohibited or unenforceable as referred to in Section 11.C.

E. The Agreement will terminate automatically:

(1) in the event that the Financial Agency Agreement, dated February 18, 2009, by and between Fannie Mae and the Treasury is terminated; or

(2) upon the expiration or termination of the Program.

F. The remedies available to Fannie Mae upon an Event of Default under this Section are cumulative and not exclusive; further, these remedies are in addition to, and not in lieu of, any other remedies available to Fannie Mae at law or in equity.

G. If the event of termination of the Agreement under any circumstances, Servicer and Fannie Mae agree to cooperate with one another on an ongoing basis to ensure an effective and orderly transition or resolution of the Services, including the provision of any information, reporting, records and data required by Fannie Mae and Freddie Mac.

H. If an Event of Default under Section 6.A.1., Section 6.A.4., or Section 6.A.5. occurs and Fannie Mae determines, in its sole discretion, that the Event of Default is curable and elects to exercise its right to terminate the Agreement, Fannie Mae will provide written notice of the Event of Default to Servicer and the Agreement will terminate automatically thirty (30) days after Servicer's receipt of such notice, if the Event of Default is not cured by Servicer to the reasonable satisfaction of Fannie Mae prior to the end of such thirty (30) day period.  If Fannie Mae determines, in its sole discretion, that an Event of Default under Section 6.A.1., Section 6.A.4, or Section 6.A. 5. is not curable, or if an Event of Default under Section 6.A.2. or Section 6.A.3. occurs, and Fannie Mae elects to exercise its right to terminate the Agreement under Section 6.B.4., Fannie Mae will provide written notice of termination to the Servicer on or before the effective date of the termination.

## 7. Disputes

Fannie Mae and Servicer agree that it is in their mutual interest to resolve disputes by agreement. If a dispute arises under the Agreement, the parties will use all reasonable efforts to promptly resolve the dispute by mutual agreement. If a dispute cannot be resolved informally by mutual agreement at the lowest possible level, the dispute shall be referred up the respective chain of command of each party in an attempt to resolve the matter. This will be done in an expeditious manner. Servicer shall continue diligent performance of the Services pending resolution of any dispute. Fannie Mae and Servicer reserve the right to pursue other legal or equitable rights they may have concerning any dispute. However, the parties agree to take all reasonable steps to resolve disputes internally before commencing legal proceedings.

## 8. Transfer or Assignment

A.  Servicer must provide written notice to Fannie Mae and Freddie Mac pursuant to Section 9 below of: (i) any transfers or assignments of mortgage loans subject to this Agreement; and (ii) any other transfers or assignments of Servicer's rights and obligations under this Agreement.  Such notice must include payment instructions for payments to be made to the transferee or assignee of the mortgage loans subject to the notice (if applicable), and evidence of the assumption by such transferee or assignee of the mortgage loans or other rights and obligations that are transferred, in the form of Exhibit C (the "Assignment and

Assumption Agreement"). Servicer acknowledges that Fannie Mae will continue to remit payments to Servicer in accordance with Section 4.B. with respect to mortgage loans that have been assigned or transferred, and that Servicer will be liable for underpayments, overpayments and misdirected payments, unless and until such notice and an executed Assignment and Assumption Agreement are provided to Fannie Mae and Freddie Mac. Any purported transfer or assignment of mortgage loans or other rights or obligations under the Agreement in violation of this Section is void.

B. Servicer shall notify Fannie Mae as soon as legally possible of any proposed merger, acquisition, or other change of control of Servicer, and of any financial and operational circumstances which may impair Servicer's ability to perform its obligations under the Agreement.

## 9. Notices

All legal notices under the Agreement shall be in writing and referred to each party's point of contact identified below at the address listed below, or to such other point of contact at such other address as may be designated in writing by such party. All such notices under the Agreement shall be considered received: (a) when personally delivered; (b) when delivered by commercial over-night courier with verification receipt; (c) when sent by confirmed facsimile; or (d) three (3) days after having been sent, postage prepaid, via certified mail, return receipt requested. Notices shall not be made or delivered in electronic form, except as provided in Section 12.B. below, provided, however, that the party giving the notice may send an e-mail to the party receiving the notice advising that party that a notice has been sent by means permitted under this Section.

To Servicer:

> ██████████

Bank of America
2900 Madera Road
Mail Code: CA6-920-01-07
Simi Valley, CA 93065
email: ████████████████████
Facsimile: ██████████

With copy to:

> ██████████

Bank of America
Bank of America Plaza
101 S. Tryon Street
Mail Code: NC1-002-29-01
Charlotte, NC 28255-0001
email: ██████████
Facsimile: ██████████

To Fannie Mae:

    Fannie Mae
    3900 Wisconsin Avenue, NW
    Washington, DC 20016
    Attention:  General Counsel
    Facsimile: ▮
    email: ▮

To Treasury:

    Chief
    Office of Homeownership Preservation
    Office of Financial Stability
    Department of the Treasury
    1500 Pennsylvania Avenue, NW
    Washington, DC  20220
    Facsimile:  (202) 622-9219

To Freddie Mac:

    Freddie Mac
    8100 Jones Branch Drive
    McLean, VA 22102
    Attention:  Vice President, Making Home Affordable -- Compliance
    Facsimile: (703) 903-2544
    Email to: MHA_Compliance@freddiemac.com

## 10.  Modifications

A.  Subject to Sections 10.B. and 10.C., modifications to the Agreement shall be in writing and signed by Fannie Mae and Servicer.

B.  Fannie Mae and the Treasury each reserve the right to unilaterally modify or supplement the terms and provisions of the Program Documentation that relate (as determined by Fannie Mae or the Treasury, in their reasonable discretion) to the compliance and performance requirements of the Program, and related remedies established by Freddie Mac, and/or to technical, administrative, or procedural matters or compliance and reporting requirements that may impact the administration of the Program.

C.  Notwithstanding Sections 10.A. and 10.B., any modification to the Program Documentation that materially impact the borrower eligibility requirements, the amount of payments of the Purchase Price to be made to Participating Servicers, Investors and borrowers under the Program, or the rights, duties, or obligations of Participating Servicers, Investors or borrowers in connection with the Program (each, a "<u>Program Modification</u>" and, collectively, the "<u>Program Modifications</u>") shall be effective only on a prospective basis; Participating Servicers will be afforded the opportunity to opt-out of the Program when Program Modifications are published with respect to some or all of the mortgage loans sought to be modified under the Program on or after the effective date of the Program Modification, at Servicer's discretion. Opt-out procedures, including, but not limited to, the time and process for notification of election to opt-out and the window for such election, will be set forth in the Program Documentation describing the Program Modification, provided, however, that Servicer will be given at least thirty (30) days to elect to opt-out of a Program Modification. For the avoidance of doubt, during the period during which Servicer may elect to opt-out of a Program Modification

and after any such opt-out is elected by Servicer, Servicer will continue to perform the Services described in the Financial Instrument and the Program Documentation (as the Program Documentation existed immediately prior to the publication of the Program modification prompting the opt-out) with respect to qualifying mortgage loan modifications that were submitted by Servicer and accepted by Fannie Mae prior to the opt-out.

**11. Miscellaneous**

A.  The Agreement shall be governed by and construed under Federal law and not the law of any state or locality, without reference to or application of the conflicts of law principles. Any and all disputes between the parties that cannot be settled by mutual agreement shall be resolved solely and exclusively in the United States Federal courts located within the District of Columbia. Both parties consent to the jurisdiction and venue of such courts and irrevocably waive any objections thereto.

B.  The Agreement is not a Federal procurement contract and is therefore not subject to the provisions of the Federal Property and Administrative Services Act (41 U.S.C. §§ 251-260), the Federal Acquisition Regulations (48 CFR Chapter 1), or any other Federal procurement law.

C.  Any provision of the Agreement that is determined to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of the Agreement, and no such prohibition or unenforceability in any jurisdiction shall invalidate such provision in any other jurisdiction.

D.  Failure on the part of Fannie Mae to insist upon strict compliance with any of the terms hereof shall not be deemed a waiver, nor will any waiver hereunder at any time be deemed a waiver at any other time.  No waiver will be valid unless in writing and signed by an authorized officer of Fannie Mae. No failure by Fannie Mae to exercise any right, remedy, or power hereunder will operate as a waiver thereof.  The rights, remedies, and powers provided herein are cumulative and not exhaustive of any rights, remedies, and powers provided by law.

E.  The Agreement shall inure to the benefit of and be binding upon the parties to the Agreement and their permitted successors-in-interest.

F.  The Commitment and the Assignment and Assumption Agreement (if applicable) may be executed in two or more counterparts (and by different parties on separate counterparts), each of which shall be an original, but all of which together shall constitute one and the same instrument.

G.  The Commitment, together with the Financial Instrument, the Annual Certifications, the Assignment and Assumption Agreement (if applicable) and the Program Documentation, constitutes the entire agreement of the parties with respect to the subject matter hereof.  In the event of a conflict between any of the foregoing documents and the Program Documentation, the Program Documentation shall prevail.  In the event of a conflict between the Program Guidelines and the Supplemental Directives, the Program Guidelines shall prevail.

H.  Any provisions of the Agreement (including all documents incorporated by reference thereto) that contemplate their continuing effectiveness, including, but not limited to, Sections 4, 5 B., 6 F., 6 G., 9, 11 and 12 of the Commitment, and Sections 2, 3, 5, 7, 8, 9 and 10 of the Financial Instrument, and any other provisions (or portions thereof) in the Agreement that relate to, or may impact, the ability of Fannie Mae and Freddie Mac to fulfill their responsibilities as agents of the United States in connection with the Program, shall survive the expiration or termination of the Agreement.

**12. Defined Terms; Incorporation by Reference**

A.  All references to the "Agreement" necessarily include, in all instances, the Commitment and all documents incorporated into the Commitment by reference, whether or not so noted contextually, and all amendments and modifications thereto.  Specific references

- 10
-

throughout the Agreement to individual documents that are incorporated by reference into the Commitment are not inclusive of any other documents that are incorporated by reference, unless so noted contextually.

B.   The term "Effective Date" means the date on which Fannie Mae transmits a copy of the fully executed Commitment and Financial Instrument to Treasury and Servicer with a completed cover sheet, in the form attached hereto as Exhibit D (the "Cover Sheet").   The Commitment and Financial Instrument and accompanying Cover Sheet will be faxed, emailed, or made available through other electronic means to Treasury and Servicer in accordance with Section 9.

C.   The Program Documentation and Exhibit A – Form of Financial Instrument, Exhibit B – Form of Annual Certification, Exhibit C – Form of Assignment and Assumption Agreement and Exhibit D – Form of Cover Sheet (in each case, in form and, upon completion, in substance), including all amendments and modifications thereto, are incorporated into this Commitment by this reference and given the same force and effect as though fully set forth herein.

[SIGNATURE PAGE FOLLOWS; REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**In Witness Whereof,** Servicer and Fannie Mae by their duly authorized officials hereby execute and deliver this Commitment to Purchase Financial Instrument and Servicer Participation Agreement as of the Effective Date.

SERVICER: Bank of America, N.A.

By: _____

Name: _Steve R. Bailey_____

Title: _Senior Vice President____

Date: _April 17, 2009_____

FANNIE MAE, solely as Financial Agent of the United States

By: _____

Name: _Leslie Peeler_____

Title: _Vice President_____

Date: _4/17/09_____

## EXHIBITS

Exhibit A      Form of Financial Instrument

Exhibit B      Form of Annual Certification

Exhibit C      Form of Assignment and Assumption Agreement

Exhibit D      Form of Cover Sheet

**EXHIBIT A**

**FORM OF FINANCIAL INSTRUMENT**

## FINANCIAL INSTRUMENT

This Financial Instrument is delivered as provided in Section 1 of the Commitment to Purchase Financial Instrument and Servicer Participation Agreement (the "Commitment"), entered into as of the Effective Date, by and between Federal National Mortgage Association ("Fannie Mae"), a federally chartered corporation, acting as financial agent of the United States, and the undersigned party ("Servicer"). This Financial Instrument is effective as of the Effective Date. All of the capitalized terms that are used but not defined herein shall have the meanings ascribed to them in the Commitment.

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Servicer agrees as follows:

1.  Purchase Price Consideration; Services. This Financial Instrument is being purchased by Fannie Mae pursuant to Section 4 of the Commitment in consideration for the payment by Fannie Mae, in its capacity as a financial agent of the United States, of various payments detailed in the Program Documentation and referred to collectively in the Commitment as the "Purchase Price." The conditions precedent to the payment by Fannie Mae of the Purchase Price are: (a) the execution and delivery of this Financial Instrument and the Commitment by Servicer to Fannie Mae; (b) the execution and delivery by Fannie Mae of the Commitment to Servicer; (c) the delivery of copies of the fully executed Commitment and Financial Instrument to Treasury on the Effective Date; (d) the performance by Servicer of the Services described in the Agreement; and (e) the satisfaction by Servicer of such other obligations as are set forth in the Agreement. Servicer shall perform all Services in consideration for the Purchase Price in accordance with the terms and conditions of the Agreement, to the reasonable satisfaction of Fannie Mae and Freddie Mac.

2.  Authority and Agreement to Participate in Program. Subject to the limitations set forth in Section 2 of the Agreement, Servicer shall use reasonable efforts to remove all prohibitions or impediments to its authority and to obtain all third party consents and waivers that are required, by contract or law, in order to effectuate any loan modification under the Program.

3.  Audits, Reporting and Data Retention.

    (a)  Freddie Mac, the Federal Housing Finance Agency and other parties designated by the Treasury or applicable law shall have the right during normal business hours to conduct unannounced, informal onsite visits and to conduct formal onsite and offsite physical, personnel and information technology testing, security reviews, and audits of Servicer and to examine all books, records and data related to the Services provided and Purchase Price received in connection with the Program on thirty (30) days' prior written notice.

    (b)  Servicer will collect, record, retain and provide to Treasury, Fannie Mae and Freddie Mac all data, information and documentation relating to the Program and borrowers, loans and loan modifications implemented, or potentially eligible for modification, under the Program and any trials conducted in connection with the Program, as required by the Program Documentation. All such data, information and documentation must be provided to the Treasury, Fannie Mae and Freddie Mac as, when and in the manner specified in the Program Documentation. In addition, Servicer shall provide copies of executed contracts and tapes of loan pools related to the Program for review upon request.

    (c)  Servicer shall promptly take corrective and remedial actions associated with reporting and reviews as directed by Fannie Mae or Freddie Mac and provide to Fannie Mae and Freddie Mac such evidence of the effective implementation of corrective and remedial actions as Fannie Mae and Freddie Mac shall reasonably require. Freddie Mac may conduct additional reviews based on its findings and the corrective actions taken by Servicer.

