# Exhibit 3

Help for America's Homeowners



# HOME AFFORDABLE MODIFICATION PROGRAM
## BASE NET PRESENT VALUE (NPV) MODEL SPECIFICATIONS

### UPDATED: JUNE 11, 2009

### Overview

As a part of the Making Home Affordable Program, we are providing standardized guidance and a base net present value (NPV) model described herein that any servicer who participates in the Home Affordable Modification Program (HAMP) can use or, if eligible, customize into a proprietary NPV model. The base NPV model is illustrative of an NPV model that meets the specifications put forward under the Making Home Affordable Program. Servicers are not precluded from using the illustrative model for making program NPV determinations. It is our expectation that servicers may use the Base NPV Model Documentation to customize the model based on their individual portfolio experience – all within the standardized guidelines put forward for the model under the program. The base NPV model will provide consistency in NPV calculations for the Home Affordable Modification Program and help the industry move toward a more standard process for evaluating the NPV of mortgages for purposes of making modifications.

A participating servicer in the Home Affordable Modification Program must modify any loan that meets the program's eligibility criteria if the modification tests "positive" for NPV. When mortgage modifications have a positive NPV, it is in the best interests of lenders, servicers, investors, and borrowers to modify mortgages to reduce the risk of foreclosure. The Home Affordable Modification Program increases the potential number of mortgage modifications that will have a positive NPV, resulting in more servicers modifying mortgages, and keeping more Americans in their homes. The Home Affordable Modification Program specifies a precise method for determining NPV and provides a base NPV model that any servicer can use or customize into a proprietary NPV model that satisfies all of the program's methodological requirements.

Under the program, a defined set of parameters for the base NPV model can be customized for each servicer. Every servicer is given discretion, within specified limits, to choose a discount rate. In addition, larger servicers are given discretion to develop portfolio-specific default rates. These customization capabilities are built into the base NPV model to preserve the ability of servicers, lenders, and investors to tailor the base NPV model to reflect the unique characteristics of the loans that they service or own, and to incorporate knowledge gained from years of working with those particular groups of mortgages. For other servicers, the baseline parameters can provide a sufficient NPV tool to evaluate loans being considered for modification.

#### Net Present Value of Modification

In general, NPV refers to the value today of a cash-generating investment – such as a bond or mortgage loan. When an investor is faced with a choice between two alternative investments – specifically, between the timing and amounts of the cash flows for each investment – the investor obviously prefers the choice that has a higher present value.

In the context of a mortgage borrower who has become distressed, the investor – or a third party servicer, acting on behalf of the investor – faces a choice of whether to modify the mortgage or leave it as-is. Each choice

generates expected cash flows, and the present values of these two cash flows are likely to be different. If the loan is modified, there is a greater chance that the borrower will eventually be able to repay the loan in full. If not, there is a higher likelihood that the loan will go to foreclosure, and the investor will absorb the associated losses. If the NPV of the modified loan is higher than the NPV of the loan as-is, a modification is said to be "NPV positive."

The Making Home Affordable Program is structured to produce modifications that are more likely to test NPV positive, increasing the number of modifications that will be done and keeping more Americans in their homes. It does this, first, by lowering the probability that borrowers will default by making borrower payments more affordable and, second, by providing incentive payments that are added to cash flows received by lenders (or investors).

If a borrower meets the eligibility criteria for the Home Affordable Modification Program, a servicer will adjust the terms of the borrower's loan (modify the loan) to reduce the borrower's payment to the program's target front-end debt-to-income (DTI) ratio of 31 percent. At a 31 percent DTI, the borrower will have a monthly mortgage payment that is more affordable over the long term, so that the borrower will be more able to afford to stay in his or her home.

Servicers must reduce payments in the precise manner specified by the Making Home Affordable Program (the "Standard Waterfall"), starting with reducing the interest rate on the mortgage. Once the servicer knows which loan terms will change, the servicer is ready to run an NPV model calculation. If the expected value to the lender of the loan after a HAMP modification exceeds the expected value of the same loan to the lender if it is not modified, then the NPV test result is positive and the servicer must modify the loan.

Requiring servicers to modify all NPV-positive loans ensures that there is help for all distressed borrowers when an objective test demonstrates the modification will benefit both the borrower and the investor. The program does not require the servicer to modify the loan if the modification tests negative, though the servicer must consider other ways to prevent foreclosure.

*The Base NPV Model*
The program supplies a base NPV model that any servicer may use to satisfy the requirement to modify all eligible loans that test NPV positive for modification. Large servicers – those having a book of business exceeding $40 billion – have some discretion to customize the base NPV model with respect to two important inputs, the expected default rates for loans that are not modified and the re-default rates for loans that are modified, as discussed further below.

Both the base NPV model and a servicer's proprietary customized version will:

1. Compute the net present value of the mortgage assuming it is not modified.

    a. Determine the probability that the mortgage defaults.

    b. Project the future cash flows of the mortgage if it defaults and the present value of these cash flows.

    c. Project the future expected cash flows of the mortgage if it does not default and the present value of these cash flows.

    d. Take the probability weighted average of the two present values.

2. In the same manner, compute the net present value of the mortgage assuming it is modified, incorporating the effects on cash flows and performance of the modification terms and subsidies provided by the Home Affordable Modification Program.

3. Compare the two present values to determine if the HAMP modification is NPV positive.

An NPV model used in the HAMP takes into account the principal factors that can influence these cash flows, including:

1. The value of the home relative to the size of the mortgage.

2. The likelihood that the loan will be foreclosed on.

3. Trends in home prices.

4. The cost of foreclosure, including:

    a. legal expenses,

    b. lost interest during the time required to complete the foreclosure action,

    c. property maintenance costs, and

    d. expenses involved in reselling the property.

5. The cost of conducting a modification, including:

    a. a lower monthly payment from the borrower,

    b. the likelihood a borrower will default even after the loan is modified,

    c. financial incentives provided by the government, and

    d. the likelihood that a loan will be paid off before its term expires (prepayment probability).

The base NPV model was designed by an expert working group including the Department of the Treasury, the Federal Deposit Insurance Corp., the Federal Housing Finance Agency, Fannie Mae, and Freddie Mac. It was designed specifically for the Home Affordable Modification Program. The base NPV model reflects aggregate data across many servicers, as well as the professional judgment of the working group.

Individual servicers have their own unique experience with the loans they service. The program permits servicers to customize the base NPV model to reflect that unique experience, within certain constraints and guidelines. As a result of customization, servicer NPV results and resulting modification decisions will likely vary even when borrowers' circumstances appear to be similar, but the results will be more accurate and provide a better gauge of appropriate modifications.

## Key Parameters of the Base NPV Model and Customization of Inputs

Below is a summary of important parameters used in the Home Affordable Modification Program base NPV model, and the extent to which servicers may customize the parameters of the base NPV model.

**Discount Rate:** For a firm that owns a mortgage loan (the investor), the mortgage is a series of future cash payments expected from the borrower. But the promise of a payment in the future is worth less to an investor than cash today. How much less will depend on the discount rate – the higher the discount rate, the less a future payment is worth to an investor today. For example, a $1,000 payment in one year would be worth about $950 today using a 5 percent discount rate, and that same $1,000 payment in a year would be worth about $800 today using a 25 percent discount rate. In the base NPV model, all servicers are permitted limited discretion to adjust the discount rate by up to 250 basis points because different investors may place different values on future payments versus payments received today.

The discount rate the servicer uses may be as low as Freddie Mac's Primary Mortgage Market Survey (PMMS) weekly rate for 30-year fixed-rate conforming loans, and as high as the PMMS weekly rate plus 250 basis points. (To find the current PMMS go to http://www.freddiemac.com/pmms.) With respect to loans that are not owned or guaranteed by Fannie Mae or Freddie Mac, the servicer may apply a single discount rate or two discount rates, one for loans in its own portfolio and another for loans serviced for all other investors. However, in no case may a servicer use a higher discount rate for loans in its own portfolio than the rate used for loans it services for other investors. With respect to loans owned or guaranteed by Fannie Mae or Freddie Mac, the servicer must apply the rate specified in Fannie Mae and Freddie Mac guidance.

Whatever discount rate the servicer chooses to use must be applied to both cash flows – that is, to the cash flows if the loan is modified under the Home Affordable Modification Program, as well as the cash flows if the loan is not modified.

**Default Rates:** The base NPV model projects default rates in two scenarios. It projects the probability of default if the loan is not modified and the probability of default if the loan is modified. Default rates depend on a number of variables particular to the loan. In general, however, the default rate is assumed to vary based on the credit quality of the borrower, the borrower's debt burden, the loan-to-value (LTV) of the home at the time of modification, and whether the loan is modified earlier or later in the delinquency cycle.

In the base NPV model, the default rates are generated by a model based on the performance of GSE and non-GSE loans. As Home Affordable Modification Program performance data become available, the base NPV model will be updated to reflect actual program experience.

Large servicers – those with a book exceeding $40 billion – may customize the base NPV model to use modeled default rates that reflect their own portfolio experience. These customized default rate models must be empirically validated where possible, commercially reasonable, and will be subject to review and oversight by program monitors.

Default rates may vary significantly from one large servicer to another based on differences in their portfolios. Therefore, allowing servicers flexibility to use rates that reflect their own portfolio experience should result in more accurate evaluations of proposed modifications.

**Home Prices:** Future increases or decreases in home prices impact a borrower's willingness to stay in a house and potential financial loss in the event of foreclosure. A servicer must use the home price projection provided in the base NPV model. A servicer does not have discretion to substitute a different projection. The home price projection for the program has been made available by FHFA exclusively for this program, is based on data

from a broad cross section of mortgage transactions, and will be updated quarterly. The projection is not based on the FHFA House Price Index and does not represent an official forecast of FHFA or any other government agency.

**REO Discount:** Foreclosed or real estate owned (REO) properties generally sell for less than similar, non-distressed assets. This is referred to as the REO Discount and it recognizes the deterioration in perceived value that buyers often place on a home that has been foreclosed. The REO Discount is worse in some markets than in others. The REO Discount values used in the base NPV model are based on an analysis of sale prices of foreclosed homes sold by Fannie Mae and Freddie Mac. REO Discount values vary by state and home price. Servicers are not permitted to change the REO assumptions in the base NPV model.

# Exhibit 4

**Help for America's Homeowners**


MAKING HOME AFFORDABLE

**AS OF JANUARY 8, 2010**

# Supplemental Documentation—Frequently Asked Questions
# Home Affordable Modification Program

These frequently asked questions clarify the Supplemental Directives issued in connection with the Home Affordable Modification Program (HAMP). The questions and answers below should be reviewed by each servicer that has entered into a Servicer Participation Agreement (SPA) to participate in HAMP. These frequently asked questions constitute supplemental documentation that is included in, and shall be deemed part of, the HAMP Program Documentation described in Section 1 of the SPA.

## A. General

### Q1.  Who should I contact with HAMP-related questions?

There are three options for HAMP-related servicer support, depending on the topic and whether the question pertains to a non-GSE, Fannie Mae, or Freddie Mac loan:

| For questions regarding: | Contact: |
|---|---|
| • **Non-GSE** Supplemental Directives, policy clarifications, and loan-level questions<br>• All reporting for the U.S. Treasury Department using HAMP Data Collector or the HAMP Reporting System | **HAMP Support Center:**<br>• support@hmpadmin.com<br>• 1-866-939-4469<br>• 9:00 a.m. to 9:00 p.m. ET, Monday through Friday |
| • **Fannie Mae** HAMP-related Servicing Guide Announcements, policy clarifications, or loan-level questions<br>• Fannie Mae reporting via HomeSaver Solutions® Network (HSSN) | **Fannie Mae Servicer Support Center:**<br>• servicing_solutions@fanniemae.com<br>• 1-888-FANNIE-5 (326-6435)<br>• 9:00 a.m. to 8:00 p.m. ET, Monday through Friday |
| • **Freddie Mac** HAMP-related Guide Bulletins, policy clarifications, and loan-level questions<br>• Freddie Mac reporting | **Freddie Mac Servicer Support:**<br>• 1-800-FREDDIE (373-3343)<br>• 8:00 a.m. to 8:00 p.m. ET, Monday through Friday business days |

## B. Borrower Eligibility

### Q2. Does the reason for the default have to be resolved before a borrower is eligible for a Home Affordable Modification?

Servicers should encourage borrowers to resolve the cause of a mortgage default, when appropriate, including providing referrals to HUD-approved housing counselors. However, a servicer cannot require a borrower to resolve the reason for the default as a condition of a Home Affordable Modification if the borrower meets HAMP eligibility requirements.

### Q3. How should borrowers who contact their servicer be handled with respect to HAMP if the servicer does not yet have the proper documents or is not yet equipped to evaluate the borrower's situation?

Participating servicers are required to validate the homeowner's eligibility for HAMP and capacity to pay. Participating servicers should begin the process of collecting the required documentation from the homeowner and the information necessary to establish an escrow account on non-escrowed loans. Based on the servicer's understanding of the homeowner's ability to pay, a servicer may place a homeowner on a forbearance plan pending its ability to execute a HAMP modification. Foreclosure actions (with the exception of those in Georgia, Hawaii, Missouri and Virginia), including initiation of new foreclosure actions, must be postponed for all borrowers that meet the minimum HAMP eligibility criteria.

### Q4. Can a loan be modified to a monthly mortgage payment ratio below 31 percent?

Servicers must apply the specified modification steps until the borrower's monthly mortgage payment ratio is reduced as close as possible to 31 percent, without going under 31 percent. A servicer may modify below 31 percent, subject to applicable contractual agreements, but incentive payments will be made based only on modification terms that reflect a 31 percent monthly mortgage payment ratio.

### Q5. Are home equity loans that are in first lien position eligible for modification under HAMP?

First lien home equity loans or lines of credit are eligible for modification under HAMP provided that the borrower and loan meet the basic HAMP eligibility criteria and (i) the servicer has the capability within its servicing system to clearly identify the loan as a first lien and (ii) the servicer has the ability to establish an escrow for the loan as required by Supplemental Directive 09-01. Servicers whose systems do not provide the required functionality are strongly encouraged to complete system upgrades that will allow modification of first lien home equity loans.

Any HAMP modification of a first lien home equity line of credit must result in a modified loan that is a fixed rate, fully amortizing loan that does not permit the borrower to draw any further amounts from the line of credit.

**Q6. REVISED Can a servicer issue an offer under HAMP to a borrower whose mortgage is secured by a condominium or co-op unit if the servicer does not have current association fee information?**

No. A servicer may not issue an offer under HAMP to a borrower whose mortgage is secured by a condominium or co-op unit if the servicer does not have the current association fee information. A component of the monthly mortgage payment ratio calculation is condo or co-op association fees. Current information on the amount of the association fees is necessary to accurately complete the monthly mortgage payment ratio calculation. The servicer can contact the borrower via telephone or email to obtain this information on a stated basis, complete the necessary monthly mortgage payment ratio calculation and then issue an offer under HAMP. Documents verifying the condo or co-op association fee information, such as a copy of the payment statement, a copy of a letter from the association or a copy of a collections letter indicating the fee amount, must be submitted by the borrower with other required documentation to determine HAMP eligibility.

**Q7. If a borrower is delinquent and currently has a front end monthly mortgage payment ratio less than 31 percent, but capitalization of the delinquent amounts will cause the monthly mortgage payment ratio to exceed 31 percent, does the borrower qualify for HAMP?**

No. The borrower will only qualify for HAMP if the verified income documentation confirms that the monthly mortgage payment ratio prior to the modification is greater than 31 percent and provided that the borrower is eligible for at least a $1/8^{th}$ percent drop in the interest rate without the modified monthly mortgage payment ratio going below 31 percent.

**Q8. Must servicers suspend foreclosure or not initiate foreclosure for all borrowers who are potentially eligible for HAMP?**

To ensure that a borrower currently in foreclosure or at risk of foreclosure has the opportunity to apply for a HAMP modification, servicers should not proceed with a foreclosure sale until the borrower has been evaluated for the program. Additionally, servicers are strongly encouraged not to initiate foreclosure until a borrower has been evaluated and determined to be ineligible for the program or the borrower fails to respond to a HAMP offer that has been made by the servicer.

**Q9. Is there any guidance on the imminent default analysis for the non-GSE program?**

No additional guidance is being provided at this time with respect to determining whether a non-GSE loan is in imminent default under HAMP. However, with respect to non-GSE loans, servicers may follow the imminent default guidance provided by either GSE as long as that guidance conforms to the servicer's applicable contractual agreements and accounting standards. Servicers are reminded that for GSE loans, Supplemental Directive 09-01 requires servicers to follow the guidelines published by the particular GSE with respect to its loans.

**Q10. NEW Is a loan that secures a property owned by an *inter vivos* (living) revocable trust eligible for HAMP?  What additional information or documentation, if any, should be obtained?**

A loan secured by a property owned by an *inter vivos* revocable trust is eligible for HAMP as long as the borrower (i) is a trustee of the trust, (ii) is a primary beneficiary of the trust, and (iii) occupies the property as his or her primary residence.  The borrower must sign all HAMP-related documents in both an individual capacity and as trustee of the *inter vivos* revocable trust.  For document requirements, servicers should refer to the "Other Pertinent Information" section of the document summary for the Home Affordable Modification Agreement (Fannie Mae/Freddie Mac Uniform Instrument, Form 3157) (the "Home Affordable Modification Agreement"), which is available at www.HMPadmin.com.

**Q11. NEW Are audited profit and loss (P&L) statements required when verifying income for HAMP?**

Audited P&L statements are NOT required for HAMP.

**Q12. NEW If a borrower makes the existing contractual monthly payment rather than the trial period payment during the trial period, should the servicer accept the higher payment from the borrower, depositing the difference in a suspense account?**

All payments made by the borrower must be applied in accordance with the existing loan documents.  However, if the borrower makes a payment that is greater than his or her trial period payment, the servicer must review investor guidelines to determine if the borrower remains eligible for HAMP and, if making the contractual payment could jeopardize eligibility, notify the borrower in writing that making payments in excess of the trial period payment may impact the borrower's eligibility for a HAMP modification.

**Q13. NEW Can a borrower qualify for HAMP if the mortgage loan is currently in the redemption period after a foreclosure sale?**

The answer to this question is dependent on the amount of time remaining in the redemption period and other legal requirements of the state in which the property is located.  When permissible under state law, the servicer should, on a case-by-case basis, seek prior investor approval prior to evaluating a borrower for HAMP during a redemption period.

**Q14. NEW If borrowers who are unrelated by marriage, civil union or similar domestic partnership under applicable law purchased their home together and one borrower has vacated the property, is the occupying co-borrower eligible to apply for HAMP?**

Yes, the occupying co-borrower may pursue HAMP if a quitclaim deed evidencing that the non-occupying co-borrower has relinquished all rights to the property has been recorded.  Servicers must refer to investor guidance to determine which parties are required to sign the HAMP documents.