- 1 -

(d)  In addition to any other obligation to retain financial and accounting records that may be imposed by Federal or state law, Servicer shall retain all information described in Section 3(b), and all data, books, reports, documents, audit logs and records, including electronic records, related to the performance of Services in connection with the Program. In addition, Servicer shall maintain a copy of all computer systems and application software necessary to review and analyze these electronic records. Unless otherwise directed by Fannie Mae or Freddie Mac, Servicer shall retain these records for at least 7 years from the date the data or record was created, or for such longer period as may be required pursuant to applicable law. Fannie Mae or Freddie Mac may also notify Servicer from time to time of any additional record retention requirements resulting from litigation and regulatory investigations in which the Treasury or any agents of the United States may have an interest, and Servicer agrees to comply with these litigation and regulatory investigations requirements.

4.   Internal Control Program.

(a)  Servicer shall develop, enforce and review on a quarterly basis for effectiveness an internal control program designed to: (i) ensure effective delivery of Services in connection with the Program and compliance with the Program Documentation; (ii) effectively monitor and detect loan modification fraud; and (iii) effectively monitor compliance with applicable consumer protection and fair lending laws. The internal control program must include documentation of the control objectives for Program activities, the associated control techniques, and mechanisms for testing and validating the controls.

(b)  Servicer shall provide Freddie Mac with access to all internal control reviews and reports that relate to Services under the Program performed by Servicer and its independent auditing firm to enable Freddie Mac to fulfill its duties as a compliance agent of the United States; a copy of the reviews and reports will be provided to Fannie Mae for record keeping and other administrative purposes.

5.   Representations, Warranties and Covenants. Servicer makes the following representations, warranties and covenants to Fannie Mae, Freddie Mac and the Treasury, the truth and accuracy of which are continuing obligations of Servicer. In the event that any of the representations, warranties, or covenants made herein cease to be true and correct, Servicer agrees to notify Fannie Mae and Freddie Mac immediately.

(a)  Servicer is established under the laws of the United States or any state, territory, or possession of the United States or the District of Columbia, and has significant operations in the United States. Servicer has full corporate power and authority to enter into, execute, and deliver the Agreement and to perform its obligations hereunder and has all licenses necessary to carry on its business as now being conducted and as contemplated by the Agreement.

(b)  Servicer is in compliance with, and covenants that all Services will be performed in compliance with, all applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, codes and requirements, including, but not limited to, the Truth in Lending Act, 15 USC 1601 § et seq., the Home Ownership and Equity Protection Act, 15 USC § 1639, the Federal Trade Commission Act, 15 USC § 41 et seq., the Equal Credit Opportunity Act, 15 USC § 701 et seq., the Fair Credit Reporting Act, 15 USC § 1681 et seq., the Fair Housing Act and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices and all applicable laws governing tenant rights. Subject to the following sentence, Servicer has obtained or made, or will obtain or make, all governmental approvals or registrations required under law and has obtained or will obtain all consents necessary to authorize the performance of its obligations under the Program and the Agreement. The performance of Services under the Agreement will not conflict with, or be prohibited in any way by, any other agreement or statutory restriction by which Servicer is bound,

-2-

provided, however, that Fannie Mae acknowledges and agrees that this representation and warranty is qualified solely by and to the extent of any contractual limitations established under applicable servicing contracts to which Servicer is subject. Servicer is not aware of any other legal or financial impediments to performing its obligations under the Program or the Agreement and shall promptly notify Fannie Mae of any financial and/or operational impediments which may impair its ability to perform its obligations under the Program or the Agreement. Servicer is not delinquent on any Federal tax obligation or any other debt owed to the United States or collected by the United States for the benefit of others, excluding any debt or obligation that is being contested in good faith.

(c) Servicer covenants that: (i) it will perform its obligations in accordance with the Agreement and will promptly provide such performance reporting as Fannie Mae may reasonably require; (ii) all mortgage modifications and all trial period modifications will be offered to borrowers, fully documented and serviced in accordance with the Program Documentation; and (iii) all data, collection information and other information reported by Servicer to Fannie Mae and Freddie Mac under the Agreement, including, but not limited to, information that is relied upon by Fannie Mae or Freddie Mac in calculating the Purchase Price or in performing any compliance review will be true, complete and accurate in all material respects, and consistent with all relevant servicing records, as and when provided.

(d) Servicer covenants that it will: (i) perform the Services required under the Program Documentation and the Agreement in accordance with the practices, high professional standards of care, and degree of attention used in a well-managed operation, and no less than that which the Servicer exercises for itself under similar circumstances; and (ii) use qualified individuals with suitable training, education, experience and skills to perform the Services. Servicer acknowledges that Program participation may require changes to, or the augmentation of, its systems, staffing and procedures, and covenants and agrees to take all actions necessary to ensure it has the capacity to implement the Program in accordance with the Agreement.

(e) Servicer covenants that it will comply with all regulations on conflicts of interest that are applicable to Servicer in connection with the conduct of its business and all conflicts of interest and non-disclosure obligations and restrictions and related mitigation procedures set forth in the Program Documentation (if any).

(f) Servicer acknowledges that the provision of false or misleading information to Fannie Mae or Freddie Mac in connection with the Program or pursuant to the Agreement may constitute a violation of: (a) Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code; or (b) the civil False Claims Act (31 U.S.C. §§ 3729-3733). Servicer covenants to disclose to Fannie Mae and Freddie Mac any credible evidence, in connection with the Services, that a management official, employee, or contractor of Servicer has committed, or may have committed, a violation of the referenced statutes.

(g) Servicer covenants to disclose to Fannie Mae and Freddie Mac any other facts or information that the Treasury, Fannie Mae or Freddie Mac should reasonably expect to know about Servicer and its contractors to help protect the reputational interests of the Treasury, Fannie Mae and Freddie Mac in managing and monitoring the Program.

(h) Servicer covenants that it will timely inform Fannie Mae and Freddie Mac of any anticipated Event of Default.

(i)   Servicer acknowledges that Fannie Mae or Freddie Mac may be required to assist the Treasury with responses to the Privacy Act of 1974 (the "Privacy Act"), 5 USC § 552a, inquiries from borrowers and Freedom of Information Act, 5 USC § 552, inquiries from other parties, as well as formal inquiries from Congressional committees and members, the Government Accounting Office, Inspectors General and other government entities, as well as media and consumer advocacy group inquiries about the Program and its effectiveness. Servicer covenants that it will respond promptly and accurately to all search requests made by Fannie Mae or Freddie Mac, comply with any related procedures which Fannie Mae or Freddie Mac may establish, and provide related training to employees and contractors. In connection with Privacy Act inquiries, Servicer covenants that it will provide updated and corrected information as appropriate about borrowers' records to ensure that any system of record maintained by Fannie Mae on behalf of the Treasury is accurate and complete.

(j)   Servicer acknowledges that Fannie Mae is required to develop and implement customer service call centers to respond to borrowers' and other parties' inquiries regarding the Program, which may require additional support from Servicer. Servicer covenants that it will provide such additional customer service call support as Fannie Mae reasonably determines is necessary to support the Program.

(k)   Servicer acknowledges that Fannie Mae and/or Freddie Mac are required to develop and implement practices to monitor and detect loan modification fraud and to monitor compliance with applicable consumer protection and fair lending laws. Servicer covenants that it will fully and promptly cooperate with Fannie Mae's inquiries about loan modification fraud and legal compliance and comply with any anti-fraud and legal compliance procedures which Fannie Mae and/or Freddie Mac may require. Servicer covenants that it will develop and implement an internal control program to monitor and detect loan modification fraud and to monitor compliance with applicable consumer protection and fair lending laws, among other things, as provided in Section 4 of this Financial Instrument and acknowledges that the internal control program will be monitored, as provided in such Section.

(l)   Servicer shall sign and deliver an Annual Certification to Fannie Mae and Freddie Mac beginning on June 1, 2010 and again on June 1 of each year thereafter during the Term, in the form attached as Exhibit B to the Agreement.

6.   Use of Contractors. Servicer is responsible for the supervision and management of any contractor that assists in the performance of Services in connection with the Program. Servicer shall remove and replace any contractor that fails to perform. Servicer shall ensure that all of its contractors comply with the terms and provisions of the Agreement. Servicer shall be responsible for the acts or omissions of its contractors as if the acts or omissions were by the Servicer.

7.   Data Rights.

(a)   For purposes of this Section, the following definitions apply:

(i)   "Data" means any recorded information, regardless of form or the media on which it may be recorded, regarding any of the Services provided in connection with the Program.

(ii)   "Limited Rights" means non-exclusive rights to, without limitation, use, copy, maintain, modify, enhance, disclose, reproduce, prepare derivative works, and distribute, in any manner, for any purpose related to the administration, activities, review, or audit of, or public reporting regarding, the Program and to permit others to do so in connection therewith.

- 4 -

(iii)  "NPI" means nonpublic personal information, as defined under the GLB.

(iv)  "GLB" means the Gramm-Leach-Bliley Act, 15 U.S.C. 6801-6809.

(b) Subject to Section 7(c) below, Treasury, Fannie Mae and Freddie Mac shall have Limited Rights, with respect to all Data produced, developed, or obtained by Servicer or a contractor of Servicer in connection with the Program, provided, however, that NPI will not be transferred by Fannie Mae in violation of the GLB and, provided, further, that Servicer acknowledges and agrees that any use of NPI by, the distribution of NPI to, or the transfer of NPI among, Federal, state and local government organizations and agencies does not constitute a violation of the GLB for purposes of the Agreement. If requested, such Data shall be made available to the Treasury, Fannie Mae, or Freddie Mac upon request, or as and when directed by the Program Documentation, in industry standard useable format.

(c) Servicer expressly consents to the publication of its name as a participant in the Program, and the use and publication of Servicer's Data, subject to applicable state and federal laws regarding confidentiality, in any form and on any media utilized by Treasury, Fannie Mae or Freddie Mac, including, but not limited to, on any website or webpage hosted by Treasury, Fannie Mae, or Freddie Mac, in connection with the Program, provided that no Data placed in the public domain will: (i) contain the name, social security number, or street address of any borrower or other information that would allow the borrower to be identified; or, (ii) if presented in a form that links the Servicer with the Data, include information other than program performance and participation-related statistics such as the number of modifications, performance of modifications, characteristics of the modified loans, or program compensation or fees, with any information about any borrower limited to creditworthiness characteristics such as debt, income, and credit score. In any Data provided to an enforcement or supervisory agency with jurisdiction over the Servicer, these limitations on borrower information do not apply.

8.  Publicity and Disclosure.

(a) Servicer shall not make use of any Treasury name, symbol, emblem, program name, or product name, in any advertising, signage, promotional material, press release, Web page, publication, or media interview, without the prior written consent of the Treasury.

(b) Servicer shall not publish, or cause to have published, or make public use of Fannie Mae's name, logos, trademarks, or any information about its relationship with Fannie Mae without the prior written permission of Fannie Mae, which permission may be withdrawn at any time in Fannie Mae's sole discretion.

(c) Servicer shall not publish, or cause to have published, or make public use of Freddie Mac's name (i.e., "Freddie Mac" or "Federal Home Loan Mortgage Corporation"), logos, trademarks, or any information about its relationship with Freddie Mac without the prior written permission of Freddie Mac, which permission may be withdrawn at any time in Freddie Mac's sole discretion.

9.  Limitation of Liability. IN NO EVENT SHALL FANNIE MAE, THE TREASURY, OR FREDDIE MAC, OR THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR AFFILIATES BE LIABLE TO SERVICER WITH RESPECT TO THE PROGRAM OR THE AGREEMENT, OR FOR ANY

ACT OR OMISSION OCCURRING IN CONNECTION WITH THE FOREGOING, FOR ANY DAMAGES OF ANY KIND, INCLUDING, BUT NOT LIMITED TO DIRECT DAMAGES, INDIRECT DAMAGES, LOST PROFITS, LOSS OF BUSINESS, OR OTHER INCIDENTAL, CONSEQUENTIAL, SPECIAL OR PUNITIVE DAMAGES OF ANY NATURE OR UNDER ANY LEGAL THEORY WHATSOEVER, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND REGARDLESS OF WHETHER OR NOT THE DAMAGES WERE REASONABLY FORESEEABLE; PROVIDED, HOWEVER, THAT THIS PROVISION SHALL NOT LIMIT FANNIE MAE'S OBLIGATION TO REMIT PURCHASE PRICE PAYMENTS TO SERVICER IN ITS CAPACITY AS FINANCIAL AGENT OF THE UNITED STATES IN ACCORDANCE WITH THE AGREEMENT.

10.   Indemnification.  Servicer shall indemnify, hold harmless, and pay for the defense of Fannie Mae, the Treasury and Freddie Mac, and their respective officers, directors, employees, agents and affiliates against all claims, liabilities, costs, damages, judgments, suits, actions, losses and expenses, including reasonable attorneys' fees and costs of suit, arising out of or resulting from: (a) Servicer's breach of Section 5 (Representations, Warranties and Covenants) of this Financial Instrument; (b) Servicer's negligence, willful misconduct or failure to perform its obligations under the Agreement; or (c) any injuries to persons (including death) or damages to property caused by the negligent or willful acts or omissions of Servicer or its contractors. Servicer shall not settle any suit or claim regarding any of the foregoing without Fannie Mae's prior written consent if such settlement would be adverse to Fannie Mae's interest, or the interests of the Treasury or Freddie Mac. Servicer agrees to pay or reimburse all costs that may be incurred by Fannie Mae and Freddie Mac in enforcing this indemnity, including attorneys' fees.

IN WITNESS WHEREOF, Servicer hereby executes this Financial Instrument on the date set forth below.

Bank of America, N.A.

_____          APRIL 17, 2009
Steve R. Bailey                            Date
Senior Vice President, Mortgage Servicing Executive

6

**EXHIBIT B**

**FORM OF ANNUAL CERTIFICATION**

## ANNUAL CERTIFICATION

This Annual Certification is delivered as provided in Section 1.B. of the Commitment to Purchase Financial Instrument and Servicer Participation Agreement (the "Commitment"), effective as of [INSERT], by and between Federal National Mortgage Association ("Fannie Mae"), a federally chartered corporation, acting as financial agent of the United States, and the undersigned party ("Servicer"). All terms used, but not defined herein, shall have the meanings ascribed to them in the Commitment.