**Q15.** **NEW** **Supplemental Directive 09-07 requires a servicer to use a recent credit report to verify that the property securing the mortgage loan is the borrower's primary residence. Is it acceptable to confirm the borrower's primary residence with other forms of documentation besides the credit report?**

In all cases, a servicer must obtain a credit report to verify that the property securing the mortgage is the borrower's primary residence. If the credit report does not support the borrower's certification that the property securing the mortgage loan is the borrower's principal residence, the servicer must use other documentation, such as a federal income tax return or utility bill, to reconcile the inconsistency. This additional due diligence on the part of the servicer must be documented in the loan file/servicing system for compliance review purposes.

## C. De Minimis Test

**Q16.** **For loans that are not fully amortizing products, what payment amount is used for the de minimis test?**

In all cases, the monthly mortgage payment that was used to determine the borrower's eligibility (adjusted as applicable to include property taxes, hazard insurance, flood insurance, condominium association fees, and homeowners' association fees) should be compared to the borrower's monthly mortgage payment under HAMP (with the same adjustments). Therefore, except as noted in the next sentence, the monthly mortgage payment used to determine eligibility for loans that are not fully amortizing would not include full amortization of principal. However, if, at the time eligibility is being determined, the interest rate will reset within the next 120 days, non-GSE servicers are reminded that they should use "the greater of (i) the borrower's current scheduled monthly mortgage payment or (ii) a fully amortizing monthly mortgage payment based on the note reset rate using the index value as of the date of the evaluation" when determining both eligibility and the outcome of the de minimis test.

## D. Documents

**Q17.** **Are there separate Servicer Participation Agreements (SPA) for Fannie Mae, Freddie Mac, and non-GSE loans?**

The SPA and related documentation must be executed by servicers for non-GSE loans in order to receive Treasury-funded incentives and compensation. Servicers are not required to execute an SPA for GSE loans, since both Fannie Mae and Freddie Mac have made the program mandatory as detailed in their respective Announcements and Bulletins.

**Q18.** **What entity should sign the SPA – the servicing entity, a holding company (if applicable), or the servicer's parent? Is there any guidance available on how master servicers or subservicers would participate in the non-GSE program?**

The entity that has the direct contractual obligation to the investor to perform the servicing functions is the entity that will formally elect to participate in the non-GSE program by signing the SPA. This entity will sign the SPA regardless of whether (i) it has engaged one or more subservicers to perform some or all of the servicing functions on its behalf or (ii) it is subject to oversight by a master servicer that does not have a direct contractual obligation to the investor to perform the servicing functions. If the entity that signed the SPA sub-contracts out any portion of its responsibilities as a servicer to another party, the entity that signed the SPA will be liable for the acts and omissions of the sub-contracted party under the SPA.

In addition, the parent company of a servicing entity that has the direct contractual obligation to the investor to perform the servicing functions may alternatively sign the SPA on behalf of itself (i.e., the parent) and the contractually obligated servicing entity, as well as any other servicing subsidiaries that the parent specifies.

**Q19. If a servicer that has signed a SPA transfers mortgage loans, or servicing rights relating to mortgage loans, subject to the SPA, is the transferee servicer required to assume the transferor servicer's obligations under the SPA with respect to those mortgage loans?**

No. The transferee servicer may, but is not required to, assume the transferor servicer's obligations under the SPA with respect to the applicable mortgage loans.  Unless the obligations are assumed by the transferee servicer, the transferor servicer may not use a transfer to circumvent its existing obligations under the SPA (i.e., remitting HAMP incentive payments earned on modified loans, modifying loans that successfully complete HAMP trial periods, evaluating borrowers that are 60 or more days delinquent for HAMP eligibility).  In addition, if the transferee servicer has signed its own SPA, the mortgage loans involved in the transfer will become subject to the transferee servicer's SPA.

**Q20. Are there separate modification documents for GSE and non-GSE loans?**

A single set of model modification documents has been provided for all loans regardless of investor. However, the documents may need to be customized for certain situations that are unique to a particular investor's loan program.

**Q21. Are state-specific documents required on HAMP modifications? For example, are state-specific balloon riders required when applicable?**

The servicer must revise the HAMP documents as necessary to comply with federal, state, and local laws. For example, in the event that the HAMP modification results in principal forbearance, servicers are obligated to modify the uniform instrument to comply with laws and regulations governing balloon disclosures.

For all mortgage loans that are modified pursuant to HAMP, the servicer must follow investor guidance with respect to ensuring that the modified mortgage loan retains its first-lien position and is fully enforceable.

**Q22. REVISED If the borrower files for bankruptcy protection during the trial period, is the trial period plan canceled automatically or is a servicer required to continue to work with the borrower?**

Borrowers who file bankruptcy during the trial period remain eligible for a HAMP modification provided they make all of the required payments in a timely fashion, are otherwise in compliance with the trial period plan and the certifications set forth in the Hardship Affidavit or the MHA Request for Modification and Affidavit, as applicable, remain true and correct.  The servicer and its bankruptcy counsel must work with the borrower and the borrower's bankruptcy counsel to obtain any required court approvals of the modification.  A borrower actively involved in a bankruptcy proceeding prior to being placed in HAMP is eligible for HAMP at the servicer's discretion.  If a servicer provides an offer under HAMP to a borrower that is involved in an active bankruptcy case,

the servicer must work with the borrower or borrower's counsel to obtain all necessary approvals from the bankruptcy court.

**Q23. REVISED How should servicers address loan documents that did not include standard escrow provisions?**

Servicers must replace Section 4.D. of the Home Affordable Modification Agreement with industry standard escrow account provisions that are comparable to the escrow account provisions found in the Fannie Mae/Freddie Mac uniform instruments.

In addition, if the servicer uses a Home Affordable Modification Trial Period Plan (Fannie Mae/Freddie Mac Uniform Instrument, Form 3156) (the "Trial Period Plan"), the servicer must insert the following language at the end of section 4.C. of the Trial Period Plan:

"Unless the Lender determines that an Escrow Account may not be established in connection with the mortgage loan under applicable law, this Plan constitutes notice that the Lender's waiver as to payment of Escrow Items, if any, has been revoked, and I have been advised of the amount needed to fund my Escrow Account. If the Loan Documents do not currently have Escrow Account provisions comparable to those in the Fannie Mae/Freddie Mac Uniform Security Instruments, such Escrow Account provisions comparable to the Escrow Account provisions in the Fannie Mae/Freddie Mac Uniform Instrument for the state in which the property is located, shall be added in the Modification Agreement."

**Q24. REVISED Are servicers permitted to insert conditional language in the Trial Period Plan and the Home Affordable Modification Agreement to avoid having to review each set of base loan documents to determine if they contain prepayment or assumption provisions or, in order to retain first lien position, require subordination agreements and/or title policy endorsements?**

The Trial Period Plan and the Home Affordable Modification Agreement currently available on www.HMPadmin.com have been updated to include the necessary conditional language.

**Q25. REVISED Must all prepayment penalties be waived in connection with a HAMP modification, or only prepayment penalties associated with borrower "pay for performance" principal balance reduction payments?**

Except as provided below in Q26, no prepayment penalties may be assessed in connection with modifications under HAMP. Therefore, if any provision in the note or in any addendum or amendment to the note allows for the assessment of a penalty for full or partial prepayment of the note, such provision must be waived. Conditional language to implement this waiver is included in the Home Affordable Modification Agreement.

**Q26. REVISED Is a participating servicer required to modify loans that are eligible for HAMP if the servicer is subject to a pooling and servicing agreement or similar servicing contract ("PSA") that requires payment of a material sum to investors if any applicable prepayment penalties are waived?**

Yes, such loans must be modified if they are eligible for HAMP modifications, and servicers must use reasonable efforts to eliminate the PSA provision requiring payment by the servicer if the

prepayment penalty is waived. However, if the servicer is unable to eliminate the PSA provision, the servicer is not required to waive the prepayment penalty as part of the HAMP modification, provided that the prepayment penalty must be waived with respect to any borrower "pay for performance" principal balance reduction payments that are applied to the borrower's mortgage loan. In such a case, servicers should replace Section 4.I. of the Home Affordable Modification Agreement with the following language:

> "That, as of the Modification Effective Date, any provision in the Note, as amended, for the assessment of a penalty for full or partial prepayment of the Note must be waived with respect to any borrower "pay for performance" principal balance reduction payments that are applied to the Loan."

### Q27. REVISED If the standard modification waterfall requires principal forbearance, should the Home Affordable Modification Agreement be amended to reflect the principal forbearance amount?

The Home Affordable Modification Agreement must be revised to reflect the principal forbearance amount. The exact modification language can be obtained from the document summary for the Home Affordable Modification Agreement, available at www.HMPadmin.com.

### Q28. If the borrower had no obligation under the Loan Documents to remit escrow items or the lender waived the requirement to pay escrow items prior to entering into the trial period (the terms of which revoked that waiver), must the borrower continue to remit escrow items with the monthly payment if the borrower fails the trial period?

Once the escrow account is established, the borrower must continue to make monthly escrow payments. However, upon a borrower's failure of the trial period, a servicer may waive the requirement to make monthly escrow payments, subject to any limitations imposed by applicable law and any investor or other contractual requirements (e.g., servicer obligations to advance tax, insurance and other third party payments to protect the investor's first lien position).

## E. Escrow

### Q29. Can escrow payment estimates be used to determine payments during the trial period to avoid delays in processing?

Servicers may perform an escrow analysis based on estimates prior to extending a HAMP offer. However, if a servicer estimates the escrow payments for the HAMP offer, the servicer is not permitted to use national averages in the estimate calculations. Prior to determining the borrower's eligibility for HAMP based on documentation, servicers must complete an escrow analysis to determine the exact escrow payments.

### Q30. How should servicers treat escrow shortages?

In the event the initial escrow analysis identifies an escrow shortage – a deficiency in the escrow deposits needed to pay all future tax and insurance payments – the servicer must take steps to eliminate the shortage. Any actions taken by the servicer to eliminate the escrow shortage must be in compliance with applicable laws, rules, and regulations, including, but not limited to, the Real Estate Settlement Procedures Act.

**Q31. NEW If a borrower has successfully completed the trial period plan and the servicer is preparing the Home Affordable Modification Agreement, should the servicer have the borrower execute a note for any escrow advance? Should the servicer provide a Truth-in-Lending (TIL) statement for this loan?**

The servicer should not have the borrower execute a note for any escrow advance. Instead, the servicer should capitalize any escrow advance that has been or will be paid to a third party before the modification agreement's effective date as outlined in Supplemental Directive 09-01. If capitalization is prohibited by applicable law, the servicer should have the borrower repay the advance in accordance with investor guidelines, the underlying security instrument and all applicable laws, rules and regulations including, but not limited to, RESPA and TILA.

## F. Principal Forbearance

**Q32. If a borrower with principal forbearance makes a substantial principal curtailment that is greater than or equal to the interest-bearing unpaid principal balance (UPB), should the curtailment be applied to the interest bearing principal or the principal forbearance portion?**

The curtailment should be applied to the principal forbearance portion. This policy eliminates the possibility of a curtailment paying off (and satisfying) the interest-bearing portion of the UPB (the entire loan would become due and payable at that point), thereby forcing the borrower to pay off the principal forbearance portion of the loan balance. In those instances, to avoid that negative result, the curtailment must be applied to the principal forbearance amount. Any remaining funds would be applied to the interest-bearing UPB.

**Q33. REVISED Does the earlier FDIC guidance on accounting treatment of principal forbearance apply under HAMP?**

Yes. For loans within securitizations, servicers, securities administrators and other transaction parties should treat HAMP principal forbearance amounts as realized losses as of the applicable loan modification dates under any applicable securitization pooling or trust agreement. The only exception to that principle is that servicers and securities administrators are permitted not to treat HAMP principal forbearance amounts as realized losses if, and only if, (i) the applicable securitization pooling or trust agreement specifically addresses principal forbearance in the HAMP context (i.e., it includes the permanent forgiveness of interest and postponement of principal repayment for a long period, as described below) and (ii) such agreement explicitly and affirmatively directs that such forborne principal not be treated as a realized loss.

For the avoidance of doubt, "principal forbearance" in the context of HAMP is non-interest bearing and non-amortizing. Securitization pooling or trust agreements often use the term "principal forbearance" in a context which only requires delaying of the date on which certain payments of principal are due for short periods; interest typically continues to accrue and is required to be capitalized. For HAMP, not only must principal forbearance delay the date in which such forborne principal is due to maturity sale or payoff, but no interest may accrue on such forborne amounts.

## G. HUD Counseling

### Q34. Who pays for the HUD counseling?

There is no charge to either borrowers or servicers for HUD-approved counseling (borrowers whose back-end debt-to-income ratio is equal to or greater than 55% must represent in writing in the HAMP documents that they will obtain such counseling). Servicers may, at their discretion, use a portion of the servicer incentive compensation to compensate counselors for counseling services provided in conjunction with HAMP.

### Q35. If a borrower has recently completed HUD-approved debt counseling, do they still need to work with a counselor?

Borrowers with back-end debt-to-income ratios of 55 percent or more must agree in writing to obtain HUD-approved counseling as a condition of receiving a HAMP modification, even if they recently completed counseling.

## H. Income Verification

### Q36. REVISED Why must the borrower submit an IRS Form 4506-T?

Servicers should refer to the guidance provided in Supplemental Directive 09-07 with respect to IRS Form 4506-T. Servicers should also note that on October 21, 2009, the IRS introduced Form 4506T-EZ. Form 4506T-EZ is a permissible substitute under HAMP for Form 4506-T for borrowers who filed a Form 1040 series on a calendar-year basis.

### Q37. If a borrower submits unsigned tax returns, but provides evidence the returns were electronically filed, does evidence of the electronic filing satisfy the requirement for "signed tax returns"? If a borrower submits unsigned tax returns, must a servicer file the Form 4506-T or Form 4506T-EZ, as applicable, or may they return the tax returns to the homeowner for signature?

Evidence of an electronically filed tax return satisfies the signed tax return requirement. If the borrower submits an unsigned tax return without evidence of electronic filing, the servicer may either file the Form 4506-T or Form 4506T-EZ, as applicable, or return the tax return to the homeowner for signature. Upon execution, the borrower should return the "signed" return to the servicer.

### Q38. REVISED Is the borrower eligible for HAMP if he or she is not a current tax filer?

Yes. Only the borrower's most recent tax return needs to be obtained. If the tax return for the most recent tax year is not available, the servicer must process the borrower's signed Form 4506-T to confirm that the borrower did not file a tax return for that year.

### Q39. REVISED Is the borrower eligible for HAMP if he or she is not required to file a tax return?

Yes. Such a borrower must document why he or she does not need to file a tax return. The servicer must review and approve this rationale. A borrower is not eligible for HAMP if the borrower was required to file a tax return but failed to do so.

**Q40. If the borrower can provide two pay stubs that show current earnings used for qualifying purposes under HAMP, can the servicer use only that information and not require YTD earnings?**

No. Documentation of YTD earnings is a requirement of HAMP. Current earnings should be used to qualify the borrower. YTD earnings can be used to substantiate additional income such as bonuses and overtime.

**Q41. REVISED Could you please clarify the intent behind "third party documents" related to self-employed income?**

As provided in Supplemental Directive 09-07, third party documents are no longer required for self-employed borrowers.

**Q42. Can income of a household member not on the original note be used in the income calculations to qualify for the modification? If so, would it require that the person be added to the Note for the modification?**

A borrower has the option of disclosing a household member's income (where the household member is not included on the Note). Servicers should include non-borrower household income in monthly gross income if it is voluntarily provided by the borrower and if there is documentary evidence that the income has been, and reasonably can continue to be, relied upon to support the mortgage payment. All non-borrower household income included in monthly gross income must be documented and verified by the servicer using the same standards for verifying a borrower's income. The borrower may elect to add a new borrower to the note, but it is not a requirement in order to include the household member's income in the Home Affordable Modification evaluation.

**Q43. If income from other non-borrower household members is considered under HAMP, should a servicer also consider expenses for the other household members?**

A servicer should not consider expenses of non-borrower household members but may consider the percentage of his or her income that the non-borrower routinely contributes to the household.

**Q44. What action should the servicer take if the tax returns do not align with the paystubs provided?**

The servicer should ask the homeowner to explain material differences between tax returns and income documentation, and document such differences in the servicing system. If the verified documentation reasonably indicates that a borrower is committing fraud, the servicer should not extend the modification.

**Q45. For a loan in foreclosure, may a servicer require the homeowner to make the initial trial period payment in certified funds?   May a servicer require certified funds on subsequent trial period payments?**

Servicers should continue to follow their current practices, subject to applicable law and the mortgage documents, as it relates to requiring borrowers to make payments using certified funds.

Servicers may not impose any stricter standard for payments due under HAMP than are applied in the servicer's other loss mitigation programs.

## I. Net Present Value (NPV) Model

### Q46. What is the NPV model and what is it used for?

The NPV model determines the NPV outcome (positive or negative) for a given modification. A positive NPV occurs where the discounted value of expected cash flows for the modified loan is higher than the discounted value of expected cash flows for the unmodified loan. The NPV model software tool resides on the servicer Web portal (www.HMPadmin.com), and is available to all participating servicers of both GSE and non-GSE mortgage loans eligible for a Home Affordable Modification.

### Q47. Is there a different NPV model for non-GSE and GSE loans?

The same basic NPV model will be used by each servicer for both non-GSE and GSE loans. However, as discussed below, large servicers of non-GSE loans will be able to customize the model based on the unique performance of their own portfolios. Additionally, with respect to certain assumptions such as discount rate, servicers may use different values for non-GSE and GSE loans, subject to the respective GSE's guidelines.

### Q48. Will every servicer be required to use the same discount rate in calculating NPV?

For GSE loans, servicers must follow the respective GSE guidance with respect to the discount rate. For non-GSE loans, servicers have the option of using the same discount rate for all loans or choosing one discount rate for loans they service for themselves and a different discount rate for loans serviced for all third party investors. The discount rate applied to loans serviced on behalf of third party investors must be at least as high as the discount rate applied to a servicer's held portfolio, but in no event higher than the maximum rate permitted under the HAMP. Program guidelines establish a base discount rate for non-GSE loans equal to the Freddie Mac Primary Mortgage Market Survey (PMMS) rate for 30-year fixed-rate conforming loans.  Servicers of non-GSE loans may add a premium of up to 250 basis points to this rate.

### Q49. REVISED Can the HAMP modification be pursued if the NPV result is negative?

For non-GSE loans, a servicer is not required to offer the HAMP modification on a loan where the NPV result is negative, but it may do so at its discretion in accordance with investor guidelines.  If the NPV is negative and the servicer chooses to modify the loan, any principal forbearance amount may not reduce the interest-bearing principal to less than 100 percent of the mark-to-market loan-to-value (LTV) ratio.  For GSE loans, servicers should refer to the applicable GSE guidelines as it relates to NPV results and HAMP eligibility.

### Q50. Will servicers be able to build the NPV model into their platform/system? Can they customize the NPV Calculator?

Yes.  Detailed business and technology requirements for servicers wishing to install the NPV Calculator on their own systems are forthcoming and will be posted on www.HMPadmin.com.  The most recent Net Present Value Model Documentation can be obtained at www.HMPadmin.com.