Servicer hereby certifies, as of [INSERT DATE ON WHICH CERTIFICATION IS GIVEN], that:

1.          Servicer is established under the laws of the United States or any state, territory, or possession of the United States or the District of Columbia, and has significant operations in the United States. Servicer had full corporate power and authority to enter into, execute, and deliver the Agreement and to perform its obligations hereunder and has all licenses necessary to carry on its business as now being conducted and as contemplated by the Agreement.

2.          Servicer is in compliance with, and certifies that all Services have been performed in compliance with, all applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, codes and requirements, including, but not limited to, the Truth in Lending Act, 15 USC 1601 § et seq., the Home Ownership and Equity Protection Act, 15 USC § 1639, the Federal Trade Commission Act, 15 USC § 41 et seq., the Equal Credit Opportunity Act, 15 USC § 701 et seq., the Fair Credit Reporting Act, 15 USC § 1681 et seq., the Fair Housing Act and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices and all applicable laws governing tenant rights. Subject to the following sentence, Servicer has obtained or made all governmental approvals or registrations required under law and has obtained all consents necessary to authorize the performance of its obligations under the Program and the Agreement. The performance of Services under the Agreement has not conflicted with, or been prohibited in any way by, any other agreement or statutory restriction by which Servicer is bound, except to the extent of any contractual limitations under applicable servicing contracts to which Servicer is subject. Servicer is not aware of any other legal or financial impediments to performing its obligations under the Program or the Agreement and has promptly notified Fannie Mae of any financial and/or operational impediments which may impair its ability to perform its obligations under the Program or the Agreement. Servicer is not delinquent on any Federal tax obligation or any other debt owed to the United States or collected by the United States for the benefit of others, excluding any debts or obligations that are being contested in good faith.

3.          (i) Servicer has performed its obligations in accordance with the Agreement and has promptly provided such performance reporting as Fannie Mae and Freddie Mac have reasonably required; (ii) all mortgage modifications and all trial period modifications have been offered by Servicer to borrowers, fully documented and serviced by Servicer in accordance with the Program Documentation; and (iii) all data, collection information and other information reported by Servicer to Fannie Mae and Freddie Mac under the Agreement, including, but not limited to, information that was relied upon by Fannie Mae and Freddie Mac in calculating the Purchase Price and in performing any compliance review, was true, complete and accurate in all material respects, and consistent with all relevant servicing records, as and when provided.

4.          Servicer has: (i) performed the Services required under the Agreement in accordance with the practices, high professional standards of care, and degree of attention used in a well-managed operation, and no less than that which the Servicer exercises for itself under similar circumstances; and (ii) used qualified individuals with suitable training, education, experience and skills to perform the Services. Servicer acknowledges that Program participation required changes to, or the augmentation of, its systems, staffing and procedures; Servicer took all actions necessary to ensure that it had the capacity to implement the Program in accordance with the Agreement.

5.          Servicer has complied with all regulations on conflicts of interest that are applicable to Servicer in connection with the conduct of its business and all conflicts of interest and non-disclosure obligations and restrictions and related mitigation procedures set forth in the Program Documentation (if any).

6.          Servicer acknowledges that the provision of false or misleading information to Fannie Mae or Freddie Mac in connection with the Program or pursuant to the Agreement may constitute a violation of: (a) Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code; or (b) the civil False Claims Act (31 U.S.C. §§3729-3733). Servicer has disclosed to Fannie Mae and Freddie Mac any credible evidence, in connection with the Services, that a management official, employee, or contractor of Servicer has committed, or may have committed, a violation of the referenced statutes.

7.        Servicer has disclosed to Fannie Mae and Freddie Mae any other facts or information that the Treasury, Fannie Mae or Freddie Mac should reasonably expect to know about Servicer and its contractors to help protect the reputational interests of the Treasury, Fannie Mae and Freddie Mac in managing and monitoring the Program.

8.        Servicer acknowledges that Fannie Mae and Freddie Mac may be required to assist the Treasury with responses to the Privacy Act of 1974 (the "Privacy Act"), 5 USC § 552a, inquiries from borrowers and Freedom of Information Act, 5 USC § 552, inquiries from other parties, as well as formal inquiries from Congressional committees and members, the Government Accounting Office, Inspectors General and other government entities, as well as media and consumer advocacy group inquiries about the Program and its effectiveness.  Servicer has responded promptly and accurately to all search requests made by Fannie Mae and Freddie Mae, complied with any related procedures which Fannie Mae and Freddie Mac have established, and provided related training to employees and contractors.  In connection with Privacy Act inquiries, Servicer has provided updated and corrected information as appropriate about borrowers' records to ensure that any system of record maintained by Fannie Mae on behalf of the Treasury is accurate and complete.

9.        Servicer acknowledges that Fannie Mae is required to develop and implement customer service call centers to respond to borrowers' and other parties' inquiries regarding the Program, which may require additional support from Servicer.  Servicer has provided such additional customer service call support as Fannie Mae has reasonably requested to support the Program.

10.       Servicer acknowledges that Fannie Mae and/or Freddie Mac are required to develop and implement practices to monitor and detect loan modification fraud and to monitor compliance with applicable consumer protection and fair lending laws.  Servicer has fully and promptly cooperated with Fannie Mae's inquiries about loan modification fraud and legal compliance and has complied with any anti-fraud and legal compliance procedures which Fannie Mae and/or Freddie Mac have required.  Servicer has developed and implemented an internal control program to monitor and detect loan modification fraud and to monitor compliance with applicable consumer protection and fair lending laws, among other things, as provided in Section 4 of the Financial Instrument.

In the event that any of the certifications made herein are discovered not to be true and correct, Servicer agrees to notify Fannie Mae and Freddie Mac immediately.

[INSERT FULL LEGAL NAME OF SERVICER]:


_____          _____
[Name of Authorized Official]                            Date
[Title of Authorized Official]

- 3 -

**EXHIBIT C**

**FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT**

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (the "Assignment and Assumption Agreement") is entered into as of [INSERT DATE] by and between [INSERT FULL LEGAL NAME OF ASSIGNOR] ("Assignor") and [INSERT FULL LEGAL NAME OF ASSIGNEE] ("Assignee").  All terms used, but not defined, herein shall have the meanings ascribed to them in the Underlying Agreement (defined below).

WHEREAS, Assignor and Federal National Mortgage Association, a federally chartered corporation, as financial agent of the United States ("Fannie Mae"), are parties to a Commitment to Purchase Financial Instrument and Servicer Participation Agreement, a complete copy of which (including all exhibits, amendments and modifications thereto) is attached hereto and incorporated herein by this reference (the "Underlying Agreement");

WHEREAS, Assignor has agreed to assign to Assignee: (i) all of its rights and obligations under the Underlying Agreement with respect to the mortgage loans identified on the schedule attached hereto as Schedule 1 ("Schedule 1") and/or (ii) certain other rights and obligations under the Underlying Agreement that are identified on Schedule 1; and

WHEREAS, Assignee has agreed to assume the mortgage loans and other rights and obligations under the Underlying Agreement identified on Schedule 1.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.  Assignment.  Assignor hereby assigns to Assignee all of Assignor's rights and obligations under the Underlying Agreement with respect to the mortgage loans identified on Schedule 1 and such other rights and obligations under the Underlying Agreement that are identified on Schedule 1.

2.  Assumption.  Assignee hereby accepts the foregoing assignment and assumes all of the rights and obligations of Assignor under the Underlying Agreement with respect to the mortgage loans identified on Schedule 1 and such other rights and obligations under the Underlying Agreement that are identified on Schedule 1.

3.  Effective Date.  The date on which the assignment and assumption of rights and obligations under the Underlying Agreement is effective is [INSERT EFFECTIVE DATE OF ASSIGNMENT/ASSUMPTION].

4.  Successors.  All future transfers and assignments of the mortgage loans, rights and obligations transferred and assigned hereby are subject to the transfer and assignment provisions of the Underlying Agreement.  This Assignment and Assumption Agreement shall inure to the benefit of, and be binding upon, the permitted successors and assigns of the parties hereto.

5.  Counterparts.  This Assignment and Assumption Agreement may be executed in counterparts, each of which shall be an original, but all of which together constitute one and the same instrument.

- 1 -

IN WITNESS WHEREOF, Assignor and Assignee, by their duly authorized officials, hereby execute and deliver this Assignment and Assumption Agreement, together with Schedule 1, effective as of the date set forth in Section 3 above.

ASSIGNOR: [INSERT FULL LEGAL NAME OF ASSIGNOR]          ASSIGNEE: [INSERT FULL LEGAL NAME OF ASSIGNEE]

By:_____          By:_____
Name:_____          Name:_____
Title:_____          Title:_____
Date:_____          Date:_____

**SCHEDULE 1**

**To**

**ASSIGNMENT AND ASSUMPTION AGREEMENT**

**EXHIBIT D**

**FORM OF COVER SHEET**

**Cover Sheet for Transmission of**

**Commitment to Purchase Financial Instrument and Servicer Participation Agreement**

**To:** [INSERT FULL LEGAL NAME OF SERVICER] ("Servicer"), [INSERT SERVICER CONTACT]

**From:** Federal National Mortgage Association, a federally chartered corporation, as financial agent of the United States ("Fannie Mae")

**Copy To:** The U.S. Department of the Treasury, [INSERT TREASURY CONTACT]

**Date:** [INSERT DATE OF TRANSMISSION]

**Method of Transmission:** [Facsimile to [INSERT FAX NUMBER OF SERVICER]] [[Email with PDF file attached to [INSERT SERVICER EMAIL ADDRESS][Specify other method of electronic delivery]]

**NOTICE**

This transmission constitutes notice to Servicer that the Commitment to Purchase Financial Instrument and Servicer Participation Agreement, by and between Fannie Mae and Servicer (the "Commitment") and the Financial Instrument attached thereto have been fully executed and are effective as of the date of this transmission. The date of this transmission shall be the "Effective Date" of the Commitment and the Financial Instrument.

Copies of the fully executed Commitment and Financial Instrument are attached to this transmission for your records.

- 1 -

# Exhibit 2

 **Home Affordable Modification Program**

*Supplemental Directive 09-01*                     *April 6, 2009*

## Introduction of the Home Affordable Modification Program

### Background

On February 18, 2009, President Obama announced the Homeowner Affordability and Stability Plan to help up to 7 to 9 million families restructure or refinance their mortgages to avoid foreclosure. As part of this plan, the Treasury Department (Treasury) announced a national modification program aimed at helping 3 to 4 million at-risk homeowners – both those who are in default and those who are at imminent risk of default – by reducing monthly payments to sustainable levels. On March 4, 2009, the Treasury issued uniform guidance for loan modifications across the mortgage industry. This Supplemental Directive provides additional guidance to servicers for adoption and implementation of the Home Affordable Modification program (HAMP) for mortgage loans that are not owned or guaranteed by Fannie Mae or Freddie Mac (Non-GSE Mortgages).

Under the HAMP, a servicer will use a uniform loan modification process to provide a borrower with sustainable monthly payments. The guidelines set forth in this document apply to all eligible mortgage loans secured by one- to four-unit owner-occupied single-family properties.

In order for a servicer to participate in the HAMP with respect to Non-GSE Mortgages, the servicer must execute a servicer participation agreement and related documents (Servicer Participation Agreement) with Fannie Mae in its capacity as financial agent for the United States (as designated by Treasury) on or before December 31, 2009. The Servicer Participation Agreement will govern servicer participation in the HAMP program for all Non-GSE Mortgages. Servicers of mortgage loans that are owned or guaranteed by Fannie Mae or Freddie Mac should refer to the HAMP announcement issued by the applicable GSE.

The HAMP reflects usual and customary industry standards for mortgage loan modifications contained in typical servicing agreements, including pooling and servicing agreements (PSAs) governing private label securitizations. As detailed in the Servicer Participation Agreement, participating servicers are required to consider all eligible mortgage loans unless prohibited by the rules of the applicable PSA and/or other investor servicing agreements. Participating servicers are required to use reasonable efforts to remove any prohibitions and obtain waivers or approvals from all necessary parties in order to carry out any modification under the HAMP.

To help servicers implement the HAMP, this Supplemental Directive covers the following topics:

- HAMP Eligibility
- Underwriting
- Modification Process
- Reporting Requirements
- Fees and Compensation
- Compliance

## HAMP Eligibility

A Non-GSE Mortgage is eligible for the HAMP if the servicer verifies that all of the following criteria are met:

- The mortgage loan is a first lien mortgage loan originated on or before January 1, 2009.
- The mortgage loan has not been previously modified under the HAMP.
- The mortgage loan is delinquent or default is reasonably foreseeable; loans currently in foreclosure are eligible.
- The mortgage loan is secured by a one- to four-unit property, one unit of which is the borrower's principal residence. Cooperative share mortgages and mortgage loans secured by condominium units are eligible for the HAMP. Loans secured by manufactured housing units are eligible for the HAMP.
- The property securing the mortgage loan must not be vacant or condemned.
- The borrower documents a financial hardship and represents that (s)he does not have sufficient liquid assets to make the monthly mortgage payments by completing a Home Affordable Modification Program Hardship Affidavit and provides the required income documentation. The documentation supporting income may not be more than 90 days old (as of the date the servicer is determining HAMP eligibility).
- The borrower has a monthly mortgage payment ratio of greater than 31 percent.
- A borrower in active litigation regarding the mortgage loan is eligible for the HAMP.
- The servicer may not require a borrower to waive legal rights as a condition of the HAMP.
- A borrower actively involved in a bankruptcy proceeding is eligible for the HAMP at the servicer's discretion. Borrowers who have received a Chapter 7 bankruptcy discharge in a case involving the first lien mortgage who did not reaffirm the mortgage debt under applicable law are eligible, provided the Home Affordable Modification Trial Period Plan and Home Affordable Modification Agreement are revised as outlined in the *Acceptable Revisions to HAMP Documents* section of this Supplemental Directive.
- The borrower agrees to set up an escrow account for taxes and hazard and flood insurance prior to the beginning of the trial period if one does not currently exist.
- Borrowers may be accepted into the program if a fully executed Home Affordable Modification Trial Period Plan is in the servicer's possession on December 31, 2012.

- The current unpaid principal balance (UPB) of the mortgage loan prior to capitalization must be no greater than:
  - o  1 Unit: $729,750
  - o  2 Units: $934,200
  - o  3 Units: $1,129,250
  - o  4 Units: $1,403,400

Note: Mortgage loans insured, guaranteed or held by a federal government agency (e.g., FHA, HUD, VA and Rural Development) may be eligible for the HAMP, subject to guidance issued by the relevant agency. Further details regarding inclusion of these loans in the HAMP will be provided in a subsequent Supplemental Directive.