Servicers having at least a $40 billion servicing book will have the option to create a version of the NPV model that uses a set of cure rates and redefault rates estimated based on the experience of their own portfolios. The default model must take into consideration, if feasible, current LTV, current monthly mortgage payment, current credit score, delinquency status, and other loan or borrower attributes. Customized versions of the NPV model must utilize the base NPV model values for variables such as home price projections and foreclosure and REO timelines and costs. These values are posted on www.HMPadmin.com, and will be periodically updated. Any servicer electing to either build the NPV model into their platform/system and/or create a customized version of the NPV model must first successfully pass an output test, as to ensure that the servicer NPV model outputs are consistent with the base Treasury model. Servicers may not begin using a recoded or customized model without first obtaining an acceptable output test.

GSE servicers must consult each GSE with respect to the loans it services on behalf of that GSE before building the NPV model into their own platform/system or customizing the NPV Calculator.

### Q51. Will Freddie Mac, in its capacity as Compliance Agent for the Treasury, monitor implementation or customization of the NPV model?

Yes. Servicers electing either to implement the NPV model on their own systems or, where eligible, to create a customized version must first successfully pass an NPV output test to ensure that the servicer's NPV model outputs are consistent with those of the Base NPV Model v3.0.

Servicers who plan to begin using their own NPV Model v3.0 by September 1, 2009 are required to conduct and pass the NPV output test before that date. Servicers planning to implement or customize the NPV model *after* September 1, 2009 must pass an output test before they begin using that model.

The MHA Compliance Agent (Freddie Mac) will administer and evaluate the results of all servicer NPV output tests and provide the necessary clearance for servicers to begin using their own NPV models. The test will involve running a dataset of sample modifications against the servicer's NPV model. To pass the test, the servicer NPV model results for the entire dataset of sample modifications must be consistent with the corresponding base NPV model results, within a defined threshold of acceptable variance. Additional instructions regarding the NPV output test will be provided to servicers upon request. Please e-mail Dane D'Alessandro, Director, Program Management, MHA Compliance at: dane_d'alessandro@mhacompliance.com.

Subsequent to the test, servicers electing to use a customized version of the NPV model will be asked to provide documentation on methodology and key assumptions, as well as evidence that the servicer has instituted adequate controls and governance procedures with respect to the model.

NPV compliance testing will be conducted on an ongoing basis for the life of the HAMP program, and will be triggered both by changes to the base NPV model and by servicer-driven changes, such as migration to new systems, subsequent decisions to use servicer-specific default rates (where permitted) or to change those rates, and other related factors.

Servicers of Fannie Mae and Freddie Mac loans must follow the respective GSE's guidance regarding building the NPV model into their own platform/system or customizing the NPV model.

**Q52. How soon after release of a new version of the Making Home Affordable NPV model or after signing a Servicer Participation Agreement must a servicer begin to use the new base NPV model?**

Participating and new servicers will have a grace period to implement each new version of the Making Home Affordable (MHA) Net Present Value Base Model. The grace period for each new version will be set forth in the applicable NPV release documentation. In addition, the release documentation will provide guidance as to which NPV model version servicers should use during the grace period. After the grace period, servicers must use either the most recent version of the base MHA Net Present Value Model or a customized version that meets the requirements for customization outlined in the model documentation.

**Q53. Will mortgage insurance (MI) be considered in the NPV model?**

Yes. MI is considered in calculating the net present value of both the modified and unmodified loan. MI payments reduce investor losses in the event of a default for both of these scenarios. In addition, partial MI claims can be entered to increase the value of the modification to the investor.

**Q54. I initially tested a borrower under an earlier NPV model (e.g., Version 1.5) and he passed. I received the borrower's income documentation after the next major model version was released (e.g., version 2.0). Should I retest the borrower based on verified income using the current version of the NPV model?**

No. Servicers should test borrowers using the same major NPV model version each time the borrower is evaluated. All previous major versions of the NPV model are available on www.HMPadmin.com so that borrowers can be tested using the same major NPV model version for each evaluation.

**Q55. Can servicers choose the NPV model version used to test a specific borrower?**

No. New applicants to HAMP should be tested using the latest available NPV model version, and retests should use the same major model version as the initial test.

**Q56. I tested a borrower using the NPV model and he passed. Since then, I have received the borrower's income documentation. When I retest the borrower based on verified income, which NPV inputs should I hold constant and which NPV inputs should I update?**

The only NPV inputs that should be updated when the borrower is retested are those that were incorrect on the date of the initial NPV evaluation and since have been corrected based on the borrower's income documentation. Inputs that have changed in the interim but were correct on the date of the initial NPV evaluation should be held constant. Elements that change based on documentation are likely to be limited to borrower-reported information, such as income, homeowner association fees, and monthly tax payments. The terms of the modification – the interest rate reduction, term extension, and forbearance amount – also may change as the borrower-reported inputs are adjusted. In the portal version of the NPV model servicers should not change the "Data Collection Date" or the associated UPB and remaining term information. This information should be reported for the retest as it was in the initial NPV evaluation.

## J. Reporting Requirements

### Q57. When will reporting requirements, including the key data points, be available for servicers? What type of reporting format/medium will be required?

Servicers must begin providing loan level data to Fannie Mae, the program administrator, when a HAMP loan enters a trial period. Details on the required loan level data for these reporting requirements are provided in the "HAMP Data Dictionary" available at www.HMPadmin.com.

### Q58. What date should be reported by the servicer for the Interest Rate Lock Date for Modification in the trial period set up file and in the loan set up file?

The Interest Rate Lock Date for Modification is the date that the Interest Rate Cap for a modified mortgage loan is determined. For trial set up reporting, the servicer should report the date that it selected the Freddie Mac Weekly Primary Mortgage Market Survey (PMMS) Rate used to determine eligibility for HAMP when establishing the interest rate terms in the standard waterfall process for the trial period payment under the trial period plan. For loan set up reporting, the servicer should report the date that it selected the Freddie Mac Weekly PMMS Rate used to establish the interest rate terms in the standard waterfall process for the modification payment under the Modification Agreement. As specified in Supplemental Directive 09-01, the Freddie Mac Weekly PMMS Rate used for the modification payment should be the rate, rounded to the nearest 0.125 percent, in effect as of the date that the Modification Agreement is prepared.

### Q59. If the servicer does not have the property condition from an appraisal or BPO, what should the servicer enter in the "property condition" field in IR2?

The servicer should enter "3" (Fair) when they don't have a property condition from an appraisal or a BPO, provided the property meets HAMP eligibility requirements. Servicers must enter "5" if the property is condemned. When servicers enter "3" because they don't have a property condition from an appraisal or a BPO: (i) the "property condition" field in IR2 may not be relied on by the servicer as a justification or presumption that the loan qualifies for HAMP and that any subsequent payout based on the information in IR2 does not constitute a waiver on the part of the investor and/or Treasury who reserves all rights to seek reimbursement of an improper payout or repurchase of the loan in the event the property does not meet HAMP eligibility requirements; and (ii) the "property condition" field in IR2 may not be relied on by the investor as grounds for repurchase of the loan due to a breach of a representation and warranty related to the property condition.

### Q60. NEW What should a servicer do if its servicing system will not report to credit bureaus based on the due date of the trial period payment as stated in the Trial Period Plan cover letter, but instead reports based on the contractual due date? If the servicer cannot follow the process, can it delete the specific language in the cover letter regarding credit reporting?

As outlined in Supplemental Directive 09-01, if a borrower is current prior to entering the trial period, servicers are required to report to the credit bureaus that the borrower is current but on a modified payment if the borrower makes timely trial period payments by the 30th day of each trial period. If the servicer's servicing system will not allow them to report in this manner, servicers may edit the Trial Period Plan cover letter to accurately describe the servicer's practice related to credit bureau

reporting.  Note: The new Trial Period Plan Notice does not contain detailed language related to credit bureau reporting practices.

**Q61. NEW The IRS Form 1098 does not contain the UPB for the applicable loan.  In the case of a loan with a principal forbearance, would it be an accurate assumption that a notation is not necessary on the 1098 to remind the borrower of the principal forbearance?**

Yes.

**Q62. NEW If the servicer utilizes an IRS-compliant Annual Borrower Statement that includes the UPB of the modified loan as a substitute 1098 and the loan has principal forbearance, is it necessary to state the principal forbearance amount on the statement?**

Yes.  Any borrower statement that includes the unpaid principal balance of the loan must include the principal forbearance amount, if applicable.

## K. Trial Period

### Q63. REVISED Must foreclosure be suspended during the trial period?

Except in "foreclosure restart states" as described in Q65 below, any foreclosure sale must be suspended and no new foreclosure action may be initiated during the trial period.  Foreclosure actions may not be initiated or restarted until the borrower has failed the trial period and the borrower has been considered and found ineligible for other available foreclosure prevention options.

### Q64. REVISED What is success or failure under a trial period plan?

The trial period plan is considered to be successful if the borrower has made all of the trial period plan payments no later than the last business day of the month in which the last trial period plan payment is due, the borrower has provided all required documentation, the borrower has complied with all other requirements of the trial period plan and the certifications set forth in the Hardship Affidavit or the MHA Request for Modification and Affidavit, as applicable, remain true and correct. If the servicer has not received all trial period plan payments or required documentation by this deadline or determines the borrower has not otherwise complied with the trial period plan, the borrower has failed the trial period and is not eligible for a permanent loan modification under HAMP.  The servicer must consider the borrower for other foreclosure prevention alternatives, including pre-foreclosure sales and deeds in lieu of foreclosure, as appropriate.

### Q65. What rules apply to loans that were in active foreclosure in foreclosure restart states prior to initiation of the trial period plan? Will borrowers be considered to have failed the trial period plan if they are not current at the time the foreclosure sale is scheduled? How could such borrowers be current if foreclosure was already in process?

Due to unique foreclosure law requirements in Georgia, Hawaii, Missouri, and Virginia, borrowers in these states who were in active foreclosure prior to executing a trial period plan will be considered to have failed the trial period plan and servicers may proceed with the foreclosure if either (a) the

servicer determines that the borrower made a misrepresentation under the trial period plan or (b) the borrower has not made all required trial period payments through the end of the month preceding the month in which the foreclosure sale is scheduled to occur.

**Q66. When a borrower is placed in a trial period plan, does the loan information need to be changed on the servicer's system and the investor's system to reflect the trial period terms?**

No, scheduled loan terms in servicing systems should not be modified during the trial period. However, servicers must follow the requirements for reporting to the credit reporting agencies during the trial period as set forth in Supplemental Directive 09-01 and discussed below in Q67.

**Q67. How should borrower payments be reported to credit reporting agencies during the trial period?**

Servicers should continue to report a "full file" status report to the four major credit reporting agencies while evaluating a borrower for program eligibility and during the trial period plan. If a borrower is current when they enter the trial period, the servicer should report the borrower current but on a modified payment if the borrower makes timely payments by the last business day of each trial period month at the modified amount during the trial period. If a borrower is delinquent when they enter the trial period, the servicer should continue to report in such a manner that accurately reflects the borrower's delinquency and workout status following usual and customary reporting standards.

In both cases the servicer should report the modification when it becomes final.

**Q68. REVISED If the borrower fails during the trial period, can he or she be provided with another offer under HAMP?**

Deleted. Refer to Q71.

**Q69. REVISED If the borrower makes the first trial period payment before the servicer prepares the Trial Period Plan, and the borrower never returns a signed Trial Period Plan, can he or she be provided with another offer under HAMP?**

Deleted. Refer to Q71.

**Q70. REVISED If the servicer prepared a Trial Period Plan based on the borrower's stated income information and, upon receipt of the income documentation, discovers that the original Trial Period Plan was out of tolerance, can the borrower be provided with another offer under HAMP?**

Deleted. Refer to Q71.

**Q71.** REVISED Is a borrower who has received a HAMP offer eligible for a subsequent HAMP offer? When is a servicer's SPA obligation to offer a borrower a HAMP modification considered satisfied?

A borrower who has a received a HAMP offer is ineligible for a subsequent HAMP offer, and the servicer's SPA obligation to offer the borrower a HAMP modification is considered satisfied, in the following circumstances:

- the borrower received a HAMP modification and lost good standing, or

- the borrower received a HAMP offer and made the first payment under trial period plan, but did not (i) make all required payments by the end of the trial period, or (ii) provide all required documents by the end of the trial period.

A borrower may seek reconsideration for a HAMP modification and the servicer is obligated to consider the borrower's request under the SPA, in the following circumstances:

- the borrower was found ineligible, either for a trial period plan or during the trial period plan, but circumstances such as income have changed sufficiently to impact the previous determination, or

- the borrower received a HAMP offer, but did not make the first trial period payment by the end of the month in which it was due.

**Q72.** REVISED Can the borrower accelerate his or her modification effective date by making his or her trial period payments earlier than scheduled?

No. Although the borrower may make scheduled payments earlier than expected, under HAMP, the payments may not result in acceleration of the modification effective date. There is no variation to this rule.

## L. Valuation

**Q73.** REVISED Why is an appraisal, broker price opinion (BPO), or automated valuation model (AVM) generated property valuation necessary and when does such a valuation become stale?

The appraisal, BPO, or AVM-generated property valuation is an input to the NPV calculator. Pursuant to Supplemental Directive 09-07, the valuation must be less than 90 days old on the date the servicer first evaluates the borrower for HAMP eligibility using the NPV model. The information will remain valid for the duration of the trial period and does not need to be updated for any subsequent NPV evaluation.

**Q74.** What is considered a reliable confidence score for an AVM?

Servicers relying on their internal AVM should establish reasonable confidence scores. Confidence scores that are deemed reasonable by bank examiners are also considered reasonable for purposes of this program.    For GSE AVMs, each GSE will communicate guidance on the permissibility to use internal AVMs and reasonable confidence scores.

**Q75.** If a broker price opinion (BPO) is utilized, will an exterior inspection be sufficient or is an interior/exterior inspection with photos required?

Where BPOs are utilized, exterior-only inspections are sufficient.

## M. Verification

**Q76.** If one of the borrowers on the loan is non-responsive (will not supply income documentation and will not sign a Home Affordable Modification Agreement), can the HAMP modification proceed with the remaining borrower who is residing in the household, as long as the HAMP modification does not have to be recorded?

Unless a borrower or co-borrower is deceased or a borrower and a co-borrower are divorced, all parties who signed the original loan documents or their duly authorized representative(s) must execute the HAMP documents. If a borrower and a co-borrower are divorced and the property has been transferred to one spouse in the divorce decree, the spouse who no longer has an interest in the property is not required to execute the HAMP documents. Servicers may evaluate requests on a case-by-case basis when the borrower is unable to sign due to circumstances such as mental incapacity, military deployment, etc.

**Q77.** NEW Can HAMP be considered for a borrower that is temporarily displaced (e.g., incarceration, temporary foreign service assignment, military service, etc.) from his/her home if s/he is the only borrower on the original loan documents but an occupant, who is not on the loan, is still living in the property as a primary residence?

If the borrower was occupying the property as his or her principal residence immediately prior to his or her displacement, intends to occupy the property as his or her principal residence upon his or her return and the current occupant is not a tenant, the mortgage loan is eligible for consideration under HAMP. The servicer must confirm the borrower's occupancy representations as set forth in Supplemental Directive 09-07.

**Q78.** NEW Is extinguishment of a second lien required under HAMP?

No. Extinguishment of second lien instruments is not a requirement of HAMP. Servicers should refer to guidance on the Second Lien Modification Program provided in Supplemental Directive 09-05 or by the applicable GSE.

**Q79.** NEW Please clarify the definition of non-borrower household income. Who is a non-borrower?

A non-borrower is someone who is not on the original note (and may or may not be on the original security instrument), but whose income has been relied upon to support the mortgage payment. Non-borrower household income that may be considered for HAMP qualification must come from someone who resides in the residence. Examples include a non-borrower spouse, parent, child or a non-relative, but in each case, a person who shares in the occupancy of the home and provides some support for the household expenses.

**Q80.** **NEW** **What information must a borrower provide to document unemployment benefit income (UI)?  What resources exist to allow a servicer to verify this unemployment insurance benefit information?**

Borrowers must document the amount, frequency and duration of the unemployment benefits.  This information is typically obtained through official UI benefit documentation (the "Monetary Determination Letter").  Note that the Monetary Determination Letter does not include exceptional state benefit extensions and federally funded benefit extensions; therefore the total duration of the borrower's UI eligibility is not reflected in the "Maximum Benefit Amount" field of the Monetary Determination Letter.

To determine the total length of time an unemployed borrower may continue receiving payments – including federal and state-specific extensions – the servicer may use the Department of Labor UI benefit tool which is available at http://www.ows.doleta.gov/unemploy/ben_entitle.asp.  If this tool is used, a screen shot of the output should be included with the loan file.  Information about the length of benefit eligibility for workers qualifying for Trade Adjustment Assistance can also be found at the above Web site.

**Q81.** **NEW** **Is a borrower who is unemployed with six months of unemployment benefits remaining and the ability to file for an extension extending benefits beyond the required nine months eligible for HAMP?**

If the servicer makes a reasonable determination that the borrower is eligible to file for an extension for the unemployment benefits, and the extension would extend to or beyond nine months from the servicer's initial evaluation of the borrower for HAMP eligibility, such unemployment income is eligible to be included when qualifying the borrower for HAMP.  The borrower must also meet all other HAMP eligibility criteria.

**Q82.** **NEW** **How should the borrower's "pay for performance" incentive be treated for tax reporting purposes?**

The IRS has ruled that the borrower's "pay for performance" principal balance reduction payment will be excluded from gross income for tax reporting purposes.

**Q83.** **NEW** **Is it permissible for a servicer to require a delinquent borrower to make a "good faith" or contribution payment pending the processing of the trial period plan before the plan starts?**

No, servicers may not require the borrower to make a "good faith" or contribution payment.

**Q84.** **NEW** **May a servicer accept information provided on behalf of borrowers by trusted advisors such as HUD-approved housing counselors?**

Yes.  Servicers should accept borrower information delivered by an authorized trusted advisor on behalf of a borrower and may use that information to determine HAMP eligibility.  In such cases, the servicer must comply with applicable privacy and other laws and, when necessary, obtain evidence of the borrower's consent to the servicer's sharing of the borrower's private financial information with the trusted advisor.

Servicers may pledge any portion of the upfront servicer incentive that is earned in conjunction with a completed HAMP modification to compensate trusted advisors acting on behalf of a borrower, provided that there is no fee charged to the borrower.

### Q85. NEW If there are changes in a borrower's tax and insurance premium payments during the trial period (but after a verified approval), must the servicer re-evaluate the borrower for HAMP eligibility and obtain a new NPV result?

No, the servicer is not required to re-evaluate the borrower for HAMP eligibility or obtain a new NPV result after the eligibility determination based on verified income documentation. However, the servicer must provide written notice to the borrower – in addition to any escrow notification required by RESPA – which explains the impact of the new escrow payment on the trial period plan.