The HAMP documents are available through www.financialstability.gov. Documents include the Home Affordable Modification Trial Period Plan (hereinafter referred to as Trial Period Plan), the Home Affordable Modification Agreement (hereinafter referred to as the Agreement), the Home Affordable Modification Program Hardship Affidavit (hereinafter referred to as the Hardship Affidavit) and various cover letters.

## Underwriting

## Hardship Affidavit

Every borrower and co-borrower seeking a modification, whether in default or not, must sign a Hardship Affidavit that attests to and describes one or more of the following types of hardship:

1. A reduction in or loss of income that was supporting the mortgage.
2. A change in household financial circumstances.
3. A recent or upcoming increase in the monthly mortgage payment.
4. An increase in other expenses.
5. A lack of sufficient cash reserves to maintain payment on the mortgage and cover basic living expenses at the same time. Cash reserves include assets such as cash, savings, money market funds, marketable stocks or bonds (excluding retirement accounts and assets that serve as emergency fund – generally equal to three times the borrower's monthly debt payments).
6. Excessive monthly debt payments and overextension with creditors, e.g., the borrower was required to use credit cards, a home equity loan, or other credit to make the mortgage payment.
7. Other reasons for hardship detailed by the borrower.

Note: The borrower is not required to have the Hardship Affidavit notarized.

## Reasonably Foreseeable (Imminent) Default

A borrower that is current or less than 60 days delinquent who contacts the servicer for a modification, appears potentially eligible for a modification, and claims a hardship must

be screened for imminent default. The servicer must make a determination as to whether a payment default is imminent based on the servicer's standards for imminent default and consistent with applicable contractual agreements and accounting standards. If the servicer determines that default is imminent, the servicer must apply the Net Present Value test.

In the process of making its imminent default determination, the servicer must evaluate the borrower's financial condition in light of the borrower's hardship as well as inquire as to the condition of and circumstances affecting the property securing the mortgage loan. The servicer must consider the borrower's financial condition, liquid assets, liabilities, combined monthly income from wages and all other identified sources of income, monthly obligations (including personal debts, revolving accounts, and installment loans), and a reasonable allowance for living expenses such as food, utilities, etc. The hardship and financial condition of the borrower shall be verified through documentation.

### *Documenting the Reason for and Timing of Imminent Default*

A servicer must document in its servicing system the basis for its determination that a payment default is imminent and retain all documentation used to reach its conclusion. The servicer's documentation must also include information on the borrower's financial condition as well as the condition and circumstances of the property securing the mortgage loan.

## Net Present Value (NPV) Test

All loans that meet the HAMP eligibility criteria and are either deemed to be in imminent default (as described above) or 60 or more days delinquent must be evaluated using a standardized NPV test that compares the NPV result for a modification to the NPV result for no modification. If the NPV result for the modification scenario is greater than the NPV result for no modification, the result is deemed "positive" and the servicer MUST offer the modification. If the NPV result for no modification is greater than NPV result for the modification scenario, the modification result is deemed "negative" and the servicer has the option of performing the modification in its discretion. For mortgages serviced on behalf of a third party investor for which the modification result is deemed "negative," however, the servicer may not perform the modification without express permission of the investor. If a modification is not pursued when the NPV result is "negative," the servicer must consider the borrower for other foreclosure prevention options, including alternative modification programs, deeds-in-lieu, and preforeclosure sale programs.

Whether or not a modification is pursued, the servicer MUST maintain detailed documentation of the NPV model used, all NPV inputs and assumptions and the NPV results.

Fannie Mae has developed a software application for servicers to submit loan files to the NPV calculator. The software application is available on the Home Affordable

Modification servicer web portal accessible through www.financialstability.gov. On this portal, servicers will have access to the NPV calculator tool as well as detailed guidelines for submitting proposed modification data.

Servicers having at least a $40 billion servicing book will have the option to create a version of the NPV calculator that uses a set of cure rates and redefault rates estimated based on the experience of their own portfolios, taking into consideration, if feasible, current LTV, current monthly mortgage payment, current credit score, delinquency status and other loan or borrower attributes. Detailed guidance on required inputs for custom NPV calculations is forthcoming.

For mortgages serviced on behalf of a third party investor, the servicer must use a discount rate at least as high as the rate used on the servicer's own portfolio, but in no event higher than the maximum rate permitted under the HAMP.

To obtain a property valuation input for the NPV calculator, servicers may use either an automated valuation model (AVM), provided that the AVM renders a reliable confidence score, or a broker's price opinion (BPO). A servicer may use an AVM provided by one of the GSEs. As an alternative, servicers may rely on their internal AVM provided that:

(i)     the servicer is subject to supervision by a Federal regulatory agency;
(ii)    the servicer's primary Federal regulatory agency has reviewed the model; and
(iii)   the AVM renders a reliable confidence score.

If a GSE AVM or the servicer AVM is unable to render a value with a reliable confidence score, the servicer must obtain an assessment of the property value utilizing a BPO or a property valuation method acceptable to the servicer's Federal regulatory supervisor. Such assessment must be rendered in accordance with the Interagency Appraisal and Evaluation Guidelines (as if such guidelines apply to loan modifications). In all cases, the property valuation used cannot be more than 90 days old.

## Verifying Borrower Income and Occupancy Status

Servicers may use recent verbal financial information obtained from the borrower and any co-borrower 90 days or less from the date the servicer is determining HAMP eligibility to assess the borrower's eligibility. The servicer may rely on this information to prepare and send to the borrower a solicitation for the HAMP and an offer of a Trial Period Plan. When the borrower returns the Trial Period Plan and related documents, the servicer must review them to verify the borrower's financial information and eligibility – except that documentation of income may not be more than 90 days old as of the determination of eligibility.

As an alternative, a servicer may require a borrower to submit the required documentation to verify the borrower's eligibility and income prior to preparing a Trial Period Plan. Upon receipt of the documentation and determination of the borrower's

eligibility, a servicer may prepare and send to the borrower a letter indicating that the borrower is eligible for the HAMP together with a Trial Period Plan.

The borrower will only qualify for the HAMP if the verified income documentation confirms that the monthly mortgage payment ratio prior to the modification is greater than 31 percent. The "monthly mortgage payment ratio" is the ratio of the borrower's current monthly mortgage payment to the borrower's monthly gross income (or the borrowers' combined monthly gross income in the case of co-borrowers). The "monthly mortgage payment" includes the monthly payment of principal, interest, property taxes, hazard insurance, flood insurance, condominium association fees and homeowner's association fees, as applicable (including any escrow payment shortage amounts subject to a repayment plan). When determining a borrower's monthly mortgage payment ratio, servicers must adjust the borrower's current mortgage payment to include, as applicable, property taxes, hazard insurance, flood insurance, condominium association fees and homeowner's association fees if these expenses are not already included in the borrower's payment. The monthly mortgage payment does not include mortgage insurance premium payments or payments due to holders of subordinate liens.

With respect to adjustable rate loans where there is a rate reset scheduled within 120 days after the date of the evaluation (a "Reset ARM"), the monthly mortgage payment used to determine eligibility will be the greater of (i) the borrower's current scheduled monthly mortgage payment or (ii) a fully amortizing monthly mortgage payment based on the note reset rate using the index value as of the date of the evaluation (the "Reset Interest Rate"). With respect to adjustable rate loans that reset more than 120 days after the date of the evaluation, the borrower's current scheduled monthly mortgage payment will be used to determine eligibility.

The borrower's "monthly gross income" is the borrower's income amount before any payroll deductions and includes wages and salaries, overtime pay, commissions, fees, tips, bonuses, housing allowances, other compensation for personal services, Social Security payments, including Social Security received by adults on behalf of minors or by minors intended for their own support, and monthly income from annuities, insurance policies, retirement funds, pensions, disability or death benefits, unemployment benefits, rental income and other income. If only net income is available, the servicer must multiply the net income amount by 1.25 to estimate the monthly gross income.

Servicers should include non-borrower household income in monthly gross income if it is voluntarily provided by the borrower and if there is documentary evidence that the income has been, and reasonably can continue to be, relied upon to support the mortgage payment. All non-borrower household income included in monthly gross income must be documented and verified by the servicer using the same standards for verifying a borrower's income.

The servicer may not require a borrower to make an up-front cash contribution (other than the first trial period payment) for the borrower to be considered for the HAMP.

The HAMP documents instruct the borrower (the term "borrower" includes any co-borrower) to provide the following financial information to the servicer:

If the borrower is employed:
- A signed copy of the most recently filed federal income tax return, including all schedules and forms, if available,
- A signed IRS Form 4506-T (Request for Transcript of Tax Return), and
- Copies of the two most recent paystubs indicating year-to-date earnings.
- For additional income such as bonuses, commissions, fees, housing allowances, tips and overtime, a servicer must obtain a letter from the employer or other reliable third-party documentation indicating that the income will in all probability continue.

If the borrower is self-employed:
- A signed copy of the most recent federal income tax return, including all schedules and forms, if available,
- A signed IRS Form 4506-T (Request for Transcript of Tax Return), and
- The most recent quarterly or year-to-date profit and loss statement for each self-employed borrower.
- Other reliable third-party documentation the borrower voluntarily provides.

Note: For both a salaried or a self-employed borrower, if the borrower does not provide a signed copy of the most recently filed federal income tax return, or if the Compliance Agent so requires, the servicer must submit the Form 4506-T to the IRS to request a transcript of the return.

If the borrower elects to use alimony or child support income to qualify, acceptable documentation includes:
- Photocopies of the divorce decree, separation agreement, or other type of legal written agreement or court decree that provides for the payment of alimony or child support and states the amount of the award and the period of time over which it will be received. Servicers must determine that the income will continue for at least three years.
- Documents supplying reasonably reliable evidence of full, regular and timely payments, such as deposit slips, bank statements or signed federal income tax returns.

If the borrower has other income such as social security, disability or death benefits, or a pension:
- Acceptable documentation includes letters, exhibits, a disability policy or benefits statement from the provider that states the amount, frequency, and duration of the benefit. The servicer must determine that the income will continue for at least three years.
- The servicer must obtain copies of signed federal income tax returns, IRS W-2 forms, or copies of the two most recent bank statements.

If the borrower receives public assistance or collects unemployment:

- Acceptable documentation includes letters, exhibits or a benefits statement from the provider that states the amount, frequency, and duration of the benefit. The servicer must determine that the income will continue for at least nine months.

If the borrower has rental income, acceptable documentation includes:

- Copies of all pages from the borrower's most recent two years of signed federal income tax returns and Schedule E – Supplemental Income and Loss. The monthly net rental income to be calculated for HAMP purposes equals 75 percent of the gross rent, with the remaining 25 percent considered vacancy loss and maintenance expense.

A servicer must confirm that the property securing the mortgage loan is the borrower's primary residence as evidenced by the most recent signed federal income tax return (or transcript of tax return obtained from the IRS), a credit report and one other form of documentation that would supply reasonable evidence that the property is the borrower's primary residence (such as utility bills in the borrower's name).

A servicer is not required to modify a mortgage loan if there is reasonable evidence indicating the borrower submitted false or misleading information or otherwise engaged in fraud in connection with the modification.

## Standard Modification Waterfall

Servicers are required to consider a borrower for a refinance through the Hope for Homeowners program when feasible. Consideration for a Hope for Homeowners refinance should not delay eligible borrowers from receiving a modification offer and beginning the trial period. Servicers must use the modification options listed below to begin the HAMP modification and work to complete the Hope for Homeowners refinance during the trial period.

Servicers must apply the modification steps enumerated below in the stated order of succession until the borrower's monthly mortgage payment ratio is reduced as close as possible to 31 percent, without going below 31 percent (the "target monthly mortgage payment ratio"). If the applicable PSA or other investor servicing agreement prohibits the servicer from taking a modification step, the servicer may seek approval for an exception.

Servicers are not precluded under the HAMP from agreeing to a modification that reduces the borrower's monthly mortgage payment ratio below 31% as long as the modification otherwise complies with the HAMP requirements. Similarly and where otherwise permitted by the applicable PSA or other investor servicing contract, servicers are not precluded under the HAMP from agreeing to a modification where the interest rate does not step up after five years, or where additional principal forbearance is substituted for extending the term as needed to achieve the target monthly mortgage payment ratio of 31%, so long as the modification otherwise complies with HAMP

requirements. However, borrower, servicer and investor incentive payments for these modifications will be paid based on modification terms that reflect the target monthly mortgage payment ratio and standard modification terms.

**Note:** If a borrower has an adjustable-rate mortgage (ARM) or interest-only mortgage, the existing interest rate will convert to a fixed interest rate, fully amortizing loan.

**Step 1:** Capitalize accrued interest, out-of-pocket escrow advances to third parties, and any required escrow advances that will be paid to third parties by the servicer during the trial period and servicing advances (costs and expenses incurred in performing its servicing obligation, such as those related to preservation and protection of the security property and the enforcement of the mortgage) paid to third parties in the ordinary course of business and not retained by the servicer, if allowed by state law. The servicer should capitalize only those third party delinquency fees that are reasonable and necessary. Fees permitted by Fannie Mae and Freddie Mac for GSE loans shall be considered evidence of fees that would be reasonable for non-GSE loans. Late fees may not be capitalized and must be waived if the borrower satisfies all conditions of the Trial Period Plan.

**Step 2:** Reduce the interest rate. If the loan is a fixed rate mortgage or an adjustable-rate mortgage, then the starting interest rate is the current interest rate. If the loan is a Reset ARM, the starting interest rate is the Reset Interest Rate.

Reduce the starting interest rate in increments of .125 percent to get as close as possible to the target monthly mortgage payment ratio. The interest rate floor in all cases is 2.0 percent.

- If the resulting rate is below the Interest Rate Cap, this reduced rate will be in effect for the first five years followed by annual increases of one percent per year (or such lesser amount as may be needed) until the interest rate reaches the Interest Rate Cap, at which time it will be fixed for the remaining loan term.
- If the resulting rate exceeds the Interest Rate Cap, then that rate is the permanent rate.

The "Interest Rate Cap" is the Freddie Mac Weekly Primary Mortgage Market Survey (PMMS) Rate for 30-year fixed rate conforming loans, rounded to the nearest 0.125 percent, as of the date that the Agreement is prepared.

**Step 3:** If necessary, extend the term and reamortize the mortgage loan by up to 480 months from the modification effective date (i.e., the first day of the month following the end of the trial period) to achieve the target monthly mortgage payment ratio. If a term extension is not permitted under the applicable PSA or other investor servicing agreement, reamortize the mortgage loan based upon an amortization schedule of up to 480 months with a balloon payment due at maturity. Negative amortization after the effective date of the modification is prohibited.