## N. Standard Modification Waterfall Questions

### Q86. Please clarify the servicer's obligation as it relates to the HOPE for Homeowners (H4H) requirement.

While the servicer is gathering information to determine if a borrower meets the minimum eligibility criteria for HAMP, it should also be assessing whether the borrower may be eligible to refinance through an FHA H4H loan. This assessment would involve asking the following set of questions:

- Will the loan amount exceed $550,440?
- Has the borrower made less than 6 full payments during the life of the first lien loan?
- Does the borrower have an ownership interest in other residential real estate (including 2nd homes/rental properties)?
- Was the mortgage to be refinanced originated after January 1, 2008?
- Does the property contain more than 1 unit?

If the answer to all of these questions is "NO", the borrower may be eligible for H4H. In this case, the servicer should counsel the borrower to seek a refinance with an H4H lender. If the servicer's origination division does not participate in the H4H program, a listing of participating lenders can be found at the following link:

http://portal.hud.gov/portal/page?_pageid=73,7605762&_dad=portal&_schema=PORTAL

If the servicer knows that the related owner or third party investor does not permit principal forgiveness, which is required under H4H, no servicer action is required with respect to that loan. However, the servicer may not refuse to consider a borrower for HAMP or refuse to initiate a trial period plan for an otherwise qualified borrower subject to that borrower applying for and being denied a loan under H4H.

Servicers should demonstrate compliance with this requirement by documenting the date of the referral. Servicers are not – under any circumstances – required to take a loan application from the borrower.

**Q87.** REVISED **If a pooling and servicing agreement or other investor servicing agreement ("PSA") or applicable law restricts or prohibits a modification step in the standard modification waterfall and the servicer partially performs it or skips it, does the modification still qualify for HAMP?**

Yes. Servicers should maintain evidence in the loan file documenting the nature of any deviation from taking any sequential modification step in the standard modification waterfall. The evidence should demonstrate that the applicable PSA or applicable law restricted or prohibited the servicer from fully performing or taking the modification step. If a servicer was restricted or prohibited from fully performing or taking the modification step, the documentation should show that it made reasonable efforts to seek a waiver from the applicable investor and whether the requested waiver was approved or denied.

The requirement set forth in Supplemental Directive 09-01 to seek prior approval from Fannie Mae, in its capacity as program administrator, for deviating from the standard modification waterfall has been eliminated.

**Q88. May a servicer extend the term before reducing the interest rate if the servicer believes the outcome is better for the borrower?**

Servicers must follow the waterfall steps sequentially as outlined by Supplemental Directive 09-01. The interest rate must be fully reduced to 2 percent prior to any term extension. However, servicers are not precluded under HAMP from agreeing to a modification where additional principal forbearance is substituted for extending the term as needed to achieve the target monthly mortgage payment ratio of 31 percent, as long as the modification otherwise complies with HAMP requirements. In this case, borrower, servicer and investor incentive / reimbursement payments will be paid on modification terms that reflect the target monthly mortgage payment ratio and standard modification terms.

**Q89. Can servicers agree to a rate below 2 percent or fix the reduced rate for the life of the loan?**

Yes. Subject to investor guidelines or applicable law, servicers are not precluded under HAMP from agreeing to a modification where the interest rate is reduced to less than 2 percent or does not step up after five years. However, borrower, servicer and investor incentive/reimbursement payments for these modifications will be paid based on modification terms that reflect the target monthly mortgage payment ratio and standard modification terms.

**Q90.** NEW **If a PSA prohibits term extension (but not extension of the amortization schedule), may a servicer modify the loan under HAMP by reducing the interest rate and extending the amortization schedule as necessary to achieve the target monthly mortgage payment ratio and edit the Home Affordable Modification Agreement accordingly to reflect the extended amortization schedule?**

Yes. As provided in Supplemental Directive 09-01, if a servicer is prohibited under a PSA from extending the term (but is not prohibited from extending the amortization schedule), the servicer may extend the amortization schedule up to 480 months to achieve the target monthly mortgage payment ratio. If, in this case, the amortization schedule would terminate after the loan's maturity date, then the borrower must pay the remaining balance on the maturity date in the form of a balloon payment. Servicers are reminded that they are required to amend the Home Affordable

Modification Agreement and Trial Period Plan as necessary to comply with applicable federal, state and local law, which would include any required disclosures of a balloon payment. In addition, in this circumstance, a servicer should amend the payment schedule in Section 3C of the Modification Agreement to reflect a final balloon payment due at maturity of the loan. Finally, the servicer must document the PSA prohibition on term extension as set forth in Q87 above.

**Q91. Where can the servicer obtain the Freddie Mac Primary Mortgage Market Survey rate?**

The Freddie Mac Primary Mortgage Market Survey rate (PMMS) is the conventional mortgage rate published in the Federal Reserve's H.15 bulletin. The weekly PMMS rate is available on the Freddie Mac home page at www.freddiemac.com.

**Q92. REVISED Is there a limit to the balloon payment on the end? Is there a maximum amount?**

Deleted. Refer to Q96.

**Q93. If subordination of a junior lien holder is required and that junior lien holder imposes a fee or cost reimbursement requirement, can the servicer pay the item and capitalize the amount?**

The servicer may not capitalize junior lien holder subordination fees. Servicers are not required, but may choose to pay those fees out of pocket and offset costs out of their incentive payments.

**Q94. If a loan was modified in the past and has a principal/interest forbearance tied to the previous modification, can that previous forbearance amount be capitalized?   How should that balance be handled?**

Any prior forbearance amount may be capitalized to the extent that such forbearance is permitted under, and any required disclosures comply with, all applicable laws, rules and regulations.

**Q95. If the servicer cannot reduce the borrower's payment to achieve the 31 percent target monthly mortgage payment ratio, can the servicer still modify the loan under HAMP (for example, to a 35 percent monthly mortgage payment ratio) and receive HAMP incentives?**

If the servicer cannot reduce the borrower's monthly mortgage payment ratio to the target of 31 percent, the modification will not satisfy the HAMP requirements and no incentives will be payable in connection with the modification. However, the servicer should consider all other loss mitigation options that may be available based on investor guidelines and contractual agreements.

**Q96. REVISED Are there limits to how much forbearance is required in the standard modification waterfall?**

If the result of the NPV test is "positive", servicers are not required to forbear more than the greater of (i) 30 percent of the unpaid principal balance of the mortgage loan (after any capitalization under Step 1 of the standard modification waterfall) or (ii) an amount resulting in a modified interest-bearing balance that would create a current mark-to-market loan-to-value ratio equal to 100

percent. If the borrower's monthly mortgage payment cannot be reduced to the target monthly mortgage payment ratio of 31 percent unless the servicer forbears more than the amounts described above, the servicer may consider the borrower ineligible for a HAMP modification. However, servicers are permitted, at their discretion, to forbear principal in excess of the amounts described above in order to achieve the target monthly mortgage payment ratio of 31 percent.

If the result of the NPV test is "negative", the servicer may not forbear more than an amount resulting in a modified interest-bearing balance that would create a current mark-to-market loan-to-value ratio equal to 100 percent. If the borrower's monthly mortgage payment cannot be reduced to the target monthly mortgage payment ratio of 31 percent unless the servicer forbears more than the amount described above, the servicer must consider the borrower ineligible for a HAMP modification.

### Q97. Is a borrower with a mortgage loan that has a current remaining term (prior to modification) that is greater than 480 months eligible for a HAMP modification?

Yes. The fact that the loan's current remaining term is greater than 480 months does not disqualify the borrower from HAMP eligibility. If the borrower is otherwise eligible under HAMP and reduction of the borrower's current interest rate to two percent would not be sufficient to reach the target monthly mortgage payment ratio of 31 percent, the servicer should skip the term extension step of the standard modification waterfall and proceed to the principal forbearance step of the waterfall to attempt to achieve the target monthly mortgage payment ratio of 31 percent. The servicer should enter the remaining term in the NPV input field labeled "Amortization Term after Modification" so that the number in this field and the "Remaining Term" NPV input field are identical.

## O. Incentives and Payments

### Q98. What does it mean to be in good standing?

A borrower is considered to be in good standing under the program if they are not delinquent by the equivalent of three full monthly payments at the end of the month in which the last of the three delinquent payments was due.

### Q99. If there is a 30-60 day delinquency during the year, will the incentive payments still accrue?

Borrower "pay for success" principal balance reduction payments will accrue as long as the borrower is current and makes his or her monthly payment on time (the payment is made by the last day of the month in which the payment is due). For example, if the borrower is current and makes 10 out of 12 payments on time, he or she will be credited for 10/12 of the annual incentive payment as long as the loan is in good standing at the time the annual incentive is paid. A borrower whose loan is delinquent on a rolling 30- or 60-day basis will not accrue annual incentive payments.

Servicer "pay for success" fees will be paid annually as long as the loan is in good standing at the time the annual incentive is paid.

### Q100.     How does a borrower lose good standing?

If a borrower misses three payments following execution of a Home Affordable Modification Agreement (three monthly payments are due and unpaid on the last day of the third month), the

loan is no longer considered to be in "good standing". A loan that is not in good standing permanently loses eligibility to receive further incentives and reimbursements under the program. Undisbursed payments to borrowers, servicers and investors, even if accrued, will not be made. Once lost, good standing cannot be restored and eligibility for incentives and interest reimbursements cannot be reclaimed, even if the borrower fully cures the delinquency.

**Q101.** REVISED Is a borrower that has failed a HAMP modification eligible for another HAMP offer?

No. A borrower that fails a HAMP modification is not eligible for another HAMP offer. However, the servicer must work with the borrower to attempt to cure the delinquency. If a cure is not possible, the servicer must consider the borrower for any other home retention loss mitigation options that may be available. If those options are unsuccessful, the servicer must consider the borrower for a short sale or deed-in-lieu when applicable.

**Q102.** In what form will the incentive payments be paid -- physical checks or wires? Will they be by individual loan or consolidated? If consolidated, will Fannie Mae provide loan-level accounting for the incentives? Are there any differences in payment method between Fannie Mae, Freddie Mac and non-GSE? Finally, for investor payments, can you clarify when the investor incentive will be sent to the servicer? For securitization Trusts, is Treasury going to issue any guidance on how those funds are to be passed through to security holders?

Incentive payments for all modifications, whether held by Fannie Mae, Freddie Mac or non-GSE investors, will be paid via wire transfer in a consolidated fashion. Fannie Mae will provide loan-level accounting for the incentives. The investor monthly cost share reduction payment is paid monthly to servicers starting in the first month after the official modification. It is the servicers' obligation to remit the investor monthly cost share reduction payments to the appropriate investors/security holders. Treasury is not providing guidance on how those funds are to be passed through to security holders of securitization trusts. However, Freddie Mac, Treasury's Compliance Agent, will monitor to ensure that cost share reduction payments are remitted to security holders and that pay for success payments are applied to borrower accounts in accordance with the program's guidelines.

**Q103.** If a borrower receives a modification under HAMP and pays the loan off early, would the borrower subsequently receive his or her accrued incentive for the months in which he or she performed (e.g., the borrower pays off the mortgage before the anniversary date of the beginning of the trial period, but had accrued several months of incentive)? Would a servicer receive any incentive payment?

Incentives, including accrued but unearned incentives, will not be paid to any party after the loan is paid in full.

**Q104.    For GSE loans, do the respective announcements, bulletins, and Guide chapters published by either Fannie Mae or Freddie Mac constitute part of the "guidelines issued by the Secretary of the Treasury or his designee under the Emergency Economic Stabilization Act of 2008" for purposes of determining the scope and availability of the Servicer Safe Harbor for Mortgage Modifications as set forth in section 201 of the Helping Families Save Their Homes Act of 2009?**

Yes.  In order to enjoy the protections afforded by the Servicer Safe Harbor, servicers of loans owned, guaranteed, or securitized by Fannie Mae ("Fannie Mae Mortgages") must service Fannie Mae Mortgages in accordance with Fannie Mae Announcement 09-05R and any related announcement published by Fannie Mae governing the implementation of HAMP with respect to Fannie Mae Mortgages.   In order to enjoy the protections afforded by the Servicer Safe Harbor, servicers of loans owned, guaranteed, or securitized by Freddie Mac ("Freddie Mac Mortgages") must service Freddie Mac Mortgages in accordance with the Freddie Mac Seller/Servicer Guide, Chapter C65 and any related Bulletins published by Freddie Mac governing the implementation of HAMP with respect to Freddie Mac Mortgages.

**Q105.    NEW Is the investor payment reduction cost share compensation retroactive to the trial period start date, or does it accrue from modification effective date forward and pay annually on that anniversary date?**

The investor payment reduction cost share compensation accrues monthly from the effective date of the official modification, not from the start of the trial period. The compensation is paid monthly beginning the month following month of the effective date of the official modification.   Such compensation shall accrue monthly as the borrower makes each payment so long as the loan is in good standing as defined in Supplemental Directive 09-01. This compensation will be provided for up to five years or until the loan is paid off, whichever is earlier.

**Q106.    NEW If a borrower's "pay for performance" incentive is due to be paid when the borrower is delinquent, should the servicer apply the payment as a principal curtailment?**

In the event the borrower is delinquent, but still in good standing, the borrower's incentive should continue to be applied as a curtailment to the interest-bearing UPB.

## P. Government Monitoring Data

### Q107.    What information are servicers required to collect?

Servicers must request information regarding the race, sex, and ethnicity (Government Monitoring Data) of any borrower (including any co-borrower) who seeks a modification under HAMP.

### Q108.    Why does the federal government need the Government Monitoring Data?

In the federal Fair Housing Act, Congress prohibited discrimination in the sale and financing of housing and charged HUD with administering the Fair Housing Act.  HUD requests the data in order to ensure that HAMP modifications are conducted in compliance with the Fair Housing Act.  Under the Fair Housing Act, neither note holders nor their servicers may discriminate against any person

seeking a modification under HAMP on the basis of race, national origin, sex, or any other prohibited basis.

**Q109.**   REVISED **When are servicers required to begin collecting and reporting Government Monitoring Data?**

Servicers should refer to the guidance provided in Supplemental Directive 09-06 with respect to the collection and reporting of Government Monitoring Data.

**Q110.**   **At what point in the HAMP process is the requirement to request Government Monitoring Data triggered, and how should servicers request Government Monitoring Data from the borrower?**

Government Monitoring Data must be requested when servicers receive a modification request under HAMP from the borrower. A request will be considered to have been received once the borrower has furnished the servicer with either a Hardship Affidavit (Rev. April 2009 or later) or an MHA Request for Modification and Affidavit form ("RMA").   Servicers should request the Government Monitoring Data as follows:

(a)   If the borrower completes the Hardship Affidavit or RMA in a face-to-face setting by mail or over the Internet, the borrower will be able to read the disclosure contained just beneath the Information for Government Monitoring Purposes section heading, determine whether he or she wishes to furnish the Government Monitoring Data, and complete the remainder of the Information for Government Monitoring Purposes section accordingly.   "Complete" means either furnish the requested Government Monitoring Data or check the box which states "I do not wish to furnish this information".

(b)   If the servicer is gathering the information necessary to complete the Government Monitoring Data from the borrower in a face-to-face interview or over the phone, the servicer should first read to the borrower the disclosure contained just beneath the Information for Government Monitoring Purposes section heading. This will inform the borrower that the federal government requests this monitoring information in order to monitor compliance with federal statutes that prohibit lenders from discriminating against borrowers based on the borrower characteristics collected in the Government Monitoring Data. It will also inform the borrower that if he or she chooses not to provide the Government Monitoring Data, then, where the Hardship Affidavit or RMA is taken in person, the servicer is required to note the data on the basis of visual observation or surname.   After reading the disclosure to the borrower, the servicer should ask the borrower whether he or she desires to furnish the information. If the borrower elects to furnish the Government Monitoring Data, the servicer should read the race, ethnicity and sex categories and options from the Information for Government Monitoring Purposes section, ask the borrower which boxes he or she would like checked, and then check the boxes as directed by the borrower.   If the borrower declines to furnish the information, see Q112 below.

While servicers must ask and encourage each borrower who completes a Hardship Affidavit or RMA to furnish the Government Monitoring Data, servicers may not require the borrower to furnish the Government Monitoring Data.

**Q111.    What response should a servicer provide when asked by a borrower why the Government Monitoring Data is requested?**

Servicers should ensure that their servicing staff and managers understand the importance of requesting that HAMP participants provide the Government Monitoring Data.    The federal government requests this monitoring information in order to monitor compliance with federal statutes that prohibit lenders from discriminating against borrowers on the basis of race, ethnicity and sex. In instances where borrowers decline to provide the information, servicing staff should be provided with training and job aids, e.g., desk references, scripts and, where feasible, system prompts, to supply this information as described below in Q113.

Additionally, servicers should ensure that their internal quality control plans include procedures for monitoring compliance with these requirements regarding the request for Government Monitoring Data.

**Q112.    What if the borrower declines to provide the Government Monitoring Data?**

If a borrower declines or fails to furnish all or part of the Government Monitoring Data, either the servicer or the borrower should note that fact on the Hardship Affidavit or RMA.

(a)    If the borrower completes the Hardship Affidavit or RMA in a face-to-face setting and chooses not to furnish the Government Monitoring Data, he or she should check the "I do not wish to furnish this information" box within the Information for Government Monitoring Purposes section of the Hardship Affidavit or RMA. If the borrower chooses not to check the box, the servicer should note this fact on the form. See Q113 below for further guidance on providing the Government Monitoring Data based on visual observation or surname.

(b)    If the borrower completes the Hardship Affidavit or RMA by mail, telephone or over the Internet, he or she should check or direct the servicer to check the "I do not wish to furnish this information" box within the Information for Government Monitoring Purposes section of the Hardship Affidavit or RMA. If the borrower chooses not to furnish the data or check the box, the servicer should indicate in the appropriate spaces within the Information for Government Monitoring Purposes section that the Hardship Affidavit or RMA was received by mail, telephone, or Internet and note the fact that the borrower chose not to furnish the Government Monitoring Data.

(c)    If the borrower furnishes the hardship information to the servicer as the servicer completes the Hardship Affidavit or RMA in either a face-to-face interview or over the phone, and the borrower elects not to furnish the Government Monitoring Data, the servicer should check the "I do not wish to furnish this information" box within the Information for Government Monitoring Purposes section of the Hardship Affidavit or RMA. If the servicer is completing the Hardship Affidavit or RMA over the phone, note that fact in the appropriate space within the Information for Government Monitoring Purposes section.

**Q113.    If the borrower declines to provide the Government Monitoring Data, must servicers provide it?**

If a borrower declines to provide the Government Monitoring Data, servicers must attempt to provide it if the Hardship Affidavit or RMA is completed in a <u>face-to-face meeting</u> with the borrower

(either by the borrower or by the servicer based on information gathered from the borrower during the interview). In that situation, servicers should note the borrower's race, ethnicity and sex, but only to the extent possible on the basis of visual observation or surname.

If the borrower declines to provide the Government Monitoring Data or fails to provide the information on a Hardship Affidavit or RMA taken by mail, telephone or over the Internet, the data need not be provided.