**Step 4:** If necessary, the servicer must provide for principal forbearance to achieve the target monthly mortgage payment ratio. The principal forbearance amount is non-interest

bearing and non-amortizing. The amount of principal forbearance will result in a balloon payment fully due and payable upon the earliest of the borrower's transfer of the property, payoff of the interest bearing unpaid principal balance, or maturity of the mortgage loan. The modified interest bearing balance (i.e., the unpaid principal balance excluding the deferred principal balloon amount) must create a current mark-to-market LTV (current LTV based upon the new valuation) greater than or equal to 100 percent if the result of the NPV test is negative and the servicer elects to perform the modification.

There is no requirement to forgive principal under the HAMP. However, servicers may forgive principal to achieve the target monthly mortgage payment ratio on a standalone basis or before any step in the standard waterfall process set forth above. If principal is forgiven, subsequent steps in the standard waterfall may not be skipped. If principal is forgiven and the interest rate is not reduced, the existing rate will be fixed and treated as the modified rate for the purposes of the Interest Rate Cap.

## Verifying Monthly Gross Expenses

A servicer must obtain a credit report for each borrower or a joint report for a married couple who are co-borrowers to validate installment debt and other liens. In addition, a servicer must consider information concerning monthly obligations obtained from the borrower either orally or in writing. The "monthly gross expenses" equal the sum of the following monthly charges:

- The monthly mortgage payment, taxes, property insurance, homeowner's or condominium association fee payments and assessments related to the property whether or not they are included in the mortgage payment.
- Any mortgage insurance premiums.
- Monthly payments on all closed-end subordinate mortgages.
- Payments on all installment debts with more than ten months of payments remaining, including debts that are in a period of either deferment or forbearance. When payments on an installment debt are not on the credit report or are listed as deferred, the servicer must obtain documentation to support the payment amount included in the monthly debt payment. If no monthly payment is reported on a student loan that is deferred or is in forbearance, the servicer must obtain documentation verifying the proposed monthly payment amount, or use a minimum of 1.5 percent of the balance.
- Monthly payment on revolving or open-end accounts, regardless of the balance. In the absence of a stated payment, the payment will be calculated by multiplying the outstanding balance by 3 percent.
- Monthly payment on a Home Equity Line of Credit (HELOC) must be included in the payment ratio using the minimum monthly payment reported on the credit report. If the HELOC has a balance but no monthly payment is reported, the servicer must obtain documentation verifying the payment amount, or use a minimum of one percent of the balance.
- Alimony, child support and separate maintenance payments with more than ten months of payments remaining, if supplied by the borrower.

- Car lease payments, regardless of the number of payments remaining.
- Aggregate negative net rental income from all investment properties owned, if supplied by the borrower.
- Monthly mortgage payment for second home (principal, interest, taxes and insurance and, when applicable, leasehold payments, homeowner association dues, condominium unit or cooperative unit maintenance fees (excluding unit utility charges)).

## Total Monthly Debt Ratio

The borrower's total monthly debt ratio ("back-end ratio") is the ratio of the borrower's monthly gross expenses divided by the borrower's monthly gross income. Servicers will be required to send the Home Affordable Modification Program Counseling Letter to borrowers with a post-HAMP modification back-end ratio equal to or greater than 55 percent. The letter states the borrower must work with a HUD-approved housing counselor on a plan to reduce their total indebtedness below 55 percent. The letter also describes the availability and advantages of counseling and provides a list of local HUD-approved housing counseling agencies and directs the borrower to the appropriate HUD website where such information is located. The borrower must represent in writing in the HAMP documents that (s)he will obtain such counseling.

Face-to-face counseling is encouraged; however, telephone counseling is also permitted from HUD-approved housing counselors provided it covers the same topics as face-to-face sessions. Telephone counseling sessions provide flexibility to borrowers who are unable to attend face-to-face sessions or who do not have an eligible provider within their area.

A list of approved housing counseling agencies is available at http://www.hud.gov/offices/hsg/sfh/hcc/fc/ or by calling the toll-free housing counseling telephone referral service at 1-800-569-4287. A servicer must retain in its mortgage files evidence of the borrower notification. There is no charge to either borrowers or servicers for this counseling.

## Mortgages with No Due-on-Sale Provision

If a mortgage that is not subject to a due-on-sale provision receives an HAMP, the borrower agrees that the HAMP will cancel the assumability feature of that mortgage.

## Escrow Accounts

All of the borrower's monthly payments must include a monthly escrow amount unless prohibited by applicable law. The servicer must assume full responsibility for administering the borrower's escrow deposit account in accordance with the mortgage documents and all applicable laws and regulations. If the mortgage loan being considered for the HAMP is a non-escrowed mortgage loan, the servicer must establish an escrow deposit account prior to the beginning of the trial period. Servicers who do not

have this capacity must implement an escrow process within six months of signing the Servicer Participation Agreement.   However, the servicer must ensure that the trial payments include escrow amounts and must place the escrow funds into a separate account identified for escrow deposits.

Servicers are encouraged to perform an escrow analysis prior to establishing the trial period payment.   When performing an escrow analysis, servicers should take into consideration tax and insurance premiums that may come due during the trial period. When the borrower's escrow account does not have sufficient funds to cover an expense and the servicer advances the funds necessary to pay an expense to a third party, the amount of the servicer advance that is paid to a third party may be capitalized.

In the event the initial escrow analysis identifies a shortage – a deficiency in the escrow deposits needed to pay all future tax and insurance payments – the servicer must take steps to eliminate the shortage. Any actions taken by the servicer to eliminate the escrow shortage must be in compliance with applicable laws, rules and regulations, including, but not limited to, the Real Estate Settlement Procedures Act and the Truth in Lending Act.

## Compliance with Applicable Laws

Each servicer (and any subservicer it uses) must be aware of, and in full compliance with, all federal, state, and local laws (including statutes, regulations, ordinances, administrative rules and orders that have the effect of law, and judicial rulings and opinions) – including, but not limited to, the following laws that apply to any of its practices related to the HAMP:

- Section 5 of the Federal Trade Commission Act, which prohibits unfair or deceptive acts or practices.
- The Equal Credit Opportunity Act and the Fair Housing Act, which prohibit discrimination on a prohibited basis in connection with mortgage transactions. Loan modification programs are subject to the fair lending laws, and servicers and lenders should ensure that they do not treat a borrower less favorably than other borrowers on grounds such as race, religion, national origin, sex, marital or familial status, age, handicap, or receipt of public assistance income in connection with any loan modification. These laws also prohibit redlining.
- The Real Estate Settlement Procedures Act, which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts.
- The Fair Debt Collection Practices Act, which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another.

## Modification Process

### Borrower Solicitation

Servicers should follow their existing practices, including complying with any express contractual restrictions, with respect to solicitation of borrowers for modifications.

A servicer may receive calls from current or delinquent borrowers directly inquiring about the availability of the HAMP. In that case, the servicer should work with the borrower to obtain the borrower's financial and hardship information and to determine if the HAMP is appropriate. If the servicer concludes a current borrower is in danger of imminent default, the servicer must consider an HAMP modification.

When discussing the HAMP, the servicer should provide the borrower with information designed to help them understand the modification terms that are being offered and the modification process. Such communication should help minimize potential borrower confusion, foster good customer relations, and improve legal compliance and reduce other risks in connection with the transaction. A servicer also must provide a borrower with clear and understandable written information about the material terms, costs, and risks of the modified mortgage loan in a timely manner to enable borrowers to make informed decisions. The servicer should inform the borrower during discussions that the successful completion of a modification under the HAMP will cancel any assumption feature, variable or step-rate feature, or enhanced payment options in the borrower's existing loan, at the time the loan is modified.

Servicers must have adequate staffing, resources, and facilities for receiving and processing the HAMP documents and any requested information that is submitted by borrowers. Servicers must also have procedures and systems in place to be able to respond to inquiries and complaints about the HAMP. Servicers should ensure that such inquiries and complaints are provided fair consideration, and timely and appropriate responses and resolution.

### Document Retention

Servicers must retain all documents and information received during the process of determining borrower eligibility, including borrower income verification, total monthly mortgage payment and total monthly gross debt payment calculations, NPV calculations (assumptions, inputs and outputs), evidence of application of each step of the standard waterfall, escrow analysis, escrow advances, and escrow set-up. The servicers must retain all documents and information related to the monthly payments during and after the trial period, as well as incentive payment calculations and such other required documents.

Servicers must retain detailed records of borrower solicitations or borrower-initiated inquiries regarding the HAMP, the outcome of the evaluation for modification under the HAMP and specific justification with supporting details if the request for modification

under the HAMP was denied. Records must also be retained to document the reason(s) for a trial modification failure. If an HAMP modification is not pursued when the NPV result is "negative," the servicer must document its consideration of other foreclosure prevention options. If a borrower under an HAMP modification loses good standing, the servicer must retain documentation of its consideration of the borrower for other loss mitigation alternatives.

Servicers must retain required documents for a period of seven years from the date of the document collection.

## Temporary Suspension of Foreclosure Proceedings

To ensure that a borrower currently at risk of foreclosure has the opportunity to apply for the HAMP, servicers should not proceed with a foreclosure sale until the borrower has been evaluated for the program and, if eligible, an offer to participate in the HAMP has been made. Servicers must use reasonable efforts to contact borrowers facing foreclosure to determine their eligibility for the HAMP, including in-person contacts at the servicer's discretion. Servicers must not conduct foreclosure sales on loans previously referred to foreclosure or refer new loans to foreclosure during the 30-day period that the borrower has to submit documents evidencing an intent to accept the Trial Period Plan offer. Except as noted herein, any foreclosure sale will be suspended for the duration of the Trial Period Plan, including any period of time between the borrower's execution of the Trial Period Plan and the Trial Period Plan effective date.

However, borrowers in Georgia, Hawaii, Missouri, and Virginia will be considered to have failed the trial period if they are not current under the terms of the Trial Period Plan as of the date that the foreclosure sale is scheduled. Accordingly, servicers of HAMP loans secured by properties in these states may proceed with the foreclosure sale if the borrower has not made the trial period payments required to be made through the end of the month preceding the month in which the foreclosure sale is scheduled to occur.

## Mortgage Insurer Approval

If applicable, a servicer must obtain mortgage insurer approval for HAMP modifications. Servicers should consult their mortgage insurance providers for specific processes related to the reporting of modified terms, payment of premiums, payment of claims, and other operational matters in connection with mortgage loans modified under the HAMP.

## Executing the HAMP Documents

Servicers must use a two-step process for HAMP modifications. Step one involves providing a Trial Period Plan outlining the terms of the trial period, and step two involves providing the borrower with an Agreement that outlines the terms of the final modification.

In step one, the servicer should instruct the borrower to return the signed Trial Period Plan, together with a signed Hardship Affidavit and income verification documents (if not previously obtained from the borrower), and the first trial period payment (when not using automated drafting arrangements), to the servicer within 30 calendar days after the Trial Period Plan is sent by the servicer.   The servicer is encouraged to contact the borrower before the expiration of the 30-day period if the borrower has not yet responded to encourage submission of the material.  The servicer may, in its discretion, consider the offer of a Trial Period Plan to have expired at the end of 60 days if the borrower has not submitted both an executed Trial Period Plan and complete documentation as required under the Trial Period Plan.  If the borrower's submission is incomplete, the servicer should work with the borrower to complete the Trial Period Plan submission.  Note: The borrower is not required to have the Hardship Affidavit notarized.

Upon receipt of the Trial Period Plan from the borrower, the servicer must confirm that the borrower meets the underwriting and eligibility criteria.  Once the servicer makes this determination and has received good funds for the first month's trial payment, the servicer should sign and immediately return an executed copy of the Trial Period Plan to the borrower.  Payments made by the borrower under the terms of the Trial Period Plan will count toward successful completion irrespective of the date of the executed copy of the Trial Period Plan.

If the servicer determines that the borrower does not meet the underwriting and eligibility standards of the HAMP after the borrower has submitted a signed Trial Period Plan to the servicer, the servicer should promptly communicate that determination to the borrower in writing and consider the borrower for another foreclosure prevention alternative.

In step two, servicers must calculate the terms of the modification using verified income, taking into consideration amounts to be capitalized during the trial period.  Servicers are encouraged to wait to send the Agreement to the borrower for execution until after receipt of the second to the last payment under the trial period.  Note: the borrower is not required to have the Agreement notarized.

Servicers are reminded that all HAMP documentation must be signed by an authorized representative of the servicer and reflect the actual date of signature by the servicer's representative.

### Acceptable Revisions to HAMP Documents

Servicers are strongly encouraged to use the HAMP documents available through www.financialstability.gov.  Should a servicer decide to revise the HAMP documents or draft its own HAMP documents, it must obtain prior written approval from Treasury or Fannie Mae with the exception of the following circumstances:

- The servicer must revise the HAMP documents as necessary to comply with Federal, State and local law.  For example, in the event that the HAMP results in a

principal forbearance, servicers are obligated to modify the uniform instrument to comply with laws and regulations governing balloon disclosures.

- The servicer may include, as necessary, conditional language in HAMP offers and modification agreements indicating that the HAMP will not be implemented unless the servicer receives an acceptable title endorsement, or similar title insurance product, or subordination agreements from other existing lien holders, as necessary, to ensure that the modified mortgage loan retains its first lien position and is fully enforceable.

- If the borrower previously received a Chapter 7 bankruptcy discharge but did not reaffirm the mortgage debt under applicable law, the following language must be inserted in Section 1 of the Trial Period Plan and Section 1 of the Agreement: "I was discharged in a Chapter 7 bankruptcy proceeding subsequent to the execution of the Loan Documents. Based on this representation, Lender agrees that I will not have personal liability on the debt pursuant to this Agreement."

- The servicer may include language in the HAMP cover letter providing instructions for borrowers who elect to use an automated payment method to make the trial period payments.

Unless a borrower or co-borrower is deceased or a borrower and a co-borrower are divorced, all parties who signed the original loan documents or their duly authorized representative(s) must execute the HAMP documents. If a borrower and a co-borrower are divorced and the property has been transferred to one spouse in the divorce decree, the spouse who no longer has an interest in the property is not required to execute the HAMP documents. Servicers may evaluate requests on a case-by-case basis when the borrower is unable to sign due to circumstances such as mental incapacity, military deployment, etc. Furthermore, a borrower may elect to add a new co-borrower.

### Use of Electronic Records

Electronic records for HAMP are acceptable as long as the electronic record complies with applicable law.