**Q114.** **If the borrower declines to provide Government Monitoring Data in connection with a request for modification but a servicer has race, ethnicity and sex data in its system that was obtained at the time of loan origination, should the servicer complete the Hardship Affidavit or RMA using the original race, ethnicity and sex data?**

If the servicer has reasonable access to Government Monitoring Data supplied by the borrower at origination and the borrower and co-borrower remain the same, the servicer is required to provide that information.

**Q115.** **If servicers have race, ethnicity and sex data in their systems obtained at the time of loan origination, should the original data be replaced with the Government Monitoring Data from the Hardship Affidavit or RMA? Should servicers amend any HMDA reporting for the year in which the loan origination occurred?**

This is a question that should be directed to the servicers' counsel or compliance expert.

**Q116.** **If a servicer has not asked for Government Monitoring Data in connection with a modification request it has already received, does the servicer need to contact the borrower to request the Government Monitoring Data now?**

Yes. The servicer should contact the borrower and ask him or her to furnish the Government Monitoring Data prior to completing the modification if the monitoring information is required and the servicer failed to request it. There are several ways the servicer can make the request. They include:

(a)     Mailing to the borrower either (i) a blank Hardship Affidavit or RMA containing the Information for Government Monitoring Purposes section, or (ii) an exact copy of the Information for Government Monitoring section of the Hardship Affidavit or RMA. The servicer should request that the borrower read and complete the Information for Government Monitoring Information Purposes section and mail the form back to the servicer. The servicer should inform the borrower that while he or she is encouraged to complete the form, he or she is not required to complete it. If the servicer mails the entire Hardship Affidavit or RMA, the servicer is encouraged to strike through all sections of the Hardship Affidavit or RMA (including the signature lines) except for the Information for Government Monitoring Purposes section in order to avoid confusion and rework on the part of the borrower. Either mailing should include a cover letter describing the intended use and importance of the Government Monitoring Data and encouraging the borrower to provide it. Servicers should also either provide a self addressed postage paid envelope for return of the form, or should provide a toll free number and/or internet address that the borrower may use to supply the data.

(b)     Telephone the borrower and request the Government Monitoring Data by following the guidance furnished in Q110 above. As indicated in Q110, in requesting the Government Monitoring Data by phone, the servicer must use the exact text from the Information for Government Monitoring Purposes section of the Hardship Affidavit or RMA to request and record responses from the borrower and any co-borrower. The servicer should also develop a script for use by their servicing staff to encourage borrowers to voluntarily furnish the Government Monitoring Data request.

(c)     Send by e-mail or make available to the borrower through a website, access to a digital online form or a .pdf copy of either (i) the Hardship Affidavit or RMA containing the Information for Government Monitoring Purposes section, or (ii) the Information for Government Monitoring Purposes section of the Hardship Affidavit or RMA only. The format and text of any electronic or digital version of the Information for Government Monitoring Purposes section must be identical to that found in the Hardship Affidavit or RMA. Be sure to request that the borrower read and complete the Information for Government Monitoring Purposes section and, as appropriate, either submit to the servicer electronically or print and mail the completed form back to the servicer.

The servicer's email or website should explain the intended use and importance of the Government Monitoring Data and encourage the borrower to provide it. It should also inform the borrower that while he or she is encouraged to complete the form, he or she is not required to complete it. If the servicer makes available the entire Hardship Affidavit or RMA, the servicer is encouraged to emphasize to the borrower that only the Information for Government Monitoring Purposes section should be completed. In the event the servicer makes an electronic version of the Hardship Affidavit, the RMA or the Information for Government Monitoring Purposes section available to the borrower, the servicer must comply with all applicable privacy, data security, disclosure and other laws and regulations.

**Q117.    If the prior version of the Hardship Affidavit (which did not contain the Information for Government Monitoring Purposes section) has been completed and signed by the borrower, does a servicer need to ask the borrower to complete the current version of the Hardship Affidavit (Rev. April 2009 or later) or the RMA, in whole or in part?**

Yes. Prior to the completion of the modification, the servicer should ask the borrower to complete only the Information for Government Monitoring Purposes section of the current version of the Hardship Affidavit or the RMA. See Q116 above for three ways in which a servicer may make the request. However, please note that when asking the borrower to complete the form, the servicer should clearly instruct the borrower not to complete or sign the remaining portions of the current version of the Hardship Affidavit or the RMA.

**Q118.    Will Freddie Mac, in its capacity as Compliance Agent for the Treasury, monitor servicer compliance with collection of Government Monitoring Data?**

Yes. Freddie Mac is currently developing its compliance and monitoring protocol which will include monitoring of servicers with respect to requests for and the collection and reporting of Government Monitoring Data.

**Q119.    Does a servicer have the legal authority to request Government Monitoring Data from borrowers?**

The Federal Reserve Board regulations interpreting ECOA permit the collection of information on the race, ethnicity and sex of borrowers when the information is "required by a[n] . . . agreement . . . entered into with  . . . an enforcement agency…to monitor or enforce compliance with [ECOA], this regulation, or other federal or state statutes or regulations." 12 C.F.R. 202.5(a)(2).  HUD has requested the collection of the data pursuant to its obligation to enforce the Fair Housing Act (see a copy of the HUD letter here).

On behalf of HUD, Treasury has directed Fannie Mae, as a financial agent of the United States, to enter into agreements to require servicers that offer modifications under HAMP to request Government Monitoring Data from borrowers (see a copy of the Treasury letter here).

Fannie Mae has incorporated Supplemental Directive 09-02, which explains these data collection requirements, into the Servicer Participation Agreements by reference.  As a result, Supplemental Directive 09-02: (a) constitutes an agreement entered into between Fannie Mae, on behalf of HUD, and servicers participating in HAMP; and (b) is an agreement entered into by participating servicers with an enforcement agency (i.e., HUD) to permit the enforcement agency to monitor or enforce compliance with federal law, within the meaning of 12 C.F.R. 202.5(a)(2).

If a servicer has any questions regarding its legal obligations, the servicer should consult its own counsel.

# Exhibit 5



**Help for America's Homeowners**

*Supplemental Directive 09-08*          *November 3, 2009*

## Home Affordable Modification Program – Borrower Notices

### Background

In Supplemental Directive 09-01, the Treasury Department (Treasury) announced the eligibility, underwriting and servicing requirements for the Home Affordable Modification Program (HAMP). Under HAMP, servicers apply a uniform loan modification process to provide eligible borrowers with sustainable monthly payments for their first lien mortgage loans. While HAMP program guidelines are intended to reach a broad range of at-risk borrowers, there will be loans that cannot be approved for a HAMP Trial Period Plan (Trial Period Plan) or official HAMP modification, and there will be borrowers who choose not to accept a Trial Period Plan or official HAMP modification offer. In such cases, borrowers must be informed in writing of the reasoning for servicer determinations regarding program eligibility.

This Supplemental Directive provides guidance to servicers of first lien mortgage loans that are not owned or guaranteed by Fannie Mae or Freddie Mac (Non-GSE Mortgages). Servicers of mortgage loans that are owned or guaranteed by Fannie Mae or Freddie Mac should refer to the related HAMP guidelines issued by the applicable GSE.

Servicers participating in HAMP with respect to Non-GSE Mortgages are required to execute a Servicer Participation Agreement, through which they are contractually obligated to "perform the services required under the Program Documentation and the Agreement in accordance with the practices, high professional standards of care, and degree of attention used in a well managed [servicing] operation". That high standard of care is considered to include providing borrowers with timely and accurate written communication about the modification process, including but not limited to, notice that a borrower will not be offered a HAMP modification. This Supplemental Directive provides servicers with additional guidance related to the format, content and timing of notices that must be provided to borrowers requesting consideration for a HAMP modification (Borrower Notices). This Supplemental Directive is effective January 1, 2010; however, servicers are encouraged to implement this guidance as soon as possible.

### Borrower Notices

A servicer must send a Borrower Notice to every borrower that has been evaluated for HAMP but is not offered a Trial Period Plan, is not offered an official HAMP modification, or is at risk of losing eligibility for HAMP because they have failed to provide required financial documentation. The written notices must comply with all laws, rules and regulations including but not limited to, the Equal Credit Opportunity Act, when applicable to the transaction.

**Evaluation for HAMP**. Supplemental Directive 09-06 announced additional data reporting requirements that are triggered when a mortgage loan is evaluated for HAMP. It provided that a mortgage is evaluated for HAMP when one of the following events has occurred:

- A borrower has submitted a written request (either hardcopy or electronic submission) for consideration for a HAMP modification that includes, at a minimum, current borrower income and a reason for default or explanation of hardship, as applicable; or
- A borrower has verbally provided sufficient financial and other data to allow the servicer to complete a Net Present Value (NPV) analysis; or
- A borrower has been offered a Trial Period Plan.

When a borrower is evaluated for HAMP and the borrower is not offered a Trial Period Plan or official HAMP modification, servicers are required to provide data specified in *Schedule IV* of Supplemental Directive 09-06 (Schedule IV) to Fannie Mae as Treasury's program administrator. The data reporting requirements in Schedule IV are designed to document the disposition of borrowers evaluated for HAMP.

Whenever a servicer is required to provide data specified in Schedule IV, the servicer must also comply with the requirements in this Supplemental Directive and send the appropriate Borrower Notice. With the exception of the Notice of Incomplete Information, all Borrower Notices must be mailed no later than 10 business days following the date of the servicer's determination that a Trial Period Plan or official HAMP modification will not be offered. Borrower Notices may be sent electronically only if the borrower has previously agreed to exchange correspondence relating to the modification with the Servicer electronically.

**Content of Borrower Notices.** The content of the Borrower Notices will vary depending on the information intended to be conveyed or the determination made by the servicer. All Borrower Notices must be written in clear, non-technical language, with acronyms and industry terms such as "NPV" explained in a manner that is easily understandable. The explanation(s) should relate to one or more of the Not Approved/Not Accepted reason codes specified in Schedule IV. Model clauses for reasons that relate to the codes in Schedule IV are attached as Exhibit A. Use of the model clauses is optional; however, they illustrate a level of specificity that is deemed to be in compliance with the language requirements of this Supplemental Directive.

- *Non-Approval* – for borrowers not approved for a Trial Period Plan or official HAMP modification, this notice must provide the primary reason or reasons for the non-approval. The notice must also describe other foreclosure alternatives for which the borrower may be eligible, if any, including but not limited to other modification programs, short sale and/or deed in lieu or forbearance, and identify the steps the borrower must take in order to be considered for those options. If the servicer has already approved the borrower for another foreclosure alternative, information necessary to participate in or complete the alternative should be included. Whenever a non-government foreclosure prevention option is discussed, the notice should be clear that the borrower was considered for but is not eligible for HAMP.

When the borrower is not approved for a HAMP modification because the transaction is NPV negative, the notice must, in addition to an explanation of NPV, include a list of certain input fields that are considered in the NPV decision and a statement that the borrower may, within 30 calendar days of the date of the notice, request the date the NPV calculation was completed and the values used to populate the NPV input fields defined in Exhibit A. The purpose of providing this information is to allow the borrower the opportunity to correct values that may impact the analysis of the borrower's eligibility.

If the borrower, or the borrower's authorized representative, requests the specific NPV values orally or in writing within 30 calendar days from the date of the notice, the servicer must provide them to the borrower within 10 calendar days of the request. If the loan is scheduled for foreclosure sale when the borrower requests the NPV values, the servicer may not complete the foreclosure sale until 30 calendar days after the servicer delivers the NPV values to the borrower. This will allow the borrower time to make a request to correct any values that may have been inaccurate.

Upon written receipt from the borrower of evidence that one or more of the NPV values is inaccurate, the servicer must verify the evidence and if accurate must re-run the NPV calculation if the correction is material and is likely to change the NPV outcome. Other values not affected by the correction do not need to be changed from the first NPV calculation. If the borrower identifies inaccuracies in the NPV values, the servicer must suspend the foreclosure sale until the inaccuracies are reconciled. Servicers are not required to provide the numeric NPV results or NPV input values not enumerated in Exhibit A.

- *Payment Default During the Trial Period Plan* – this notice informs the borrower that the borrower failed to make all the trial period payments by the end of the Trial Period Plan and is in default. The notice must also describe other foreclosure alternatives for which the borrower may be eligible, if any, including but not limited to other modification programs, short sale and/or deed in lieu or forbearance and identify the steps the borrower must take in order to be considered for these options. If the servicer has already approved the borrower for another foreclosure alternative, information necessary to participate in or complete the alternative should be included.   Whenever a non-government foreclosure prevention option is discussed, the notice should be clear that the borrower was considered for but is not eligible for HAMP.

- *Loan Paid Off or Reinstated* – this notice confirms that the subject loan was paid off or reinstated and must provide the payoff or reinstatement date. If the loan was reinstated this notice must include a statement that the borrower may contact the servicer to request reconsideration under HAMP if they experience a subsequent financial hardship.

- *Withdrawal of Request or Non-Acceptance of Offer* – this notice confirms that the borrower withdrew the request for consideration for either a Trial Period Plan or HAMP modification or did not accept a either a Trial Period Plan or a HAMP modification offer. Failure to make the first trial period payment in a timely manner is considered non-acceptance of the Trial Period Plan.

- *Incomplete Information* – this notice provides a list of the financial verification documents the servicer previously requested from the borrower but has not received. Servicers must develop and implement outreach procedures to obtain financial information from borrowers who do not provide verification documentation in a timely manner. As part of these procedures, the servicer must mail the borrower a notice listing all documents needed to complete the evaluation and a date by which the information must be received before the borrower becomes ineligible for HAMP. If the borrower fails to provide all required verification documents by the date provided, the servicer will declare the borrower ineligible for a modification and send the borrower a Non-Approval Notice.

  When used to determine if a borrower is qualified for a verified income Trial Period Plan, the servicer must send the notice to the borrower no earlier than 30 days after the date of the first written request for documentation and not less than 30 days before the servicer discontinues its evaluation for HAMP. When used in conjunction with a Trial Period Plan based on stated income, the servicer must send the notice not less than 30 calendar days prior to the expiration of a Trial Period Plan.

  As provided in Supplemental Directive 09-01, a servicer that offers a Trial Period Plan to a borrower based on stated income must obtain financial documentation in order to verify the borrower's eligibility for a HAMP modification. Supplemental Directive 09-01 provides that the servicer may, in its discretion, consider the offer of a Trial Period Plan to have expired at the end of 60 days if the borrower has not submitted the required documentation. The servicer must consider the Trial Period Plan to have expired if the borrower has not submitted the required documentation by the end of the trial period.

All Borrower Notices must also include the following:

- A toll-free number through which the borrower can reach a servicer representative capable of providing specific details about the contents of the Borrower Notice and reasons for a non-approval determination.
- The HOPE Hotline Number (888-995-HOPE), with an explanation that the borrower can seek assistance at no charge from HUD-approved housing counselors and can request assistance in understanding the Borrower Notice by asking for MHA HELP.
- Any information, disclosures or notices required by the borrower's mortgage documents and applicable federal, state and local law.

## Compliance

Treasury has selected Freddie Mac to serve as its compliance agent for HAMP. Supplemental Directive 09-01 describes the overall roles and responsibilities of servicers and the compliance agent in performing servicer reviews and oversight, which are unchanged by this Supplemental Directive. As compliance agent, Freddie Mac will examine the expanded reporting codes provided to Treasury, the content and distribution of Borrower Notices sent to borrowers, and the responsiveness of the servicer's customer service hotline for borrowers seeking additional detail about the information contained in the Borrower Notice. Servicers are expected to retain in the

borrower file a copy of the Borrower Notice(s) sent to the borrower.  The review will also confirm the existence and evaluate the effectiveness of the servicer's quality assurance program as it relates to the notification process and customer service hotline. Such evaluation will include, without limitation, the timing and size of the sample selection, the scope of the quality assurance reviews, and the reporting and remediation process.

## Exhibit A

## Model Clauses for Borrower Notices

The model clauses in this exhibit provide sample language that may be used to communicate the status of a borrower's request for a Home Affordable Modification. The model clauses relate to the Not Approved/Not Accepted reason codes in *Schedule IV* of Supplemental directive 09-06. Use of the model clauses is optional, however, they illustrate a level of specificity that is deemed to be in compliance with language requirements of the program.

### *Non Approval Notice*

1. **Ineligible Mortgage**. We are unable to offer you a Home Affordable Modification because your loan did not meet one or more of the basic eligibility criteria of the Home Affordable Modification Program.

   ☐ You did not obtain your loan on or before January 1, 2009.

   ☐ Your loan with us is not a first lien mortgage.

   ☐ The current unpaid principal balance on your loan is higher than the program limit. ($729,750 for a one unit property, $934,200 for a two unit property, $1,129,250 for a three unit property and $1,403,400 for a four unit property).

2. **Ineligible Borrower**. We are unable to offer you a Home Affordable Modification because your current monthly housing expense, which includes the monthly principal and interest payment on your first lien mortgage loan plus property taxes, hazard insurance and homeowner's dues (if any) is less than or equal to 31% of your gross monthly income (your income before taxes and other deductions) which, (*select one*) [you told us is $_____ ] OR [we verified as $_____ ]. Your housing expense must be greater than 31% of your gross monthly income to be eligible for a Home Affordable Modification. If you believe this verified income is incorrect, please contact us at the number provided below.

3. **Property Not Owner Occupied**. We are unable to offer you a Home Affordable Modification because you do not live in the property as your primary residence.

4. **Ineligible Property**. We are unable to offer a Home Affordable Modification because your property:

   ☐ Is vacant

   ☐ Has been condemned.

   ☐ Has more than four dwelling units.

5. **Investor Guarantor Not Participating**. We are unable to offer you a Home Affordable Modification because:

☐ We service your loan on behalf of an investor or group of investors that has not given us the contractual authority to modify your loan under the Home Affordable Modification Program.

☐ Your loan is insured by a private mortgage insurance company that has not approved a modification under the Home Affordable Modification Program.

☐ Your loan is guaranteed and the guarantor has not approved a modification under the Home Affordable Modification Program.

6. **Bankruptcy Court Declined**. We are unable to offer you a Home Affordable Modification because you have filed for bankruptcy protection and the proposed modified loan terms were not approved by the Bankruptcy Court. You may wish to contact your bankruptcy counsel or trustee to discuss this decision.

7. **Negative NPV**. The Home Affordable Modification Program requires a calculation of the net present value (NPV) of a modification using a formula developed by the Department of the Treasury. The NPV calculation requires us to input certain financial information about your income and your loan including the factors listed below. When combined with other data in the Treasury model, these inputs estimate the cash flow the investor (owner) of your loan is likely to receive if the loan is modified and the investor's cash flow if the loan is not modified. Based on the NPV results the owner of your loan has not approved a modification.

If we receive a request from you within 30 calendar days from the date of this letter, we will provide you with the date the NPV calculation was completed and the input values noted below. If, within 30 calendar days of receiving this information you provide us with evidence that any of these input values are inaccurate, and those inaccuracies are material, for example a significant difference in your gross monthly income or an inaccurate zip code, we will conduct a new NPV evaluation. While there is no guarantee that a new NPV evaluation will result in the owner of your loan approving a modification, we want to ensure that the NPV evaluation is based on accurate information.