### Assignment to MERS

If the original mortgage loan was registered with Mortgage Electronic Registration Systems, Inc. (MERS) and the originator elected to name MERS as the original mortgagee of record, solely as nominee for the lender named in the security instrument and the note, the servicer MUST make the following changes to the Agreement:

(a) Insert a new definition under the "Property Address" definition on page 1, which reads as follows:

"MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for lender and lender's successors and assigns. MERS is the mortgagee under the Mortgage. MERS is organized and existing

under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, (888) 679-MERS.

(b) Add as section 4.I.:

That MERS holds only legal title to the interests granted by the borrower in the mortgage, but, if necessary to comply with law or custom, MERS (as nominee for lender and lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of lender including, but not limited to, releasing and canceling the mortgage loan.

(c) MERS must be added to the signature lines at the end of the Agreement, as follows:

---

Mortgage Electronic Registration
Systems, Inc. – Nominee for Lender

The servicer may execute the Agreement on behalf of MERS and, if applicable, submit it for recordation.

## Trial Payment Period

Servicers may use recent verbal financial information to prepare and offer a Trial Period Plan. Servicers are not required to verify financial information prior to the effective date of the trial period. The servicer must service the mortgage loan during the trial period in the same manner as it would service a loan in forbearance.

The trial period is three months in duration (or longer if necessary to comply with applicable contractual obligations). The borrower must be current under the terms of the Trial Period Plan at the end of the trial period to receive a permanent loan modification. Current in this context is defined as the borrower having made all required trial period payments no later than 30 days from the date the final payment is due.

The effective date of the trial period will be set forth in the Trial Period Plan. In most cases, the effective date is the first day of the month following the servicer's mailing of the offer for the Trial Period Plan. The trial period extends for two (or more if necessary to comply with applicable contractual obligations) additional payments after the effective date.

Servicers are encouraged to require automated payment methods, such as automatic payment drafting. If automatic payment drafting is required, it must be used by all HAMP borrowers, unless a borrower opts out.

If the verified income evidenced by the borrower's documentation exceeds the initial income information used by the servicer to place the borrower in the trial period by more

than 25 percent, the borrower must be reevaluated based on the program eligibility and underwriting requirements. If this reevaluation determines that the borrower is still eligible, new documents must be prepared and the borrower must restart the trial period.

If the verified income evidenced by the borrower's documentation is less than the initial income information used by the servicer to place the borrower in the trial period, or if the verified income exceeds the initial income information by 25 percent or less, and the borrower is still eligible, then the trial period will not restart and the trial period payments will not change; provided, that verified income will be used to calculate the monthly mortgage payment under the Agreement. (If, based on verified income the result of the NPV test is "negative" for modification, the servicer is not obligated to perform the modification.) However, if the servicer determines the borrower is not eligible for the HAMP based on verified income, the servicer must notify the borrower of that determination and that any trial period payments made by the borrower will be applied to the mortgage loan in accordance with the borrower's current loan documents.

If a servicer has information that the borrower does not meet all of the eligibility criteria for the HAMP (e.g., because the borrower has moved out of the house) the servicer should explore other foreclosure prevention alternatives prior to resuming or initiating foreclosure.

Note that under the terms of the Agreement, trial payments should be applied when they equal a full contractual payment (determined as of the time the HAMP is offered).

If the borrower complies with the terms and conditions of the Trial Period Plan, the loan modification will become effective on the first day of the month following the trial period as specified in the Trial Period Plan. However, because the monthly payment under the Agreement will be based on verified income documentation, the monthly payment due under the Agreement may differ from the payment amount due under the Trial Period Plan.

## Use of Suspense Accounts and Application of Payments

If permitted by the applicable loan documents, servicers may accept and hold as "unapplied funds" (held in a T&I custodial account) amounts received which do not constitute a full monthly, contractual principal, interest, tax and insurance (PITI) payment. However, when the total of the reduced payments held as "unapplied funds" is equal to a full PITI payment, the servicer is required to apply all full payments to the mortgage loan.

Any unapplied funds remaining at the end of the trial payment period that do not constitute a full monthly, contractual principal, interest, tax and insurance payment should be applied to reduce any amounts that would otherwise be capitalized onto the principal balance.

If a principal curtailment is received on a loan that has a principal forbearance, servicers are instructed to apply the principal curtailment to the interest bearing UPB. If, however, the principal curtailment amount is greater than or equal to the interest bearing UPB, then the curtailment should be applied to the principal forbearance portion. If the curtailment satisfies the principal forbearance portion, any remaining funds should then be applied to the interest bearing UPB.

## Recording the Modification

For all mortgage loans that are modified pursuant to the HAMP, the servicer must follow investor guidance with respect to ensuring that the modified mortgage loan retains its first lien position and is fully enforceable.

## Monthly Statements

For modifications that include principal forbearance, servicers are encouraged to include the amount of the gross UPB on the borrower's monthly payment statement. In addition, the borrower should receive information on a monthly basis regarding the accrual of "pay for performance" principal balance reduction payments.

## Redefault and Loss of Good Standing

If, following a successful trial period, a borrower defaults on a loan modification executed under the HAMP (three monthly payments are due and unpaid on the last day of the third month), the loan is no longer considered to be in "good standing." Once lost, good standing cannot be restored even if the borrower subsequently cures the default. A loan that is not in good standing is not eligible to receive borrower, servicer or investor incentives and reimbursements and these payments will no longer accrue for that mortgage. Further, the mortgage is not eligible for another HAMP modification.

In the event a borrower defaults, the servicer must work with the borrower to cure the modified loan, or if that is not feasible, evaluate the borrower for any other available loss mitigation alternatives prior to commencing foreclosure proceedings. The servicer must retain documentation of its consideration of the borrower for other loss mitigation alternatives.

## Reporting Requirements

Each servicer will be required to register with Fannie Mae to participate in the HAMP. Fannie Mae will provide an HAMP Registration form to facilitate registration.

Additionally, servicers will be required to provide periodic HAMP loan level data to Fannie Mae. The data must be accurate, complete, and in agreement with the servicer's records. Data should be reported by a servicer at the start of the modification trial period and during the modification trial period, for loan set up of the approved modification, and

monthly after the modification is set up on Fannie Mae's system. Servicers will be required to submit three separate data files as described below.

Note: The following data files can be delivered through a data collection tool on the servicer web portal available through www.financialstability.gov. Detailed guidelines for submitting data files are available at the servicer web portal. For those servicers who cannot use this process, an alternate process to submit data via a spreadsheet will be made available. More information on the alternative process for submitting data in a spreadsheet will be provided in the future.

### Trial Period

Servicers will be required to provide loan level data in order to establish loans for processing during the HAMP trial period. See Exhibit A for trial period set up attributes.

In addition, servicers will be required to report activity during the HAMP trial period in order to substantiate the receipt of proceeds during the trial period and to record modification details. See Exhibit B for trial period reporting attributes.

### Loan Setup

A one time loan set up is required to establish the approved modified HAMP loan on Fannie Mae's system. The file layout is the same that is used for establishing loans for processing during the trial period. See Exhibit A for loan set up attributes.

Servicers are required to provide the set up file the business day after the modification closes. The set up file should reflect the status of the loan after the final trial period payment is applied. The set up file will contain data for the current reporting period (e.g., prior month balances).

### Monthly Loan Activity Reporting

The month after the loan set up file is provided, servicers must begin reporting activity on all HAMP loans on a monthly basis (e.g., loan set up file provided in July, the first loan activity report is due in August for July activity). See Exhibit C for monthly reporting attributes.

The HAMP loan activity report (LAR) is due by the 4th business day each month. Servicers will have until the 15th calendar day of each month to clear up any edits and have a final LAR reported to Fannie Mae. The Fannie Mae system will validate that the borrower payment has been made as expected and that the last paid installment (LPI) date is current before accruing the appropriate monthly compensation due.

If a loan becomes past due (the LPI date does not advance), the monthly compensation on that loan will not be accrued. If the loan is brought current, compensation will not be caught up (e.g., if a loan was two months past due, and then the borrower makes the

payments and brings the loan current, the annual compensation provided would be for ten months. The two months of compensation associated with the period of delinquency is not recoverable).

### Additional Data Requirements

Additional data elements must be collected and reported as specified in Exhibit D. Some of these elements must be collected for all completed modifications regardless of the date of completion; guidance for collecting these elements will be forthcoming shortly. The requirement to collect these elements for trial modifications and for loans evaluated for a modification will be phased in as specified in Exhibit D.

## Reporting to Mortgage Insurers

Servicers must maintain their mortgage insurance processes and comply with all reporting required by the mortgage insurer for loans modified under the HAMP. Servicers should consult with the mortgage insurer for specific processes related to the reporting of modified terms, payment of premiums, payment of claims, and other operational matters in connection with mortgage loans modified under the HAMP.

Servicers are required to report successful HAMP modifications and the terms of those modifications to the appropriate mortgage insurers, if applicable, within 30 days following the end of the trial period and in accordance with procedures that currently exist or may be agreed to between servicers and the mortgage insurers.

Servicers must include the mortgage insurance premium in the borrower's modified payment, and must ensure that any existing mortgage insurance is maintained. Among other things, the servicer must ensure that the mortgage insurance premium is paid. In addition, servicers must adapt their systems to ensure proper reporting of modified loan terms and avoid impairing coverage for any existing mortgage insurance. For example, in the event that the modification includes principal forbearance, servicers must continue to pay the correct mortgage insurance premiums based on the gross UPB, including any principal forbearance amount, must include the gross UPB in their delinquency reporting to the mortgage insurer, and must ensure any principal forbearance does not erroneously trigger automatic mortgage insurance cancellation or termination.

## Transfers of Servicing

When a transfer of servicing includes mortgages modified under the HAMP, the transferor servicer must provide special notification to the transferee servicer. Specifically, the transferor servicer must advise the transferee servicer that loans modified under the HAMP are part of the portfolio being transferred and must confirm that the transferee servicer is aware of the special requirements for these loans, and agrees to assume the additional responsibilities associated with servicing them. A required form of assignment and assumption agreement must be used and is a part of the Servicer Participation Agreement.

### Credit Bureau Reporting

The servicer should continue to report a "full-file" status report to the four major credit repositories for each loan under the HAMP in accordance with the Fair Credit Reporting Act and credit bureau requirements as provided by the Consumer Data Industry Association (the "CDIA") on the basis of the following:  (i) for borrowers who are current when they enter the trial period, the servicer should report the borrower current but on a modified payment if the borrower makes timely payments by the 30th day of each trial period month at the modified amount during the trial period, as well as report the modification when completed, and (ii) for borrowers who are delinquent when they enter the trial period, the servicer should continue to report in such a manner that accurately reflects the borrower's delinquency and workout status following usual and customary reporting standards, as well as report the modification when completed.  More detailed guidance on these reporting requirements will be published by the CDIA.

"Full-file" reporting means that the servicer must describe the exact status of each mortgage it is servicing as of the last business day of each month.

## Fees and Compensation

### Late Fees

All late charges, penalties, stop-payment fees, or similar fees must be waived upon successful completion of the trial period.

### Administrative Costs

Servicers may not charge the borrower to cover the administrative processing costs incurred in connection with a HAMP.  The servicer must pay any actual out-of-pocket expenses such as any required notary fees, recordation fees, title costs, property valuation fees, credit report fees, or other allowable and documented expenses.  Servicers will not be reimbursed for the cost of the credit report(s).

### Incentive Compensation

No incentives of any kind will be paid if (i) the servicer has not executed the Servicer Participation Agreement, or (ii) the borrower's monthly mortgage payment ratio starts below 31 percent prior to the implementation of the HAMP.  The calculation and payment of all incentive compensation will be based strictly on the borrower's verified income.  Each servicer must promptly apply or remit, as applicable, all borrower and investor compensation it receives with respect to any modified loan.

With respect to payment of any incentive that is predicated on a six percent reduction in the borrower's monthly mortgage payment, the reduction will be calculated by comparing the monthly mortgage payment used to determine eligibility (adjusted as applicable to

include property taxes, hazard insurance, flood insurance, condominium association fees and homeowner's association fees) and the borrower's payment under HAMP.

The amount of funds available to pay servicer, borrower and investor compensation in connection with each servicer's modifications will be capped pursuant to each servicer's Servicer Participation Agreement (Program Participation Cap). Treasury will establish each servicer's initial Program Participation Cap by estimating the number of HAMP modifications expected to be performed by each servicer during the term of the HAMP. The Program Participation Cap could be adjusted based on Treasury's full book analysis of the servicer's loans.

The funds remaining available for a servicer's modifications under that servicer's Program Participation Cap will be reduced by the maximum amount of compensation payments potentially payable with respect to each loan modification upon entering into a trial period. In the event the compensation actually paid with respect to a loan modification is less than the maximum amount of compensation payments potentially payable, the funds remaining available for a servicer's modifications under the HAMP will be increased by the difference between such amounts.

Treasury may, from time to time and in its sole discretion, revise a servicer's Program Participation Cap. Fannie Mae will provide written notification to a servicer of all changes made to the servicer's Program Participation Cap. Once a servicer's Program Participation Cap is reached, a servicer must not enter into any agreements with borrowers intended to result in new loan modifications, and no payments will be made with respect to any new loan modifications.

### Servicer Incentive Compensation

A servicer will receive compensation of $1,000 for each completed modification under the HAMP. In addition, if a borrower was current under the original mortgage loan, a servicer will receive an additional compensation amount of $500. All such servicer incentive compensation shall be earned and payable once the borrower successfully completes the trial payment period, provided that the servicer has signed and delivered to Fannie Mae a Servicer Participation Agreement, any related documentation and any required servicer or loan set up data prior to the effective date of the loan modification.

If a particular borrower's monthly mortgage payment (principal, interest, taxes, all related property insurance and homeowner's or condominium association fees but excluding mortgage insurance) is reduced through the HAMP by six percent or more, a servicer will also receive an annual "pay for success" fee for a period of three years. The fee will be equal to the lesser of: (i) $1,000 ($83.33/month), or (ii) one-half of the reduction in the borrower's annualized monthly payment. The "pay for success" fee will be payable annually for each of the first three years after the anniversary of the month in which a Trial Period Plan was executed. If the loan ceases to be in good standing, the servicer will cease to be eligible for any further incentive payments after that time, even if the borrower subsequently cures his or her delinquency.