Available NPV Inputs
    a.  Unpaid balance on the original loan as of [Data Collection Date]
    b.  Interest rate before modification as of [Data Collection Date].
    c.  Months delinquent as of [Data Collection Date]
    d.  Next ARM reset date (if applicable)
    e.  Next ARM reset rate (if applicable)
    f.  Principal and interest payment before modification
    g.  Monthly insurance payment
    h.  Monthly real estate taxes
    i.  Monthly HOA fees (if applicable)
    j.  Monthly gross income
    k.  Borrower's Total Monthly Obligations
    l.  Borrower FICO

      m. Co-borrower FICO (if applicable)

      n. Zip Code

      o. State

8. **Default Not Imminent**. We are unable to offer you a Home Affordable Modification because you are current on your mortgage loan and after reviewing the financial information you provided us we have determined that you are not at risk of default because:

☐ You have not documented a financial hardship that has reduced your income or increased your expenses, thereby impacting your ability to pay your mortgage as agreed.

☐ You have sufficient net income to pay your current mortgage payment.

☐ You have the ability to pay your current mortgage payment using cash reserves or other assets.

9. **Excessive Forbearance**. We are unable to offer you a Home Affordable Modification because we are unable to create an affordable payment equal to 31% of your reported monthly gross income without changing the terms of your loan beyond the requirements of the program.

10. **Previous HAMP Modification**. We are unable to offer you a Home Affordable Modification because your loan was previously modified under the Home Affordable Modification Program. The program does not allow more than one modification.

11. **Request Incomplete**. We are unable to offer you a Home Affordable Modification because you did not provide us with the documents we requested. A notice which listed the specific documents we needed and the time frame required to provide them was sent to you more than 30 days ago.

12. **Trial Plan Default**. We are unable to offer you a Home Affordable Modification because you did not make all of the required Trial Period Plan payments by the end of the trial period.

***Loan Paid Off or Reinstated.*** We are not considering your request for a modification because:

☐ Your loan was paid in full on _____.

☐ Your loan was reinstated on _____ and you no longer appear to be in need of modification. If you feel that you are at risk of default please contact us to discuss your eligibility and qualification for a Home Affordable Modification.

***Offer Not Accepted by Borrower / Request Withdrawn.*** We are not considering your request for a modification because:

☐ After being offered a Trial Period Plan or Home Affordable Modification you notified us on _____ that you did not wish to accept the offer.

☐ After initially asking to be considered for a Home Affordable Modification you withdrew that request on _____.

***Incomplete Information Notice.*** We cannot continue to review your request for a Home Affordable Modification because:

☐ You are currently in a Trial Period Plan, however you have not provided all of the documentation we previously requested. If we do not receive the required documents by [insert expiration date of Trial Period Plan but no less than 30 days from the date of the letter] we will terminate your Trial Period Plan and may resume other means to collect any amounts due on your account. The documents we need are: [Insert list of required documents]

☐ You have requested consideration for a Trial Period Plan, however, you have not provided all of the documentation we previously requested. If we do not receive the required documents by [insert date no less than 30 days from the date of the letter] we will consider that you have withdrawn your request for a modification and may resume other means to collect any amounts due on your account. The documents we need are: [Insert list of required documents.]

# Exhibit 6

# Making Home Affordable Program
### Servicer Performance Report Through January 2010

## Report Highlights

### Number of Permanent Modifications Nearly Doubles Over Previous Month

- In addition to the 116,000 permanent modifications, an additional 76,000 permanent modifications have been approved by servicers and are pending borrower acceptance.
- The median savings to borrowers in permanent modifications is more than $500 each month.

### Over One Million Borrowers Have Had the Opportunity to Modify Mortgages

- Nearly 1.3 million homeowners have received offers for trial modifications.
- More than 940,000 borrowers are in active modifications; 116,000 of those are permanent modifications.
- These homeowners' lower monthly mortgage payments represent a cumulative savings of $2.2 billion.
- New streamlined documentation requirements will make it easier for borrowers to apply for a HAMP modification and receive permanent relief.

### Permanent Modifications Are Helping Borrowers Who Have Experienced a Loss of Income

- The majority of permanent modifications – 57.4% – are helping people who are coping with unemployment or who have seen a reduction in hours or wages.

### National Participation by Mortgage Lenders and Coverage of Outstanding Mortgage Debt Is Extensive

- 110 servicers have signed servicer participation agreements to modify loans under HAMP, and new servicers continue to join the program each week. In addition, approximately 2,300 lenders service loans owned or guaranteed by Fannie Mae or Freddie Mac; these GSE loans are automatically eligible for HAMP.
- Approximately 89% of eligible mortgage debt outstanding is covered by HAMP participating servicers.

## Inside:

| | |
|---|---|
| Administration Housing Initiatives | 2 |
| Economic Indicators | 3 |
| HAMP Program Snapshot | 4 |
| Waterfall of HAMP-Eligible Borrowers | 5 |
| Characteristics of Permanent Modifications | 6 |
| Servicer Activity | 7 |
| HAMP Activity by State | 8 |
| HAMP Activity by Metropolitan Area | 9 |
| Modifications by Investor Type | 9 |
| List of Non-GSE Participants | 10 |

MAKING HOME AFFORDABLE

# Making Home Affordable Program
**Servicer Performance Report Through January 2010**

## Overview of Administration Housing Stability Initiatives

### Initiatives to Support Access to Affordable Mortgage Credit and Housing

**Lower Mortgage Rates and Access to Credit:**

- Continued financial support to maintain affordable mortgage rates through the Government Sponsored Enterprises (GSEs)

- Interest rates down a full percentage point over the past year. Every 1% reduction in interest rate saves a new borrower a median of $1500 annually in mortgage payments.

- Access to sustainable mortgages through the Federal Housing Administration (FHA).

**State and Local Housing Initiatives:**

- Access for Housing Finance Agencies to provide mortgages to first-time homebuyers, refinance opportunities for at-risk borrowers, and affordable rental housing.

**Tax Credits for Housing:**

- Homebuyer credit to help homebuyers buy new homes.

- Low-Income Housing Tax Credit (LIHTC) programs to support affordable rental housing.

### Initiatives to Prevent Avoidable Foreclosures and Stabilize Neighborhoods

**Making Home Affordable – Modifications:**

- Goal of offering 3-4 million homeowners lower mortgage payments through a modification through 2012.

- Over 1 million homeowners have started trial modifications and nearly 1.3 million offers for trial modifications have been extended to borrowers.

- Homeowners in permanent modifications are saving a median of over $500 per month on mortgage payments. In aggregate, homeowners have saved over $2.2 billion through trial and permanent modifications.

**Making Home Affordable – Refinancing:**

- Refinancing flexibility and low mortgage rates, which have allowed over 4 million borrowers to refinance, saving an estimated $150 per month on average and more than $6.8 billion in total over the first year.

**Neighborhood Stabilization and Community Development Programs:**

- Support for the hardest hit communities to help stabilize neighborhoods.

MAKING HOME AFFORDABLE

# Making Home Affordable Program
## Servicer Performance Report Through January 2010

### ■ Mortgage Rates



Source: Federal Reserve.

### ■ Housing Inventory



Source: National Association of Realtors.

### ■ Home Prices

Index: Jan 2000 = 100



Sources: S&P/Case-Shiller Home Price Index; LP/Haver Analytics; FHFA.

### ■ New and Existing Home Sales



Source: National Association of Realtors, Census Bureau.

Note: Shaded areas indicate recessions.

3



# Making Home Affordable Program
**Servicer Performance Report Through January 2010**

■ **Home Affordable Modification Program (HAMP) Snapshot through January 2010[1]**

| | |
|---|---|
| Number of Trial Period Plan Offers Extended to Borrowers (Cumulative) [2] | 1,269,937 |
| All HAMP Trials Started Since Program Inception | 1,008,216 |
| All Active Modifications (Trial and Permanent) | 946,735 |
| Active Trial Modifications | 830,438 |
| Trial Modifications Canceled | 60,476 |
| All Permanent Modifications Started | 117,302 |
| Permanent Modifications Canceled | 1,005 |
| Active Permanent Modifications | 116,297 |

[1] As reported by the HAMP system of record except where noted.
[2] Source: Survey data provided by servicers.

*Additional information on HAMP can be found on MakingHomeAffordable.gov or by calling the Homeowner's HOPE Hotline at 1-888-995-HOPE (4673).*

■ **HAMP Trials Started (Cumulative, by Month)**



Source: All trial modifications started by month first payment posted; based on numbers reported by servicers to the HAMP system of record.

■ **Active Permanent Modifications**



Source: HAMP system of record.



# Making Home Affordable Program
### Servicer Performance Report Through January 2010

**Waterfall of HAMP-Eligible Borrowers**

Not all 60-day delinquent loans are eligible for HAMP. Other characteristics may preclude borrower eligibility. Based on the estimates, of the 5.6 million borrowers who are currently 60 days delinquent , 1.7 million borrowers are eligible for HAMP. As this represents a point-in-time snapshot of the delinquency population and estimated HAMP eligibility, we expect that more borrowers will become eligible for HAMP from now through 2012.



•Other exclusions include: no longer owner-occupied; investor's pooling and servicing agreement precludes modification; and manufactured housing loans with titling/chattel issues that exclude them from HAMP.

Sources: Fannie Mae; monthly survey of participating servicers for December 31, 2009. Total 60+ figure from 3rd quarter MBA delinquency survey, Q3 2009. Excluded loans are as reported by servicers by survey who have signed a servicer participation agreement for HAMP.



# Making Home Affordable Program
**Servicer Performance Report Through January 2010**

**Modification Characteristics**

• Borrowers in active trial and permanent modifications have saved more than $2.2 billion through HAMP modifications.

• Loss of income is the primary borrower hardship for borrowers in permanent modifications.

**Permanent Modifications by Modification Steps:**

| | |
|---|---|
| Interest Rate Reduction | 100% |
| Term Extension | 41.7% |
| Principal Forbearance | 27.4% |

**Predominant Hardship Reasons for Permanent Modifications**



[1] Includes borrowers who are employed but have faced a reduction in hours and/or wages as well as those who have lost their jobs.
Note: Does not include 21.0% of permanent modifications reported as Other.

**Select Median Characteristics of Permanent Modifications**

| Loan Characteristic | Before Modification | After Modification | Median Decrease |
|---|---|---|---|
| Front-End Debt-to-Income Ratio[1] | 45.1% | 31.0% | -14.2 pct pts |
| Back-End Debt-to-Income Ratio[2] | 76.1% | 59.7% | -14.7 pct pts |
| Median Monthly Payment | $1,431.30 | $835.33 | -$521.85 |

[1] Ratio of housing expenses (principal, interest, taxes, insurance and homeowners association and/or condo fees) to monthly gross income.
[2] Ratio of total monthly debt payments (including mortgage principal and interest, taxes, insurance, homeowners association and/or condo fees, plus payments on installment debts, junior liens, alimony, car lease payments and investment property payments) to monthly gross income. Borrowers who have a back-end debt-to-income ratio of greater than 55% are required to seek housing counseling under program guidelines.



# Making Home Affordable Program
### Servicer Performance Report Through January 2010

## ■ HAMP Modification Activity by Servicer

| Servicer | Estimated Eligible 60+ Day Delinquency[1] | Trial Plan Offers Extended[2] | All HAMP Trials Started[3] | Active Trial Modifications[3] | Permanent Modifications[3] | Pending Permanent Modifications[4] | Active Trials + Permanents as Share of Eligible 60+ Day Delinquencies |
|---|---|---|---|---|---|---|---|
| American Home Mortgage Servicing Inc | 127,521 | 15,137 | 12,142 | 11,764 | 333 | 2,171 | 9% |
| Aurora Loan Services, LLC | 77,985 | 43,666 | 38,187 | 21,299 | 6,554 | 2,236 | 36% |
| Bank of America, NA[5] | 1,066,025 | 329,745 | 237,766 | 221,395 | 12,761 | 13,701 | 22% |
| Bank United | 5,287 | 1,211 | 944 | 816 | 128 | 629 | 18% |
| Bayview Loan Servicing, LLC | 10,413 | 4,603 | 3,960 | 3,564 | 249 | 48 | 37% |
| Carrington Mortgage Services LLC | 18,823 | 2,781 | 1,511 | 693 | 811 | 33 | 8% |
| CCO Mortgage | 5,387 | 1,169 | 1,132 | 1,103 | 29 | 311 | 21% |
| CitiMortgage, Inc. | 246,038 | 148,200 | 130,817 | 111,247 | 10,929 | 7,299 | 50% |
| Franklin Credit Management Corp. | 9,527 | 76 | 8 | 8 | 0 | NA | 0% |
| GMAC Mortgage, Inc. | 65,751 | 45,880 | 34,486 | 21,330 | 11,494 | 1,352 | 50% |
| Green Tree Servicing LLC | 11,250 | 5,604 | 4,055 | 3,728 | 227 | 389 | 35% |
| HomEq Servicing | 41,513 | 3,250 | 2,020 | 1,333 | 596 | 16 | 5% |
| J.P. Morgan Chase Bank, NA[6] | 432,416 | 222,192 | 170,028 | 150,902 | 11,581 | 17,959 | 38% |
| Litton Loan Servicing LP | 110,795 | 30,114 | 22,782 | 18,454 | 2,568 | 942 | 19% |
| Nationstar Mortgage LLC | 49,556 | 24,399 | 17,427 | 12,953 | 2,271 | 696 | 31% |
| Ocwen Financial Corporation, Inc. | 65,608 | 18,938 | 14,217 | 7,032 | 6,930 | 4,836 | 21% |
| OneWest Bank | 112,200 | 48,548 | 30,509 | 24,741 | 3,087 | 5,848 | 25% |
| PNC Mortgage[7] | 41,365 | 20,472 | 15,523 | 13,141 | 77 | 832 | 32% |
| Saxon Mortgage Services, Inc. | 71,429 | 40,375 | 36,964 | 28,685 | 5,312 | 4,989 | 48% |
| Select Portfolio Servicing | 62,041 | 50,149 | 31,630 | 17,915 | 6,761 | 1,402 | 40% |
| US Bank NA | 29,393 | 10,626 | 7,799 | 6,673 | 1,126 | 2,366 | 27% |
| Wachovia Mortgage, FSB[8] | 86,461 | 11,418 | 2,834 | 2,443 | 330 | 873 | 3% |
| Wells Fargo Bank, NA | 357,483 | 188,749 | 144,904 | 119,476 | 17,652 | 7,554 | 38% |
| Other SPA servicers[9] | 22,981 | 2,635 | 1,921 | 1,131 | 750 | NA | 8% |
| Other GSE Servicers[10] | 277,253 | NA | 44,650 | 28,612 | 13,741 | NA | 15% |
| **Total** | **3,404,501** | **1,269,937** | **1,008,216** | **830,438** | **116,297** | **76,482** | **28%** |

[1] Estimated eligible 60+ day delinquent mortgages as reported by servicers as of December 31, 2009 include conventional loans:
- in foreclosure and bankruptcy.
- with a current unpaid principal balance less than $729,750 on a one-unit property, $934,200 on a two-unit property, $1,129,250 on a three-unit property and $1,403,400 on a four-unit property.
- on a property that was owner-occupied at origination.
- originated prior to January 1, 2009.

Estimated eligible 60+ day delinquent loans excludes:
- FHA and VA loans.
- loans that are current or less than 60 days delinquent, which may be eligible for HAMP if a borrower is in imminent default.

For servicers enrolling after December 1 that did not participate in the 60+ day delinquency survey, the delinquency count is from the servicer registration form.

[2] As reported in the weekly servicer survey through January 28, 2010.
[3] Active trial and permanent modifications as reported into the HAMP system of record by servicers.
[4] As reported by servicers. Pending permanent modifications have been approved by the servicer but have not yet been accepted by the borrower. While pending, modifications are reflected in the count of active trials.
[5] Bank of America, NA includes Bank of America, NA, BAC Home Loans Servicing LP, Home Loan Services and Wilshire Credit Corporation.
[6] J.P. Morgan Chase Bank, NA includes EMC Mortgage Corporation.
[7] Formerly National City Bank.
[8] Wachovia Mortgage FSB includes Wachovia Bank NA.
[9] Other SPA servicers are entities with less than 5,000 estimated eligible 60+ day delinquencies that have signed participation agreements with Treasury and Fannie Mae. A full list of participating servicers is in the Appendix.
[10] Includes servicers of loans owned or guaranteed by Fannie Mae and Freddie Mac.

## ■ Active Modifications as a Share of Estimated Eligible 60+ Day Delinquencies



Note: Includes active trial and permanent modifications. Servicer combinations are the same as the table at left.
November trials as a share of 60+ day delinquencies on October 31, 2009.
December trials as a share of 60+ day delinquencies on November 30, 2009.
January trials as a share of 60+ day delinquencies on December 31, 2009.





7

# Making Home Affordable Program
### Servicer Performance Report Through January 2010

## HAMP Activity by State

| State | Active Trials | Permanent Modifications | Total | State | Active Trials | Permanent Modifications | Total |
|-------|------|------|------|-------|------|------|------|
| AK | 483 | 56 | 539 | MT | 1,140 | 138 | 1,278 |
| AL | 5,907 | 723 | 6,630 | NC | 17,531 | 2,510 | 20,041 |
| AR | 2,355 | 337 | 2,692 | ND | 215 | 22 | 237 |
| AZ | 40,438 | 7,000 | 47,438 | NE | 1,367 | 186 | 1,553 |
| CA | 167,399 | 24,242 | 191,641 | NH | 3,620 | 612 | 4,232 |
| CO | 11,708 | 1,797 | 13,505 | NJ | 27,905 | 3,710 | 31,615 |
| CT | 10,655 | 1,465 | 12,120 | NM | 3,012 | 390 | 3,402 |
| DC | 1,538 | 191 | 1,729 | NV | 21,568 | 3,484 | 25,052 |
| DE | 2,667 | 428 | 3,095 | NY | 38,706 | 3,777 | 42,483 |
| FL | 101,971 | 14,598 | 116,569 | OH | 18,451 | 2,529 | 20,980 |
| GA | 33,059 | 4,508 | 37,567 | OK | 2,713 | 298 | 3,011 |
| HI | 2,891 | 436 | 3,327 | OR | 9,416 | 1,469 | 10,885 |
| IA | 2,743 | 322 | 3,065 | PA | 19,494 | 2,416 | 21,910 |
| ID | 3,335 | 508 | 3,843 | RI | 3,845 | 599 | 4,444 |
| IL | 44,281 | 5,592 | 49,873 | SC | 9,178 | 1,209 | 10,387 |
| IN | 9,255 | 1,216 | 10,471 | SD | 405 | 43 | 448 |
| KS | 2,599 | 325 | 2,924 | TN | 9,452 | 1,338 | 10,790 |
| KY | 3,647 | 453 | 4,100 | TX | 29,351 | 2,481 | 31,832 |
| LA | 5,309 | 516 | 5,825 | UT | 7,029 | 1,105 | 8,134 |
| MA | 18,647 | 2,788 | 21,435 | VA | 20,542 | 3,377 | 23,919 |
| MD | 27,183 | 4,003 | 31,186 | VT | 598 | 93 | 691 |
| ME | 2,201 | 337 | 2,538 | WA | 16,255 | 2,580 | 18,835 |
| MI | 28,062 | 3,938 | 32,000 | WI | 8,344 | 1,243 | 9,587 |
| MN | 15,359 | 2,584 | 17,943 | WV | 1,466 | 199 | 1,665 |
| MO | 10,573 | 1,234 | 11,807 | WY | 440 | 73 | 513 |
| MS | 3,413 | 474 | 3,887 | Other* | 717 | 345 | 1,062 |

\* Includes Guam, Puerto Rico and the U.S. Virgin Islands.