### Borrower's Incentive Compensation

To provide an additional incentive for borrowers to keep their modified loan current, borrowers whose monthly mortgage payment (principal, interest, taxes, all related property insurance and homeowner's or condominium association fees but excluding mortgage insurance) is reduced through the HAMP by six percent or more and who make timely monthly payments will earn an annual "pay for performance" principal balance reduction payment equal to the lesser of:  (i) $1,000 ($83.33/month), or (ii) one-half of the reduction in the borrower's annualized monthly payment for each month a timely payment is made.  A borrower can earn the right to receive a "pay for performance" principal balance reduction payment for payments made during the first five years following execution of the Agreement provided the loan continues to be in good standing as of the date the payment is made.  The "pay for performance" principal balance reduction payment will accrue monthly but will be applied annually for each of the five years in which this incentive payment accrues, prior to the first payment due date after the anniversary of the month in which the Trial Period Plan was executed.  This payment will be paid to the mortgage servicer to be applied first towards reducing the interest bearing UPB on the mortgage loan and then to any principal forbearance amount (if applicable).  Any applicable prepayment penalties on partial principal prepayments made by the government must be waived.  Borrower incentive payments do not accrue during the Trial Period; however, on the first month of the modification, the borrower will accrue incentive payments equal to the number of months in the trial period.

If and when the loan ceases to be in good standing, the borrower will cease to be eligible for any further incentive payments after that time, even if the borrower subsequently cures his or her delinquency.  The borrower will lose his or her right to any accrued incentive compensation when the loan ceases to be in good standing.

### Investor Payment Reduction Cost Share and Up Front Incentives

If the target monthly mortgage payment ratio is achieved, investors in Non-GSE Mortgages are entitled to payment reduction cost share compensation.   This compensation equals one-half of the dollar difference between the borrower's monthly payment under the modification at the target monthly mortgage payment ratio and the lesser of (i) what the borrower's monthly payment would be at a 38 percent monthly mortgage payment ratio; or (ii) the borrower's pre-modification monthly payment. Payment reduction cost share compensation shall accrue monthly as the borrower makes each payment so long as the loan is in good standing as defined in these guidelines. This compensation will be provided for up to five years or until the loan is paid off, whichever is earlier.

Additionally, investors will receive a one-time incentive of $1,500 for each Agreement executed with a borrower who was current prior to the start of the Trial Period Plan. The one-time incentive is conditional upon at least a six percent reduction in the borrower's monthly mortgage payment.

Neither the payment reduction share nor the up-front incentive shall be payable if the Trial Period Plan is not successfully completed.

## Compliance

Servicers must comply with the HAMP requirements and must document the execution of loan evaluation, loan modification and accounting processes. Servicers must develop and execute a quality assurance program that includes either a statistically based (with a 95 percent confidence level) or a ten percent stratified sample of loans modified, drawn within 30-45 days of final modification and reported on within 30-45 days of review. In addition, a trending analysis must be performed on a rolling 12-month basis.

Treasury has selected Freddie Mac to serve as its compliance agent for the HAMP. In its role as compliance agent, Freddie Mac will utilize Freddie Mac employees and contractors to conduct independent compliance assessments. In addition, loan level data will be reviewed for eligibility and fraud.

The scope of the assessments will include, among other things, an evaluation of documented evidence to confirm adherence (e.g., accuracy and timeliness) to HAMP requirements with respect to the following:

- Evaluation of Borrower and Property Eligibility
- Compliance with Underwriting Guidelines
- Execution of NPV/Waterfall processes
- Completion of Borrower Incentive Payments
- Investor Subsidy Calculations
- Data Integrity

The review will also evaluate the effectiveness of the servicer's quality assurance program; such evaluation will include, without limitation, the timing and size of the sample selection, the scope of the quality assurance reviews, and the reporting and remediation process.

There will be two types of compliance assessments: on-site and remote. Both on-site and remote reviews will consist of the following activities (among others): notification, scheduling, self assessments, documentation submission, interviews, file reviews, and reporting.

For on-site reviews, Freddie Mac will strive to provide the servicer with (i) a 30-day advance notification of a pending review and (ii) subsequent confirmation of the dates of the review. However, Freddie Mac reserves the right to arrive at the servicer's site unannounced. Freddie Mac will request the servicer to make available documentation, including, without limitation, policies and procedures, management reports, loan files and a risk control self assessment ready for review. Additionally, Freddie Mac may request additional loan files during the review. Interviews will usually be conducted in-person.

During the review window, Freddie Mac will review loan files and other requested documentation to evaluate compliance with HAMP terms. Upon the completion of the review, Freddie Mac will conduct an exit interview with the servicer to discuss preliminary assessment results.

For remote reviews, Freddie Mac will request the servicer to send documentation, including, without limitation, policies and procedures, management reports, loan files and a risk control self assessment within 30 days of the request. In addition, time will be scheduled for phone interviews, including a results summary call after the compliance review is completed to discuss preliminary results.

The targeted time frame for publishing the servicer assessment report is 30 days after the completion of the review. Treasury will receive a copy of the report five business days prior to the release of the report to the servicer.

There will be an issue/resolution appeal process for servicer assessments. Servicers will be able to submit concerns or disputes to an independent quality assurance team within Freddie Mac.

A draft rating and implication methodology for the compliance assessments will be published in a subsequent Supplemental Directive and servicer feedback will be solicited prior to the finalization of the methodology.

## Exhibit A:  HAMP Trial Modification and Official Modification Loan Setup Data Elements

The following data elements are necessary for the HAMP Loan Setup for Trial Modification and Official Modification transactions.

| Name | Definition | Data Type | Allowable Values | Loan Setup for Trial Period Mandatory / Conditional | Official Modification Mandatory / Conditional |
|---|---|---|---|---|---|
| GSE Servicer Number | The Fannie Mae or Freddie Mac unique Servicer identifier. | Text (30) | | C | C |
| Servicer Loan Number | The unique (for the lender) identifier assigned to the loan by the lender that is servicing the loan. | Text (30) | | M | M |
| HAMP Servicer Number | A unique identifier assigned to each Servicer that is participating in the HAMP program. | Text (30) | | M | M |
| GSE Loan Number | A unique number assigned to each loan by a GSE (Fannie or Freddie) | Text (30) | | C | C |
| Underlying Trust Identifier | This is the CUSIP associated with the security.  A unique identification number assigned to a security by CUSIP (Committee on Uniform Security Identification Procedures) for trading. | Text (9) | | C | C |
| Program Type/ Campaign ID | A new program type that will identify campaign types.  The unique identifier of a Loan Workout Campaign. | Text (14) | HMP1 - HMP Delinquent, HMP2 - HMP Imminent Default HMP3 - Deed-in-lieu HMP4 - Deed-in-lieu with Jr. Lien HMP5 - Short Sale HMP6 - Short Sale With Jr. Lien | M | M |
| Investor Code | Owner of the mortgage. | Numeric (4,0) | 1 - Fannie Mae 2 - Freddie Mac 3 - Private 4 - Portfolio 5 - GNMA 6 - FHLMC | M | M |
| Borrower First Name | First Name of the Borrower of record | Text (100) | | M | M |
| Borrower Last Name | The last name of the Borrower.  This is also known as the family name or surname. | Text (100) | | M | M |
| Borrower Social Security Number | The Social Security Number of the borrower | Numeric (9) | | M | M |
| Co-Borrower First Name | First Name of the co-borrower of record | Text (100) | | C | C |

| Name | Definition | Data Type | Allowable Values | Loan Setup for Trial Period Mandatory / Conditional | Official Modification Mandatory / Conditional |
|---|---|---|---|---|---|
| Co-Borrower Last Name | Last Name of the co- borrower of record | Text (100) | | C | C |
| Co-Borrower Social Security Number | The Social Security Number of the Co-Borrower | Numeric (9) | | O | O |
| Borrower Execution Date | This is the date that the borrower signs the initial documentation for a modification. | Date (CCYY-MM-DD) | | M | M |
| Submission Status | Status of loan data being submitted | Numeric (4,0) | 1-Trial 2-Borrower Disqualified 3-Official 4-Foreclosure Mitigation 5-Cancel | M | M |
| Date of Original Note | The date on which the original loan funding was dispersed to the borrower(s). | Date (CCYY-MM-DD) | | M | M |
| Unpaid Principal Balance before modification | The total principal amount outstanding as of the end of the month. The UPB should not reflect any accounting based write-downs and should only be reduced to zero when the loan has been liquidated – either paid-in-full, charged-off, REO sold or Service transferred (before modification) | Currency (20,2) | | M | M |
| Loan Mortgage Type Code | The code that specifies the type of mortgage being applied for or that has been granted. | Numeric (4,0) | 1 - FHA – Loans insured by the Federal Housing Administration 2 - VA – Loans insured by the Department of Veteran's Affairs, 3 - Conventional with PMI – Non-government insured mortgages insured by a private (non-government) insurer. 4 - Conventional w/o PMI – Mortgages with neither government nor private mortgage insurance. | M | M |
| Last Paid Installment Date before modification | The due date of the last paid installment of the loan. | Date (CCYY-MM-DD) | | M | M |
| First Lien Indicator | Indicates if loan is first lien. | Boolean | True/False | M | M |
| Foreclosure Referral Date | The date that the mortgage was referred to an attorney for the purpose of initiating foreclosure proceedings. This date should reflect the referral date of currently active foreclosure process. Loans cured from foreclosure should not have a referral date. | Date (CCYY-MM-DD) | | O | O |

| Name | Definition | Data Type | Allowable Values | Loan Setup for Trial Period Mandatory / Conditional | Official Modification Mandatory / Conditional |
|---|---|---|---|---|---|
| Projected Foreclosure Sale Date | Projected date for foreclosure sale of subject property. | Date (CCYY-MM-DD) | | O | O |
| Hardship Reason Code | Identifies the reason for the borrower's hardship on their mortgage payment obligations. | Numeric (4,0) | 1 - Death of borrower, 2 - Illness of principal borrower, 3 - Illness of borrower family member, 4 - Death of borrower family member, 5 - Martial difficulties, 6 - Curtailment of income, 7 - Excessive obligation, 8 - Abandonment of property, 9 - Distant employment transfer, 10 - Property problem, 11 - Inability to sell property, 12 - Inability to rent property, 13 - Military service, 14 - Other, 15 - Unemployment, 16 - Business failure,17 - Casualty Loss, 18 - Energy environment costs, 19 - Servicing problems, 20 - Payment adjustment, 21 - Payment dispute, 22 - Transfer of ownership pending, 23 - Fraud, 24 - Unable to contact borrower,25 - Incarceration | M | M |
| Monthly Gross Income | Total monthly income in dollars for all borrowers on the loan. This is the gross income for all borrowers. | Currency (20,2) | | M | M |
| Monthly Debt Payments excluding PITIA | Total amount of monthly debt payments excluding Principal, Interest, Taxes, Insurance and Association Dues (PITIA) | Currency (20,2) | | M | M |
| NPV Date | Net Present Value – calculation date | Date (CCYY-MM-DD) | | M | M |

| Name | Definition | Data Type | Allowable Values | Loan Setup for Trial Period Mandatory / Conditional | Official Modification Mandatory / Conditional |
|---|---|---|---|---|---|
| NPV Model Result Amount Pre-Mod | Net Present Value amount generated from the model before modification | Currency (20,2) | | M | M |
| NPV Model Result Amount Post-Mod | Net Present Value amount generated from the model after modification | Currency (20,2) | | M | M |
| Amortization Term before modification | Represents the number of months on which installment payments are based. Example: Balloon loans have a seven year life (Loan Term = 84) but a 30 year amortization period (Amortization Term = 360). Installment payments are determined based on the 360 month term. | Numeric (4,0) | | M | M |
| Interest Rate before modification | The interest rate in the month prior to loan modification. Please report as rounded to nearest 8th. (e.g. 4.125) | Numeric (6,4) | | M | M |
| Principal and Interest Payment before modification | The scheduled principal and interest amount in the month prior to loan modification. | Currency (20,2) | | M | M |
| Escrow Payment before modification | The escrow amount in the month prior to loan modification. The amount of money that is collected from [added on to] the regular monthly mortgage payment to cover periodic payments of property taxes, private mortgage insurance and hazard insurance by the servicer on behalf of the mortgagee. Depending on the mortgage terms, this amount may or may not be collected. Generally, if the down payment is less than 20%, then these amounts are collected by the servicer. | Currency (20,2) | | C | C |
| Association Dues/ Fees before modification | Existing monthly payment for association dues/fees before modification | Currency (20,2) | | C | C |
| Principal Payment Owed or Not Reported | If borrower has contributed any cash or amounts in suspense | Currency (20,2) | | C | C |
| Other Contributions | If there are any amounts contributed by the borrower due to Hazard Claims | Currency (20,2) | | C | C |
| Attorney Fees Not in Escrow | Estimated legal fee not in escrow for advances capitalization and liquidation expense calculation | Currency (20,2) | | C | C |
| Escrow Shortage for Advances | Any Escrow advance amounts to be capitalized. | Currency (20,2) | | C | C |
| Other Advances | Other advances for advances capitalization other than escrow. Example: Attorney fees, Servicing Fees, etc. | Currency (20,2) | | C | C |
| Borrower Contributions | If the borrower is contributing any amounts, they must be reported here | Currency (20,2) | | C | C |
| Modified Loan Term – Officer Signature Date | Servicer sign off at the officer level for the loan modification.  This is the date the servicer's officer approved the loan modification. This column will be populated for modification cases that need reclassification. There is no conversion needed for existing cases | Date (CCYY-MM-DD) | | C | C |

| Name | Definition | Data Type | Allowable Values | Loan Setup for Trial Period Mandatory / Conditional | Official Modification Mandatory / Conditional |
|---|---|---|---|---|---|
| Disbursement Forgiven | If there are any Forgiven disbursement for advances capitalization | Currency (20,2) | | C | C |
| Monthly Housing Expense before modification | The dollar amount per month of the borrower's present housing expense .May be used for their primary or non-primary residence. This must be Principal, Interest, Taxes, Insurance and Association Dues (PITIA). | Currency (20,2) | | M | M |
| Delinquent Interest | Delinquent interest for interest capitalization. It is the amount of delinquent interest from the delinquent loan's LPI date to the workout execution date. | Currency (20,2) | | M | M |
| Interest Owed or Payment Not Reported | If there is Interest owed/received but not reported for interest capitalization, this field must be populated. | Currency (20,2) | | C | C |
| Servicing Fee Percent after modification | Percentage of servicing Fee after loan modification ( e.g. 0.25) | Numeric (4,2) | | M | M |
| Product before Modification | The mortgage product of the loan before the modification. | Numeric (4,0) | 1- ARM, 2 - Fixed Rate, 3 - Step Rate, 4 - One Step Variable, 5 - Two Step Variable, 6 - Three Step Variable, 7 - Four Step Variable, 8 - Five Step Variable,9 - Six Step Variable, 10 - Seven Step Variable,11 - Eight Step Variable, 12 - Nine Step Variable,13 - Ten Step Variable, 14 - Eleven Step Variable, 15 - Twelve Step Variable, 16 - Thirteen Step Variable, 17 - Fourteen | M | M |
| Maturity Date before Modification | The date on which the mortgage obligation is scheduled to be paid off, according to the mortgage note. Maturity Date is commonly called Balloon Date for balloon loans, for which scheduled amortization does not pay off the balance of the loan, so that there is a final, large "balloon" payment at the end. | Date (CCYY-MM-DD) | | M | M |