## HAMP Activity by State



Note: Includes active trial and permanent modifications from the official HAMP system of record.

**HAMP Modifications**
- 5,000 and lower
- 5,001 − 10,000
- 10,001 − 20,000
- 20,001 − 35,000
- 35,001 and higher

## Mortgage Delinquency Rates by State



**60+ Day Delinquency Rate**
- 5.0% and lower
- 5.01% - 10.0%
- 10.01% - 12.5%
- 12.51% and higher

Source: Mortgage Bankers Association. Data is latest available and is as of 3rd Quarter 2009.



8

# Making Home Affordable Program
**Servicer Performance Report Through January 2010**

## 15 Metropolitan Areas With Highest HAMP Activity

| Metropolitan Statistical Area | Active Trials | Permanent Modifications | Total HAMP Activity | % of All HAMP Activity |
|---|---|---|---|---|
| New York-Northern New Jersey-Long Island, NY-NJ-PA | 51,613 | 5,743 | 57,356 | 6.1% |
| Los Angeles-Long Beach-Santa Ana, CA | 48,778 | 6,383 | 55,161 | 5.8% |
| Chicago-Naperville-Joliet, IL-IN-WI | 42,683 | 5,381 | 48,064 | 5.1% |
| Miami-Fort Lauderdale-Pompano Beach, FL | 39,356 | 5,143 | 44,499 | 4.7% |
| Riverside-San Bernardino-Ontario, CA | 38,040 | 6,139 | 44,179 | 4.7% |
| Phoenix-Mesa-Scottsdale, AZ | 33,157 | 5,834 | 38,991 | 4.1% |
| Washington-Arlington-Alexandria, DC-VA-MD-WV | 28,520 | 4,330 | 32,850 | 3.5% |
| Atlanta-Sandy Springs-Marietta, GA | 26,593 | 3,692 | 30,285 | 3.2% |
| Las Vegas-Paradise, NV | 18,000 | 2,757 | 20,757 | 2.2% |
| Detroit-Warren-Livonia, MI | 17,580 | 2,274 | 19,854 | 2.1% |
| Orlando-Kissimmee, FL | 16,265 | 2,468 | 18,733 | 2.0% |
| Philadelphia-Camden-Wilmington, PA-NJ-DE-MD | 14,807 | 1,961 | 16,768 | 1.8% |
| Boston-Cambridge-Quincy, MA-NH | 13,147 | 2,014 | 15,161 | 1.6% |
| Tampa-St. Petersburg-Clearwater, FL | 12,752 | 1,943 | 14,695 | 1.6% |
| Minneapolis-St. Paul-Bloomington, MN-WI | 12,517 | 2,123 | 14,640 | 1.5% |

A complete list of HAMP activity for all MSAs is available at
*http://www.financialstability.gov/docs/MSA%20Data%20Jan%202010.pdf*

## HAMP Modifications by Investor Type (20 Largest Servicers)

| Servicer | GSE | Private | Portfolio | Total |
|---|---|---|---|---|
| Bank of America, NA[1] | 149,464 | 73,282 | 11,410 | 234,156 |
| JP Morgan Chase NA[2] | 74,390 | 65,579 | 22,514 | 162,483 |
| Wells Fargo Bank, NA | 100,361 | 31,497 | 5,270 | 137,128 |
| CitiMortgage, Inc. | 80,917 | 7,967 | 33,292 | 122,176 |
| Saxon Mortgage Services Inc. | 1,264 | 32,403 | 330 | 33,997 |
| GMAC Mortgage, Inc. | 18,085 | 14,739 | 0 | 32,824 |
| Aurora Loan Services, LLC | 16,087 | 11,437 | 329 | 27,853 |
| OneWest Bank | 15,580 | 10,514 | 1,734 | 27,828 |
| Select Portfolio Servicing | 567 | 21,219 | 2,890 | 24,676 |
| Litton Loan Servicing LP | 2,369 | 18,653 | 0 | 21,022 |
| Nationstar Mortgage LLC | 10,248 | 4,870 | 106 | 15,224 |
| Ocwen Financial Corporation, Inc. | 3,066 | 10,857 | 39 | 13,962 |
| PNC Mortgage[3] | 11,765 | 19 | 1,434 | 13,218 |
| American Home Mortgage Servicing Inc | 816 | 11,281 | 0 | 12,097 |
| US Bank NA | 6,107 | 9 | 1,683 | 7,799 |
| Green Tree Servicing LLC | 3,756 | 190 | 9 | 3,955 |
| Bayview Loan Servicing, LLC | 1 | 3,772 | 40 | 3,813 |
| Wachovia Mortgage, FSB[4] | 1,500 | 132 | 1,141 | 2,773 |
| HomEq | 0 | 1,898 | 31 | 1,929 |
| Carrington Mortgage Services LLC | 0 | 1,504 | 0 | 1,504 |
| Remainder of HAMP Servicers | 44,040 | 29 | 2,249 | 46,318 |
| **Total** | **540,383** | **321,851** | **84,501** | **946,735** |

[1] Bank of America, NA includes Bank of America, NA, BAC Home Loans Servicing LP, Home Loans Services and Wilshire Credit Corporation.
[2] J.P. Morgan Chase Bank, NA includes EMC Mortgage Corporation.
[3] Formerly National City Bank.
[4] Wachovia Mortgage FSB includes Wachovia Bank NA.

Note: Figures reflect active trials and permanent modifications.



# Making Home Affordable Program
### Servicer Performance Report Through January 2010

## Appendix: Non-GSE Participants in HAMP

| | | |
|---|---|---|
| Allstate Mortgage Loans & Investments, Inc. | Grafton Suburban Credit Union | PennyMac Loan Services, LLC |
| American Eagle Federal Credit Union | Great Lakes Credit Union | PNC Bank, National Association |
| American Home Mortgage Servicing, Inc | Greater Nevada Mortgage Services | Purdue Employees Federal Credit Union |
| AMS Servicing, LLC | Green Tree Servicing LLC | QLending, Inc. |
| Aurora Loan Services, LLC | Harleysville National Bank & Trust Company | Quantum Servicing Corporation |
| Bank of America, N.A.[1] | Hartford Savings Bank | Residential Credit Solutions |
| Bank United | Hillsdale County National Bank | RG Mortgage Corporation |
| Bay Federal Credit Union | Home Financing Center, Inc | Roebling Bank |
| Bay Gulf Credit Union | HomEq Servicing | RoundPoint Mortgage Servicing Corporation |
| Bayview Loan Servicing, LLC | HomeStar Bank & Financial Services | Saxon Mortgage Services, Inc. |
| Carrington Mortgage Services, LLC | Horicon Bank | Schools Financial Credit Union |
| CCO Mortgage | Horizon Bank, NA | SEFCU |
| Central Florida Educators Federal Credit Union | Iberiabank | Select Portfolio Servicing |
| Central Jersey Federal Credit Union | IBM Southeast Employees' Federal Credit Union | Servis One Inc., dba BSI Financial Services, Inc. |
| Chase Home Finance, LLC | IC Federal Credit Union | ShoreBank |
| CitiMortgage, Inc. | Idaho Housing and Finance Association | Silver State Schools Credit Union |
| Citizens 1st National Bank | iServe Residential Lending LLC | Sound Community Bank |
| Citizens First Wholesale Mortgage Company | J.P.Morgan Chase Bank, NA[2] | Specialized Loan Servicing, LLC |
| Community Bank & Trust Company | Lake City Bank | Spirit of Alaska Federal Credit Union |
| CUC Mortgage Corporation | Lake National Bank | Stanford Federal Credit Union |
| Digital Federal Credit Union | Litton Loan Servicing | Sterling Savings Bank |
| DuPage Credit Union | Los Alamos National Bank | Technology Credit Union |
| Eaton National Bank & Trust Co | Marix Servicing, LLC | Tempe Schools Credit Union |
| Farmers State Bank | Members Mortgage Company, Inc | The Bryn Mawr Trust Co. |
| Fidelity Homestead Savings Bank | Metropolitan National Bank | The Golden 1 Credit Union |
| First Bank | Mission Federal Credit Union | U.S. Bank National Association |
| First Federal Savings and Loan | MorEquity, Inc. | United Bank of Georgia |
| First Federal Savings and Loan Assn. of Lakewood | Mortgage Center, LLC | United Bank Mortgage Corporation |
| First Keystone Bank | Mortgage Clearing Corporation | Vantium Capital, Inc. |
| First National Bank of Grant Park | National City Bank | Verity Credit Union |
| Franklin Credit Management Corporation | Nationstar Mortgage LLC | Wachovia Mortgage, FSB[3] |
| Fresno County Federal Credit Union | Oakland Municipal Credit Union | Wells Fargo Bank, NA |
| Glass City Federal Credit Union | Ocwen Financial Corporation, Inc. | Wescom Central Credit Union |
| Glenview State Bank | OneWest Bank | Yadkin Valley Bank |
| GMAC Mortgage, Inc. | ORNL Federal Credit Union | |
| Golden Plains Credit Union | Park View Federal Savings Bank | |

[1] Bank of America, NA includes Bank of America, NA, BAC Home Loans Servicing
LP, Home Loan Services and Wilshire Credit Corporation.
[2] J.P. Morgan Chase Bank, NA includes EMC Mortgage Corporation.
[3] Wachovia Mortgage FSB includes Wachovia Bank NA.



# Exhibit 7

**U.S. DEPARTMENT OF THE TREASURY**
Washington
March 4, 2009

**Making Home Affordable**
**Summary of Guidelines**

Making Home Affordable *will offer assistance to as many as 7 to 9 million homeowners,* making their mortgages more affordable and helping to prevent the destructive impact of foreclosures on families, communities and the national economy.

*The Home Affordable Refinance* program will be available to 4 to 5 million homeowners who have a solid payment history on an existing mortgage owned by Fannie Mae or Freddie Mac. Normally, these borrowers would be unable to refinance because their homes have lost value, pushing their current loan-to-value ratios above 80%. Under the Home Affordable Refinance program, many of them will now be eligible to refinance their loan to take advantage of today's lower mortgage rates or to refinance an adjustable-rate mortgage into a more stable mortgage, such as a 30-year fixed rate loan.

GSE lenders and servicers already have much of the borrower's information on file, so documentation requirements are not likely to be burdensome. In addition, in some cases an appraisal will not be necessary. This flexibility will make the refinance quicker and less costly for both borrowers and lenders. The Home Affordable Refinance program ends in June 2010.

The *Home Affordable Modification* program will help up to 3 to 4 million at-risk homeowners avoid foreclosure by reducing monthly mortgage payments. Working with the banking and credit union regulators, the FHA, the VA, the USDA and the Federal Housing Finance Agency, the Treasury Department today announced program guidelines that are expected to become standard industry practice in pursuing affordable and sustainable mortgage modifications. This program will work in tandem with an expanded and improved Hope for Homeowners program.

With the information now available, **servicers can begin immediately to modify eligible mortgages** under the Modification program so that **at-risk borrowers can better afford their payments.** The detailed guidelines (separate document) provide information on the following:

Eligibility and Verification
- Loans originated on or before January 1, 2009.
- First-lien loans on owner-occupied properties with unpaid principal balance up to $729,750. Higher limits allowed for owner-occupied properties with 2-4 units.
- All borrowers must fully document income, including signed IRS 4506-T, two most recent pay stubs, and most recent tax return, and must sign an affidavit of financial hardship.
- Property owner occupancy status will be verified through borrower credit report and other documentation; no investor-owned, vacant, or condemned properties.
- Incentives to lenders and servicers to modify at risk borrowers who have not yet missed payments when the servicer determines that the borrower is at imminent risk of default.
- Modifications can start from now until December 31, 2012; loans can be modified only once under the program.

Loan Modification Terms and Procedures
- Participating servicers are required to service all eligible loans under the rules of the program unless explicitly prohibited by contract; servicers are required to use reasonable efforts to obtain waivers of limits on participation.
- Participating loan servicers will be required to use a net present value (NPV) test on each loan that is at risk of imminent default or at least 60 days delinquent. The NPV test will compare the net present value of cash flows with modification and without modification. If the test is positive

– meaning that the net present value of expected cash flow is greater in the modification scenario – the servicer must modify absent fraud or a contract prohibition.

- Parameters of the NPV test are spelled out in the guidelines, including acceptable discount rates, property valuation methodologies, home price appreciation assumptions, foreclosure costs and timelines, and borrower cure and redefault rate assumptions.

- Servicers will follow a specified sequence of steps in order to reduce the monthly payment to no more than 31% of gross monthly income (DTI).

- The modification sequence requires first reducing the interest rate (subject to a rate floor of 2%), then if necessary extending the term or amortization of the loan up to a maximum of 40 years, and then if necessary forbearing principal. Principal forgiveness or a Hope for Homeowners refinancing are acceptable alternatives.

- The monthly payment includes principal, interest, taxes, insurance, flood insurance, homeowner's association and/or condominium fees. Monthly income includes wages, salary, overtime, fees, commissions, tips, social security, pensions, and all other income.

- Servicers must enter into the program agreements with Treasury's financial agent on or before December 31, 2009.

Payments to Servicers, Lenders, and Responsible Borrowers

- The program will share with the lender/investor the cost of reductions in monthly payments from 38% DTI to 31% DTI.

- Servicers that modify loans according to the guidelines will receive an up-front fee of $1,000 for each modification, plus "pay for success" fees on still-performing loans of $1,000 per year.

- Homeowners who make their payments on time are eligible for up to $1,000 of principal reduction payments each year for up to five years.

- The program will provide one-time bonus incentive payments of $1,500 to lender/investors and $500 to servicers for modifications made while a borrower is still current on mortgage payments.

- The program will include incentives for extinguishing second liens on loans modified under this program.

- No payments will be made under the program to the lender/investor, servicer, or borrower unless and until the servicer has first entered into the program agreements with Treasury's financial agent.

- Similar incentives will be paid for Hope for Homeowner refinances.

Transparency and Accountability

- Measures to prevent and detect fraud, such as documentation and audit requirements, will be central to the program.

- Servicers will be required to collect, maintain and transmit records for verification and compliance review, including borrower eligibility, underwriting, incentive payments, property verification, and other documentation.

- Freddie Mac will audit compliance.

###

# Exhibit 8



**Help for America's Homeowners**

# Supplemental Documentation—Frequently Asked Questions
# Home Affordable Modification Program—2009-2010 Conversion Campaign

These frequently asked questions clarify the Supplemental Directives issued in connection with the Home Affordable Modification Program (HAMP). The questions and answers below should be reviewed by each servicer that has entered into a Servicer Participation Agreement (SPA) to participate in HAMP. These frequently asked questions constitute supplemental documentation that is included in, and shall be deemed part of, the HAMP Program Documentation described in Section 1 of the SPA.

## January 8, 2010

**Q0108-01    Is a borrower who has received a HAMP offer eligible for a subsequent HAMP offer? When is a servicer's SPA obligation to offer a borrower a HAMP modification considered satisfied?**

A borrower who has a received a HAMP offer is ineligible for a subsequent HAMP offer, and the servicer's SPA obligation to offer the borrower a HAMP modification is considered satisfied, in the following circumstances:

- the borrower received a HAMP modification and lost good standing, or

- the borrower received a HAMP offer and made the first payment under trial period plan, but did not (i) make all required payments by the end of the trial period, or (ii) provide all required documents by the end of the trial period.

A borrower may seek reconsideration for a HAMP modification and the servicer is obligated to consider the borrower's request under the SPA, in the following circumstances:

- the borrower was found ineligible, either for a trial period plan or during the trial period plan, but circumstances such as income have changed sufficiently to impact the previous determination, or

- the borrower received a HAMP offer, but did not make the first trial period payment by the end of the month in which it was due.

(Note:  This Conversion FAQ revises Supplemental Documentation FAQ #71, which has been simultaneously updated.)

## January 6, 2010

**REVISED**
**Q0106-01**    **If a borrower did not make all required trial period payments by the end of the original trial period, but was nevertheless granted a Trial Period Extension under HAMP Waiver #20090803, as amended, may the borrower be offered a permanent HAMP modification if the borrower is otherwise eligible and makes all required trial period payments by the end of the Trial Period Extension?**

Yes. HAMP Waiver #20090803 required that a borrower make all original trial period payments by the end of the original trial period to qualify for a Trial Period Extension. Notwithstanding this requirement, a borrower who received a Trial Period Extension without making all of the original trial period payments by the end of the original trial period may be offered a permanent HAMP modification as long as: (i) the borrower makes all required trial period payments by the end of the Trial Period Extension; and (ii) the borrower is otherwise eligible under HAMP.

## December 30, 2009

**Q1230-01**    **During the temporary review period required under Supplemental Directive 09-10, are the borrower notification requirements of Supplemental Directive 09-08 suspended for borrowers who have been evaluated and determined to be ineligible for HAMP for reasons other than property ineligibility?**

During the temporary review period required under Supplemental Directive 09-10, servicers must send a non-approval notice that complies with the requirements of Supplemental Directive 09-08 to a borrower who has submitted all required documents and trial payments and who has been determined to be ineligible because the property is (a) not the borrower's principal residence, (b) vacant or condemned, or (c) more than four dwelling units. In addition, servicers should cancel these trial modifications from the Treasury system of record.

During the temporary review period required under Supplemental Directive 09-10, borrowers who have submitted all required documents and trial payments and who have been determined to be ineligible for any reason other than property ineligibility must be sent a notice similar to the following:

> Based on our preliminary review, you may not be eligible for HAMP because [insert reason for non-approval as per Supplemental Directive 09-08]. However, at the direction of the Treasury Department, your mortgage loan has been placed in a review period until January 31, 2010. During this time you should continue to make your trial period payments. If you believe the information used in our preliminary review is incorrect or you have additional information that we may not have considered, please contact us immediately at [XXX-XXX-XXXX] but no later than [insert date that is 30 days from the date of this notice].

The notice should clearly state that the borrower will continue to be considered for HAMP through the later of January 31, 2010 or 30 days from the date of the notice provided to the borrower and will receive an additional written communication of the final eligibility decision. Borrowers who receive this notice should not be canceled in Treasury's system of record (IR2) and should not be considered for, or offered alternative modification options during the extended review period.