| Name | Definition | Data Type | Allowable Values | Loan Setup for Trial Period Mandatory / Conditional | Official Modification Mandatory / Conditional |
|---|---|---|---|---|---|
| Remaining Term before Modification | The number of months until the loan will be paid off, assuming that scheduled payments are made. This will equal lesser of 1. The number of months until the actual balance of the loan will amortize to zero; or 2. the number of months difference between the Loan Extended Term and the number of payments made by the borrower, where number of payments made by the borrower is derived by: Actual Last Paid Installment Date - First Installment Due Date - 1 (in months). | Numeric (4,0) | | M | M |
| Front Ratio before Modification | The refreshed Front-end DTI (Principal, Interest, Taxes, Insurance and Association Dues (PITIA)) housing ratio. | Numeric (4,2) | | M | M |
| Back Ratio before Modification | Percentage of borrower's PITIA plus debts to income ratio.  Borrower Total Debt To Income Ratio Percent.  The monthly expenses divided by the total monthly income for the Borrower. (e.g. 30.25) | Numeric (4,2) | | M | M |
| Principal and Interest Payment at 31% DTI | Principal and Interest payable for a 31% Debt to Income ratio | Currency (20,2) | | M | M |
| Principal and Interest Payment at 38% DTI | Principal and Interest payable for a 38% Debt to Income ratio | Currency (20,2) | | M | M |
| Property – Number of Units | Number of units in subject property (Valid values are 1, 2, 3 or 4) | Numeric (4,0) | | M | M |
| Property – Street Address | The street address of the subject property | Text (100) | | M | M |
| Property – City | The name of the city where the subject property is located | Text (100) | | M | M |
| Property – State | The 2-character postal abbreviation of the state, province, or region of the subject property. | Text (2) | | M | M |
| Property – Zip Code | The code designated by the postal service to direct the delivery of physical mail or which corresponds to a physical location. In the USA, this can take either a 5 digit form (ZIP Code) or a 9-digit form (ZIP + 4). | Text (9) | | M | M |
| Property Valuation - Method | Type of value analysis. | Numeric (4,0) | 1 - Full appraisal – Prepared by a certified appraiser; 2 - Limited appraisal – Prepared by a certified appraiser; 3 - Broker Price Opinion "BPO" – Prepared by a real estate broker or agent; 4 - Desktop Valuation – Prepared by bank employee; 5 - Automated Valuation Model | M | M |

| Name | Definition | Data Type | Allowable Values | Loan Setup for Trial Period Mandatory / Conditional | Official Modification Mandatory / Conditional |
|---|---|---|---|---|---|
| | | | "AVM" 6 – Automated Valuation Model " AVM" - Other | | |
| Property Valuation - Date | Date of the property value analysis | Date (CCYY-MM-DD) | | M | M |
| Property Valuation – As Is Value | Property as-is value determined by the property valuation | Currency (20,2) | | M | M |
| Property Condition Code | A code denoting the condition of the subject property. | Numeric (4,0) | 1 - Excellent 2 - Good, 3 - Fair 4 - Poor 5 - Condemned 6 - Inaccessible | M | M |
| Property Occupancy Status Code | A code identifying the occupancy by the borrower of the subject property. | Numeric (4,0) | 1- Vacant 2 - Borrower Occupied 3 - Tenant Occupied 4 – Unknown 5 - Occupied by Unknown | M | M |
| Property Usage Type Code | A code identifying the intended use by the borrower of the property. | Numeric (4,0) | 1 - Principal Residence 2 - Second or Vacation Home 3 - Investment Property | M | M |
| Modification Effective Date | The date on which the loan terms will be modified. | Date (CCYY-MM-DD) | | M | M |
| Product After Modification | The mortgage product of the loan, after the modification (Fixed or Step). | Numeric (4,0) | 1- ARM, 2 - Fixed Rate, 3 - Step Rate, 4 - One Step Variable, 5 - Two Step Variable, 6 - Three Step Variable, 7 - Four Step Variable, 8 - Five Step Variable,9 - Six Step Variable, 10 - Seven Step Variable,11 - Eight Step Variable, 12 - Nine Step Variable,13 - Ten Step Variable, 14 - Eleven Step Variable, 15 - Twelve Step Variable, 16 - Thirteen Step Variable, 17 - Fourteen | M | M |

| Name | Definition | Data Type | Allowable Values | Loan Setup for Trial Period Mandatory / Conditional | Official Modification Mandatory / Conditional |
|---|---|---|---|---|---|
| Amortization Term after Modification | The number of months used to calculate the periodic payments of both principal and interest that will be sufficient to retire a mortgage obligation. | Numeric (4,0) | | M | M |
| Unpaid Principal Balance after modification | The unpaid principal balance of a loan after the loan modification. The unpaid principal balance after modification excludes any applicable forbearance amount and can also be referred to as Net UPB Amount. | Currency (20,2) | | M | M |
| Last Paid Installment Date after modification | The due date of the last paid installment of the loan. | Date (CCYY-MM-DD) | | M | M |
| Interest Rate after modification | The interest rate in the month after loan modification. | Numeric (6,4) | | M | M |
| Interest Rate Lock Date for Modification | The date that the rate lock was applied - in reference to modification of loan terms | Date (CCYY-MM-DD) | | M | M |
| First Payment Due Date after modification | First payment due date under the modified terms | Date (CCYY-MM-DD) | | M | M |
| Principal and Interest Payment after modification | The P&I amount after modification | Currency (20,2) | | M | M |
| Escrow Payment after modification | Existing monthly payment to escrow-after modification | Currency (20,2) | | M | M |
| Monthly Housing Expense After Modification | The dollar amount per month of the borrowers housing expense after modification .May be used for their primary or non-primary residence.  This must be Principal, Interest, Taxes, Insurance and Association Dues (PITIA). | Currency (20,2) | | M | M |
| Maturity Date after modification | The maturity date of the loan after modification | Date (CCYY-MM-DD) | | M | M |
| Principal Forbearance Amount | The total amount in dollars of the principal that was deferred through loss mitigation. | Currency (20,2) | | C | C |
| Term after Modification | For loans where the term of the loan can be extended rather than increasing the principal and interest payment, this is the total term of the loan including any extension.  For all non-extendable loans, the extended term defaults to the original term. | Numeric (4,0) | | M | M |
| Front Ratio after modification | Percentage of borrower's PITIA to income ratio | Numeric (4,2) | | M | M |
| Back Ratio after modification | Percentage of borrower's PITIA plus debts to income ratio | Numeric (4,2) | | M | M |
| Principal Write-Down (Forgiveness) | Amount of principal written-down or forgiven | Currency (20,2) | | C | C |
| Paydown or Payoff of Subordinate Liens | Have sub-ordinate liens been paid off or paid down? | Boolean | True/False | C | C |
| Paydown or Payoff of Subordinate | Amount of paydown or payoff of subordinate liens | Currency (20,2) | | C | C |

| Name | Definition | Data Type | Allowable Values | Loan Setup for Trial Period Mandatory / Conditional | Official Modification Mandatory / Conditional |
|---|---|---|---|---|---|
| Liens Amount | | | | | |
| Max Interest Rate after modification | Interest rate cap for the loan. | Number (6,4) | | M | M |
| Length of Trial Period | The length of the trial period | Numeric (3,0) | | M | M |
| 1st Trial Payment Due Date | The date the 1st payment is due during the trial period | Date (CCYY-MM-DD) | | M | O |
| 1st Trial Payment Posted Date | The date the first payment posted during the Trial period | Date (CCYY-MM-DD) | | M | O |
| 1st Trial Payment Received Amount | This is the actual amount of the Payment received from the Borrower to the Servicer for the 1st Trial payment. | Currency (20,2) | | M | O |
| If the Product Type After Modification is Step Rate then at least one occurrence of the following group of fields must exist.  The first occurrence must have a step effective date of 5 years for the first effective due date after modification. | | | | | |
| Step – Interest Rate Step Number | The sequence is used to uniquely identify and order Loan Interest Rate Adjustment schedule records specific to the loan's step rate schedule. | Numeric (4) | | M | M |
| Step – Payment Effective Date | The date the payment will be effective. | Date (CCYY-MM-DD) | | M | M |
| Step – Note Rate | The interest rate in the month after loan modification. | Numeric (6,4) | | M | M |
| Step – New Interest Rate – Step Duration | After modification step duration. If this step is the last step and will be the rate and payment effective for the life of the loan, then duration is not required. | Numeric (4) | | M | M |
| Step – Principal and Interest Payment | P&I Amount - The amount of the principal and/or interest payment due on the loan for each installment, beginning on the effective date. | Currency (20,2) | | M | M |

## Exhibit B:  HAMP Monthly Trial Data Collection Elements

The following data elements are necessary for recording borrower payments during the trial period.

| Name | Definition | Data Type | Allowable Values | Mandatory/ Conditional |
|------|-----------|-----------|-----------------|----------------------|
| HAMP Servicer Number | A unique identifier assigned to each Servicer that is participating in the HAMP program. | Text (30) | | M |
| Servicer Loan Number | The unique (for the lender) identifier assigned to the loan by the lender that is servicing the loan. | Text  (30) | | M |
| GSE Loan Number | A unique number assigned to each loan by a GSE (Fannie or Freddie) | Text (30) | | C |
| GSE Servicer Number | The Fannie Mae or Freddie Mac unique Servicer identifier. | Text (30) | | C |
| Trial Payment Number | The number of the trial payment being reported. The code that is used to define a single payment number that will be one of a series of payments that together will complete a loan trial payment period. | Numeric (4,0) | | M |
| Trial Payment Received Amount | The actual dollar amount of the payment received from the borrower to the servicer for the trial payment. | Currency (20,2) | | M |
| Trial Payment Posted Date | The date the payment was posted during the trial period. | Date (CCYY-MM-DD) | | M |

### Exhibit C:  Monthly Loan Activity Records

The following data elements are required for monthly loan activity records (LARs).  Step rate attributes (interest rate, rate effective date, P&I payment) will only be reported on the LAR the month before the rate change is effective.  The Action Code and Action Date are only reported when a loan is being removed (e.g., payoff, repurchase).

| Name | Definition | Data Type | Allowable Values | Mandatory/ Conditional |
|------|-----------|-----------|------------------|------------------------|
| HAMP Servicer Number | A unique identifier assigned to each Servicer that is participating in the HAMP program. | Text (30) | | M |
| Servicer Loan Number | The unique (for the lender) identifier assigned to the loan by the lender that is servicing the loan. | Text (30) | | M |
| Last Paid Installment Date After Modification | The due date of the last paid installment of the loan. | Date (CCYY-MM-DD) | | M |
| Unpaid Principal Balance After Modification | The unpaid principal balance of a loan after the loan modification.  The unpaid principal balance after modification excludes any applicable forbearance amount and can also be referred to as Net UPB Amount. | Currency(20,2) | | M |
| Interest Payment | Interest portion of the P&I remitted | Currency(20,2) | | M |
| Principal Payment | Principal portion of the P&I remitted | Currency(20,2) | | M |
| Step – Payment Effective Date | The date the payment will be effective. | Date (CCYY-MM-DD) | | C |
| Step – Note Rate | The interest rate in the month after loan modification. | Numeric (6,4) | | C |
| Step – Principal and Interest Payment | P&I Amount - The amount of the principal and/or interest payment due on the loan for each installment, beginning on the effective date. | Currency(20,2) | | C |
| Action Code | A code reported by the lender to update the loan that indicates the action that occurred during the reporting period | Numeric | 60 (payoff) 65 (repurchase) 70 (liquidation held for sale) 71 (liquidation 3rd party sale/ condemnation/ assigned to FHA/VA) 72 (liquidated – pending conveyance) 76 (Deed in Lieu) 77 (Deed-in-Lieu with Jr. lien) 78 (Short Sale) 79 (Short Sale with Jr. Lien) | C |
| Action Code Date | The effective date of the action associated with the action code.  The action date is required for certain action codes. | Date (CCYY-MM-DD) | N/A | C |

**Exhibit D**
**HAMP Additional Data Requirements**

Data required to be collected as specified below must be <u>reported</u> on a loan by loan basis starting on October 1, 2009. This document does not describe all of the data that the servicer must retain; it addresses only the data that must be reported.

<u>Must be reported starting October 1, 2009 for transactions occurring before October 1, 2009</u>
- Race, ethnicity, sex of borrower and co-borrower (submission by borrower is voluntary)
- Middle name of borrower and co-borrower
- Date of birth of borrower and co-borrower
- Credit score of borrower and co-borrower
- NPV Model inputs, e.g., discount rate, flag for nonstandard model, non-standard re-default rate, non-standard cure rate
- Selected data on loan, borrower, and property characteristics as of origination, to the extent already required by OCC or OTS to be reported under "Mortgage Metrics"

The above fields must be <u>collected</u> as follows and reported starting October 1, 2009:
- all completed modifications;
- trial modifications commenced on or after July 1, 2009; and
- starting on October 1, 2009, loans evaluated for a modification (to be defined) that do not enter trial modifications.

<u>Must be reported starting October 1, 2009 (detailed definitions to be provided by June 1, 2009)</u>
- Reason loans evaluated for a modification were not modified, or that trial modification was not completed
- Status and disposition of eligible loans not modified, including trial mods not completed
- Status and disposition of loans that were modified but failed to remain in good standing because they became 90 or more days delinquent
- Second liens – flag for presence of a second lien; source of information (e.g., credit report); available terms (e.g., fixed vs. ARM; closed- vs. open-end); owner; and payoff. Continuous tracking of second lien status is not required.
- Purpose of loan (e.g., home purchase, refinance, cash-out refi)
- Information about foreclosure suspension
- Information about reliance on non-borrower household income
- Flag for borrower in bankruptcy at time of modification
- Flag for borrower in loss mitigation prior to modification
- Information about involvement of a third party representing the borrower
- Information about mortgage insurance