**Q1230-02**    **During the temporary review period required under Supplemental Directive 09-10, if a borrower in an active HAMP trial modification refuses to accept a HAMP offer or withdraws a request to be considered for HAMP, may the servicer send the borrower a notice under Supplemental Directive 09-08 and cancel the trial modification from the Treasury system of record?**

Yes.  However, servicers should not solicit borrowers to opt out of consideration for HAMP during the temporary review period.

### December 22, 2009

**REVISED**
**Q1222-01**    **How should servicers handle situations where an eligible borrower successfully completed the HAMP trial period but has not been converted by the servicer to a permanent modification in a timely fashion?**

In situations where an eligible borrower successfully completed the trial period (including providing the required documentation and making the required payments) and should have been converted to a permanent modification, but for reasons beyond their control were not timely evaluated for a permanent modification, the servicer must promptly make a determination as to whether the borrower is eligible for a permanent HAMP modification.  If the borrower is eligible, then the servicer must offer the borrower a permanent HAMP modification as soon as possible, but in no event later than sixty days after discovering the error, including, but not limited to, discovery through notification from MHA Compliance, the servicer's own procedures, or notice provided by the borrower.  In addition, servicers must make permanent HAMP modification offers to eligible borrowers that are identified as currently being in this situation by February 28, 2010.  The permanent HAMP modification offered must put the borrower in the same position as he or she would have been had the servicer converted the borrower to a permanent modification in accordance with the program requirements.  A borrower in this situation remains eligible for a permanent HAMP modification regardless of whether the borrower failed to make trial period payments following the successful completion of the trial period.

In order to achieve this result, the servicer should take the following steps:

- the modification should be made effective as of the date the modification would have become effective if the servicer had converted the borrower in a timely fashion (the "Modification Effective Date") and the applicable Interest Rate Cap shall be the first Freddie Mac Weekly Primary Mortgage Market Survey (PMMS) Rate for 30-year fixed rate conforming loans, rounded to the nearest 0.125 percent, issued in the month prior to the Modification Effective Date.  For example, for a loan with a Modification Effective Date of July 1, 2009, the Interest Rate Cap should be 5.29% which is the PMMS Rate issued on June 4, 2009, the first PMMS rate issued in June 2009 (the PMMS archives are available at http://www.freddiemac.com/pmms/docs/30-yr_historics.xls);

- the initial unpaid principal balance of the modification should be the unpaid principal balance of the loan as of the Modification Effective Date, plus all accrued but unpaid amounts allowed to be capitalized under HAMP as of the Modification Effective Date;

- any payments made by the borrower after the Modification Effective Date until the time of conversion should be applied retroactively in accordance with the modified terms; however, any shortfalls between the actual payments made by the borrower after the Modification Effective Date (including any missed payments) and payments that are due under the modified terms until the time of conversion must be advanced by the servicer, capitalized and deferred as a non-interest bearing amount that is due and payable by the borrower at the time of payoff, maturity or transfer. The servicer may collect this amount subject to such restrictions as the investor may establish including, but not limited to, restrictions on collecting this amount in the event of a short payoff or other disposition of the loan;

- if, due to a shortfall in payments, amounts are deferred, the servicer must amend the Home Affordable Modification Agreement in accordance with the Document Summary for the modification agreement; and

- the servicer must take the necessary steps to correct any credit reporting for the borrower since the Modification Effective Date.

As part of its regular compliance activities, MHA Compliance will test for compliance with this guidance. In addition, MHA Compliance has been conducting, and intends to continue to conduct, focused file reviews on populations of aged trial modifications.

Servicers should note that this guidance does not apply to situations where a borrower has been granted a Trial Period Extension under HAMP Waiver #20090803 because the borrower made all required trial period payments during the original trial period but did not submit all necessary documentation. In that situation, the borrower must make an additional trial period payment for each extension month by the end of the Trial Period Extension to receive a permanent HAMP modification.

## December 15, 2009

**Q1215-01**     **What are some examples of appropriate methods of reconciling inconsistent income information in accordance with Supplemental Directive 09-07?**

Some examples where servicers may use their business judgment in reconciling inconsistent income information include, but are not limited to, the following:

- use the current income documentation when there is a discrepancy between tax returns and current income documentation if the borrower has changed jobs or has had a substantial pay cut;

- use the information from the tax transcript obtained via form 4506-T when differences exist between the transcript and the tax return provided by the borrower;

- when Schedule E is not available to document rental income because property was not previously rented, accept a current lease agreement and bank statements or cancelled rent checks; and

- when two paystubs indicate different periodic income, use year-to-date earnings to determine the average periodic income.

Notwithstanding the foregoing examples, servicers should not modify a mortgage loan if there is reasonable evidence indicating the borrower submitted income information that is false or misleading or if the borrower otherwise engaged in fraud in connection with the modification.

December 11, 2009

**Q1211-01**    **During December 2009, for borrowers currently in active trial periods that have made their first trial period payments, may a servicer consider a borrower's trial period plan offer to have expired if the borrower has not returned all required documentation within 60 days of the offer?**

No.  Notwithstanding the guidance provided in Supplemental Directive 09-01 regarding the servicer's ability, in its discretion, to consider the offer of a trial period plan to have expired at the end of 60 days if the borrower has not submitted all documentation required under HAMP, during December 2009 servicers may not exercise this right and must give borrowers the full length of the trial period, including any available trial period extension, to submit all required documentation prior to considering the trial period plan to have expired and cancelling the trial period from the Treasury system of record.  In addition, to the extent that servicers have already cancelled trial period plans scheduled to end in December 2009 as a result of incomplete documentation where the borrower did not have the entire trial period to submit income documentation, Treasury strongly encourages servicers to reverse this action in order to give the borrower the full length of the trial period to satisfy the HAMP documentation requirements.  The guidance provided Q71 of the November 12, 2009 version of the HAMP frequently asked questions does not apply to any such reversals.

**Q1211-02**    **Once a borrower has made the first trial period payment, may a servicer cancel a borrower's trial period for non-payment prior to the end of the trial period?**

No.  As provided in Supplemental Directive 09-01, the borrower must make all required trial period payments by the last day of the final trial period month.  To the extent that a servicer has cancelled a trial period plan for a borrower that has made the first trial period payment as a result of non-payment prior to the end of the trial period, the servicer must reverse this action in order to give the borrower the full length of the trial period to satisfy the HAMP trial period payment requirements.

Servicers are reminded that, as provided in Supplemental Directive 09-03, the servicer must receive the borrower's first trial period payment on or before the last day of the month in which the Trial Period Plan Effective Date occurs ("Trial Period Offer Deadline").  The servicer must consider the trial period plan offer to have expired if the servicer does not receive the borrower's first trial period payment by the Trial Period Offer Deadline.

**Q1211-03**    **If a borrower voluntarily provides alimony, separation maintenance or child support income and, as a result of that income, the borrower is ineligible for a HAMP offer, may the servicer remove that income from consideration and re-evaluate the borrower for HAMP eligibility?**

Yes.  Pursuant to Supplemental Directive 09-01 and Supplemental Directive 09-07, the borrower is not required to provide alimony, separation maintenance or child support income to qualify for HAMP.  If the borrower voluntarily provides such income, and that income renders the borrower ineligible for a HAMP offer, the servicer is allowed to remove that income from consideration and re-evaluate the borrower for HAMP eligibility.

## December 10, 2009

**Q1210-01**    **If the borrower has submitted all required documentation except a signed and completed IRS Form 4506-T or 4506T-EZ, may the servicer use the remaining income documentation to verify the borrower's income and waive the requirement for a signed and completed IRS Form 4506-T or 4506T-EZ?**

No, the servicer must always collect a signed and completed IRS Form 4506-T or 4506T-EZ, as applicable. However, if the borrower has not submitted a signed and completed Form 4506-T or 4506T-EZ but has submitted the most recent tax return (including all applicable schedules), has made all required trial period payments and is otherwise eligible for a HAMP modification, the servicer should send the Home Affordable Modification Agreement and the Form 4506-T or 4506T-EZ, as applicable, to the borrower in the same package and instruct the borrower to execute and return both documents in order to receive a permanent HAMP modification. If the borrower has not submitted the most recent tax return (including all applicable schedules), the servicer must obtain the signed and completed Form 4506-T or 4506T-EZ from the borrower and determine the borrower's eligibility for a HAMP modification prior to sending the Home Affordable Modification Agreement to the borrower.

**Q1210-02**    **How do servicers comply with the timing requirements for notices set forth in Supplemental Directive 09-07 and Supplemental Directive 09-08?**

Currently, servicers are required to comply only with the response times set forth in Supplemental Directive 09-07. Effective January 1, 2010, servicers must comply with both the response times set forth in Supplemental Directive 09-07 and the response times set forth in Supplemental Directive 09-08. Accordingly:

- If a servicer determines that a borrower is not eligible for a trial period plan based solely upon review of a borrower's verbal information and/or a completed RMA, the servicer must either:

  (i)    send a non-approval notice that satisfies the requirements of Supplemental Directive 09-08 to the borrower by the tenth business day after receipt of the verbal information or completed RMA, or

  (ii)   send a notice to the borrower by the tenth business day after receipt of the verbal information or completed RMA acknowledging the borrower's request for consideration under HAMP, and send a non-approval notice that satisfies the requirements of Supplemental Directive 09-08 to the borrower by the tenth business day following the date of the servicer's decision that a trial period plan will not be offered.

- If a servicer determines that a borrower is not eligible for a trial period plan based upon review of a full verified documentation package (including the Form 4506-T or Form 4506T-EZ, completed RMA, and income documentation), the servicer must send a non-approval notice that satisfies the requirements of Supplemental Directive 09-08 to the borrower by the earlier of (a) the tenth business day following the date of the servicer's decision that a trial period plan will not be offered, or (b) the 30th day after the borrower's documentation package is complete.

## December 9, 2009

**Q1209-01**    **If the borrower has submitted all required documentation except a signed Hardship Affidavit, may the servicer use alternative methods to verify the borrower's hardship and waive the requirement for a signed Hardship Affidavit?**

No.  However, if the borrower has not submitted or signed the Hardship Affidavit but has made all required trial period payments and is otherwise eligible for a HAMP modification, the servicer should send the Home Affordable Modification Agreement and the Hardship Affidavit to the borrower in the same package and instruct the borrower to execute and return both documents in order to receive a permanent HAMP modification.

## December 8, 2009

**Q1208-01**    **Does HAMP distinguish between short-term and long-term hardship for eligibility purposes?**

No.  HAMP does not distinguish between short-term and long-term hardships for eligibility purposes.  As stated in Supplemental Directive 09-01 and Supplemental Directive 09-07, the borrower must attest to and describe one or more allowable hardships and that he or she is having difficulty making the current mortgage payment by signing the Hardship Affidavit or the MHA Request for Modification and Affidavit form. In addition, servicers are reminded to follow investor guidelines for determining eligibility for borrowers in imminent default.

**Q1208-02**    **If a servicer sends an unsolicited HAMP offer to a borrower, but the borrower never responds to the offer or makes any trial period payments, is the borrower eligible for subsequent HAMP offer?**

Yes.  If the servicer sends an unsolicited HAMP offer to a borrower, but the borrower never responds to the servicer or makes a trial period payment, the borrower is eligible for a subsequent HAMP offer.   In this instance, the servicer's obligation under the Servicer Participation Agreement to offer a borrower a HAMP modification is not considered satisfied.

**Q1208-03**    **Should an existing escrow shortage be included in calculating a borrower's monthly mortgage payment?**

Yes.  An existing escrow shortage currently being paid by the borrower should be included in the borrower's monthly mortgage payment.   In addition, as provided in Supplemental Directive 09-01, if the servicer identifies any other escrow shortage as part of the servicer's escrow analysis, the servicer must take steps to eliminate the shortage in compliance with applicable laws, rules and regulations, including, but not limited to, RESPA and TILA.

**Q1208-04**    **When should a servicer use a "cancel" versus a "decline" when reporting to the Treasury system of record?**

There is not a "decline" field in the Treasury system of record.  If a loan is being cancelled and it is already a permanent modification, then the servicer should perform an "official cancellation transaction" and then a "trial cancellation transaction."

**Q1208-05**  **If the servicer has multiple reasons for a borrower not receiving a HAMP offer or falling out of a HAMP trial period or permanent modification, how should the servicer report those reasons to the Treasury system of record as required by Supplemental Directive 09-06?**

When more than one reason code under Schedule IV of Supplemental Directive 09-06 is applicable, the servicer must report the prevalent reason for the non-approval, non-acceptance or fallout. Pursuant to Supplemental Directive 09-08, the non-approval notices must comply with all applicable laws and regulations, including Regulation B when applicable to the transaction.

## December 7, 2009

**Q1207-01**  **May a servicer apply the interim month guidance set forth in Supplemental Directive 09-03 with respect to payments to situations in which the borrower's documentation needed to verify HAMP eligibility is received after the servicer's cutoff date?**

Yes. The interim month guidance set forth in Supplemental Directive 09-03 with respect to payments may also be applied to the receipt of documentation that is required to verify the borrower's eligibility for a HAMP modification. If the servicer receives the borrower's documentation after the servicer's cutoff date in the final trial period month but before the end of the final trial period month, the servicer may delay the modification effective date by one month in order to give the servicer time to finalize the modification, send the Home Affordable Modification Agreement to the borrower for signature, and receive the signed Home Affordable Modification Agreement from the borrower.

**Q1207-02**  **Does the servicer have to receive the signed Home Affordable Modification Agreement from the borrower prior to the effective date of the modification?**

No. The loan may be modified and the effective date of the modification does not need to be changed if the executed Home Affordable Modification Agreement is received from the borrower by the last day of the month in which the modification becomes effective. However, a servicer may not submit an official loan set up record to the HAMP Program Administrator to report the permanent modification until the servicer has obtained a fully executed Home Affordable Modification Agreement.

**Q1207-03**  **Are consecutive paystubs required to confirm a borrower's income?**

No. Although Supplemental Directive 09-01 and Supplemental Directive 09-07 require servicers to obtain a borrower's two most recent paystubs indicating year-to-date earnings, if the servicer can determine that the employment and year-to-date income is accurate by reviewing the paystubs provided, two non-consecutive paystubs are sufficient to meet HAMP requirements.

# Exhibit 9

**Bank of America**

Bank of America
475 CrossPoint Parkway
PO Box 9000
Getzville, NY 14068-9000

August 21, 2009

Kamie C Kahlo
Daniel J Kahlo
304 Boston St
Seattle WA 98109

Loan Number 7027384630-173

Dear Bank of America Customer:

This letter constitutes our offer to modify the Mortgage identified
above, subject to the terms and conditions agreement.
When signed by you, this letter will also constitute your
acceptance and agreement to these terms and conditions.

Your mortgage is currently in default.  Collection
activities, which may include foreclosure, may continue.
If you sign the attached acceptance and perform as
required in this commitment, we will cease any collection
activity when the mortgage is modified.

Indicate your acceptance of this offer for a Modified
Mortgage under the terms and conditions outlined on pages
2 and 3 by signing the attached acceptance, which must be
signed by each borrower and returned within seven days from the
date of this letter.  If we do not receive this signed acceptance
letter, this offer will expire automatically without further notice.

Sincerely,

Loss Mitigation

LM613 039                    Page 1 of 4
JBH

32-17-2208NSB  11-2006

Loan Number 7027384630-173

## Terms and Conditions Agreement

### Section A.   Terms of Modification

* The new principal balance will be $ 209,854.22.
* The interest rate(s), and the resulting principal and interest
(P&I) payment(s), are set according to the following table.
The last rate and payment amount listed will be in effect
until the maturity of the Modified Mortgage.
* 3.25% (P&I $ 781.79) effective with the 11/01/09 payment.
* 5.55% (P&I $ 1,058.82) effective with the 11/01/14 payment.
* The maturity date of the Modified Mortgage is October 1, 2049.
* All other terms and conditions of the mortgage will remain the
same for the Modified Mortgage, including but not limited to provisions
for late fees and the right of Bank of America, N. A.
to pursue collection for default, including foreclosure.

### Section B. Amounts to be Paid in Certified Funds

* A mortgagor contribution of $ 289.12 is due within seven days
from the date of this letter, which includes any required escrow
funds.  These fees are estimates and may change.  Should the title
and attorney fees be less than the estimated figure, Bank of America, N. A
apply the overage accordingly.  If they are more than stated, we will
ask you to send us certified funds to cover the shortages.

### Section C. Contingencies

* We may obtain a lender's title insurance policy or endorsement
insuring the Modified Mortgage as a first lien. If you have
any other encumbrances to the property, you may be required to
obtain subordination agreements from other secured creditors.

* If your loan contains mortgage insurance, the modification is
contingent upon approval from the mortgage insurer.

LM613 039 JBH          PAGE 2 OF 4

Loan Number 7027384630-173

   Terms and Conditions, Continued

* If any other issues-- including but not limited to deterio-
ration in the condition of the property, lawsuits, liens,
additional expenses, and defaulted amounts-- arise between
the date of this commitment and the date on which the
Modified Mortgage documents are to be signed, we may refuse
to modify the Mortgage.  We may then pursue collection
actions, including foreclosure, if the current Mortgage is
in default.

   Acceptance of Offer for Modification

As borrowers on the Mortgage identified above, we accept the
offer under the terms and conditions outlined in Sections A,
B, and C, and we agree/acknowledge that:

* The commitment for a Modified Mortgage will not be considered
a waiver of or defense to the right of Bank of America, N. A.
to commence or continue any collection action, including
foreclosure.  Even when signed by Bank of America, N. A.
and us, it will not prevent collection actions continuing if
we fail to fulfill any of its terms and conditions.
* This commitment is contingent on those listed in Section C.
Bank of America, N. A.  shall determine whether the
contingencies have been satisfied.
* We will pay by certified funds or Western Union (Code City - Welcome
State - NY) the total amount stated in Section B and any additional
sums that may become due.

* If Bank of America, N. A.  decided to add unpaid interest,
taxes, insurance, and other expenses to the principal balance of
the existing mortgage, the total, which would then be higher
than the current balance, will be the new principal amount
of the Modified Mortgage.
* We will sign all the documents necessary to complete the
Modification and pay the amounts due on the date we receive
the documents and the bill.
* We have failed to pay the Mortgage in accordance with its terms
and are now in default. We have no defense or offsets against the
right of Bank of America, N. A.  to collect or foreclose.
* Please check the appropriate box:
We {X} are  {  } are not currently occupying the property
as our primary residence.
* All representations we made pursuant to our request for a
Modified Mortgage are true and have been and will be relied
upon by Bank of America, N. A. . Any breach of the
representations will give us the right to terminate this
commitment and pursue other rights and remedies.

LM614 015 JBH        Page 3 of 4

RE: Loan Number 7027384630-173

**Acceptance of Offer for Modification, Continued**

We have had the opportunity to consult with legal and/or tax
counsel prior to agreeing to the foregoing.  We have willingly
agreed to these terms and conditions whether or not we elected
to retain such counsel.

_____    08 30 09
Signature                                     Date

_____    8-30-09
Signature                                     Date

_____    _____
Signature                                     Date

_____    _____
Signature                                     Date