1                                           HONORABLE JAMES L. ROBART

2

3

4

5

6

7      UNITED STATES DISTRICT COURT, WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

9   KAMIE KAHLO and DANIEL KAHLO, on
behalf of themselves and all others similarly

10  situated,                              No.  2:10-cv-00488 JLR

11                     Plaintiffs,    **PLAINTIFFS' RESPONSE TO
MOTION TO DISMISS**

12     v.                                 NOTED:  June 25, 2010

13  BANK OF AMERICA, N.A. and BAC
HOME LOANS SERVICING, LP,

14

15                   Defendants.

16

17

18

19

20

21

22

23

24

25

26



RESPONSE TO MOTION TO DISMISS

1918 Eighth Avenue, Suite 3300 • Seattle, WA  98101
(206) 623-7292 • FAX (206) 623-0594

010176-11  376019 V1

1

## TABLE OF CONTENTS

2

**Page**

3  I.   INTRODUCTION ...................................................................................................1

4  II.  STANDARD OF REVIEW ....................................................................................2

5  III. STATEMENT OF FACTS ......................................................................................2

6  A.   The HAMP Program as Effectuated through Servicer Participation
        Agreements .................................................................................................2

7

8         1.   The Servicer Participation Agreement into which Bank of
               America entered ...............................................................................3

9         2.   Obligations under Supplemental Directives incorporated into the SPA......4

10            a.   Identify eligible homeowners for HAMP loan modifications ........4

11            b.   Evaluate the loan and offer a trial period plan .................................5

12            c.   Bank of America must offer a permanent modification ..................6

13            d.   HAMP prohibitions and additional covenants ................................6

14  B.   Plaintiffs' Effort to Obtain a Loan Modification Under HAMP.............................7

15  IV. ARGUMENT ..........................................................................................................9

16  A.   Bank of America is Liable to Homeowners like Plaintiffs for its Failure
        to Meet Its Obligations Under the Servicer Participation Agreement ....................9

17

18        1.   Eligible homeowners are intended beneficiaries of the Servicer
               Participation Agreement ..........................................................................9

19        2.   The statutes authorizing and enabling the SPA statutes were
               enacted to benefit homeowners.................................................................12

20

21        3.   Intended beneficiaries need not be specifically identified in
               the contract...............................................................................................13

22        4.   Courts have found HAMP to provide legal rights to homeowners............14

23        5.   BoA violated obligations to the Kahlos under HAMP ............................18

24  B.   Bank of America Breached a Direct Contract with the Kahlos .............................19

25        1.   Returning the Terms and Conditions Agreement within seven
               days was not a condition to form a contract ............................................19

26



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

2.      Bank of America waived any requirement that the Agreement be returned within 7 days ........................................................... 20

3.      BoA and the Kahlos formed a contract by estoppel .................................. 20

4.      BoA breached the Terms and Conditions Agreement .............................. 21

C.     Bank of America Violated the Consumer Protection Act ....................................... 21

D.     Unjust Enrichment ..................................................................................... 23

V.     CONCLUSION ......................................................................................................... 23



1

## TABLE OF AUTHORITIES

2

### CASES

<u>Page</u>

3

*American Hosp. Ass'n v. Schweiker*,
  721 F.2d 170 (7th Cir. 1983) ........................................................13

*Ashton v. Pierce*,
  716 F.2d 56 (D.C. Cir. 1983) ...................................................11, 14

*Auster Oil & Gas, Inc. v. Stream*,
  764 F.2d 381 (5th Cir. 1985) ..........................................................2

*BAC Home Loans Servicing, L.P. v. Bates*,
  No. CV2009 06 2801 (Ohio Ct. of Common Pleas, Butler County, Mar. 8, 2010)...........16

*Badgett v. Security State Bank*,
  116 Wn.2d 563, 807 P.2d 356 (1991) .............................................18

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..........................................................................2

*Caldwell Trucking PRP v. Rexon Tech. Corp.*,
  421 F.3d 234 (3d Cir. 2005)...........................................................14

*County of Santa Clara v. Astra*,
  588 F.3d 1237 (9th Cir. 2009) ...........................................9, 10, 12, 13

*In re Daou Sys.*,
  411 F.3d 1006 (9th Cir. 2005) .........................................................2

*Davis by Davis v. Philadelphia Hous. Auth.*,
  121 F.3d 92 (3d Cir. 1997)..............................................................11

*Deutsche Bank Nat'l Trust Co. v. Hass*,
  No. 2009-2627-AV (Michigan Cir. Ct., Macomb County, Sept. 30, 2009) .....................15

*Deutsche Bank Nat'l Trust Co. v. Kane*,
  No. EQCV067273 (Iowa Dist. Ct., Linn County, Mar. 31, 2010)....................................15

*Escobedo v. Countrywide Home Loans, Inc.*,
  2009 U.S. Dist. Lexis 117017 (S.D. Cal. Dec. 15, 2009) ...........................................16, 17

*GMAC Mortg., LLC, v. Riley*,
  No. 500-09 Fc (Vermont Superior Ct., Franklin County, Mar. 5, 2010).....................16

*German v. Fed. Home Loan Mortg. Corp.*,
  885 F. Supp. 537 (S.D.N.Y. 1995), as clarified,
  896 F. Supp. 1385 (S.D.N.Y. 1995)................................................................11

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

*HSBC Bank, U.S.A. N.A. v. Garcia,*
   No. EQCV027408 (Iowa Dist. Ct., Buena Vista County, Nov. 12, 2009) ........................15

*Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.,*
   105 Wn.2d 778, 719 P.2d 531 (1986) ........................................................................22, 23

*Holbrook v. Pitt,*
   643 F.2d 1261 (7th Cir. 1981) ...........................................................10, 11, 12, 13

*Klamath Water Users Protective Ass'n v. Patterson,*
   204 F.3d 1206 (9th Cir. 2000) ......................................................................................9, 17

*Klinke v. Famous Recipe Fried Chicken, Inc.,*
   94 Wn.2d 255, 616 P.2d 644 (1980) ...............................................................................21

*Lehrer v. DSHS,*
   101 Wn. App. 509, 5 P.3d 722 (2000) .............................................................................19

*McNeill v. New York City Housing Auth.,*
   719 F. Supp. 233 (S.D.N.Y. 1989) ..................................................................................14

*Montana v. United States,*
   124 F.3d 1269 (Fed. Cir. 1997).........................................................................................13

*Parks Sch. of Business, Inc. v. Symington,*
   51 F.3d 1480 (9th Cir. 1995) ......................................................................................2, 21

*Rendleman v. Bowen,*
   860 F.2d 1537 (9th Cir. 1988) ..........................................................................................12

*Reyes v. Saxon Mortg. Servs., Inc.,*
   2009 U.S. Dist. Lexis 125235 (S.D. Cal. Nov. 5, 2009)...................................................15

*Reynolds Metal Co. v. Elec. Smith Constr. & Equip. Co.,*
   4 Wn. App. 695, 483 P.2d 880 (1971) .............................................................................20

*Roedler v. Dep't of Energy,*
   255 F.3d 1347 (Fed. Cir. 2001)..........................................................................................13

*U.S. Bank N.A. v. Peterman,*
   No. EQCV067378 (Iowa Dist. Ct., Linn County, Apr. 21, 2010) ....................................15

*Villa v. Wells Fargo Bank, N.A.,*
   2010 U.S. Dist. Lexis 23741 (S.D. Cal. Mar. 15, 2010)...................................................17

*Waterfall Victoria Master Fund Ltd. v. Hansen,*
   No. EQCV007412 (Iowa Dist. Ct., Benton County, Mar. 31, 2010)..................................15

*Wells Fargo Bank N.A. v. Gonzalez,*
   No. 100982/08 (N.Y. Sup. Ct., Richmond County, May 6, 2009) ....................................16

RESPONSE TO MOTION TO DISMISS - iv
No. 2:10-cv-00488 JLR
010176-11  376019 V1



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA  98101
(206) 623-7292 • FAX (206) 623-0594

*Wells Fargo Bank N.A. v. Lewis*,
     No. 130421/2009 (N.Y. Sup. Ct., Richmond County, Feb. 25, 2010)..............................16

**STATUTES**

12 U.S.C. § 5201 .........................................................................................................................2, 3

12 U.S.C. § 5219 ........................................................................................................................3, 13

15 U.S.C. § 1601 ...........................................................................................................................22

RCW 19.146.030 ...........................................................................................................................22

RCW 31.04.102 .............................................................................................................................22



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

# I.    INTRODUCTION

In order to receive $25 billion and other benefits from the United States Government, Bank of America entered into a contract to participate in a federal program to assist homeowners in danger of defaulting on their mortgages.  This contract, known as a Servicer Participation Agreement ("SPA") obligates Bank of America to perform loan modification services to benefit certain eligible homeowners and lays out detailed methods by which Bank of America is to modify their loans.  Plaintiffs allege that Bank of America serially failed to live up to its obligations to modify mortgages on behalf of homeowners and that it breached this agreement. Though Plaintiffs met all eligibility criteria and fulfilled the requirements for receiving a permanently modified loan, Bank of America refused to permanently modify their loan. Homeowners like the Kahlos have the right to enforce the SPA contract as third-party beneficiaries.  The terms of the SPA, the context in which it was entered, and the purposes behind the statutes it effectuates show that the contract was made with the intent to benefit homeowners like the Kahlos.  Plaintiffs bring this action to force Bank of America to honor the terms of the contract it signed.

In addition, Bank of America entered into a separate contract with the Kahlos to modify their loan.  While the Kahlos performed under that contract, Bank of America has claimed not to be bound by it.  Plaintiffs ask the Court to enforce this contract.  Finally, Plaintiffs allege that Bank of America's tactics constitute unfair and deceptive practices that violate the Washington Consumer Protection Act.  Bank of America has treated thousands of homeowners throughout Washington in a similarly unfair and deceptive manner by promising to modify certain types of mortgages and then failing to live up to its promises.  Plaintiffs limit themselves to these claims based on breach of contract and on violation of the Consumer Protection Act.  They do not oppose dismissal of their unjust enrichment claim.



## II.      STANDARD OF REVIEW

When the legal sufficiency of a complaint's allegations is tested under Rule 12(b)(6), all factual allegations in the complaint are taken "as true" and construed "in the light most favorable to [plaintiffs]."  *Parks Sch. of Business, Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).  "'Rule 12(b)(6) does not countenance … dismissals based on a judge's disbelief of a complaint's factual allegations.'"  *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556 (2007).  The Fed. R. Civ. P. 8 standard contains "a powerful presumption against rejecting pleadings for failure to state a claim."  *Auster Oil & Gas, Inc. v. Stream*, 764 F.2d 381, 386 (5th Cir. 1985).  When a claim is not sufficiently stated, the preferred remedy is dismissal with leave to amend.  *See In re Daou Sys.*, 411 F.3d 1006, 1013 (9th Cir. 2005).

## III.      STATEMENT OF FACTS

Between October 2008 and January 2009, Bank of America ("BoA") accepted $25 billion from the Federal Government along with partial guarantees against losses on mortgage-related assets as part of the Troubled Asset Relief Program.  Complaint ¶ 1.[1]  In exchange for these benefits, Bank of America entered into a Servicer Participation Agreement ("SPA") by which it agreed to participate in the Home Affordable Modification Program ("HAMP") and to follow the Treasury Department directives that detail the terms and manner in which BoA must modify eligible home mortgage loans. ¶ 2.

### A.      The HAMP Program as Effectuated through Servicer Participation Agreements

The HAMP program, and the requirement that loan servicers who receive bailout funds enter into a contract to participate in the program, are based on the Emergency Economic Stabilization Act as amended by the American Recovery and Reinvestment Act.  12 U.S.C. § 5201 *et seq.* (2009).  These statutes enable the Treasury Department to enter into Agreements with lenders and mortgage servicers, such as BoA, and to provide them with bailout funds, in a

---

[1] References to "¶ __" refer to Plaintiffs' Complaint.  References to "Ex. __" refer to exhibits attached to the Complaint.



1918 Eighth Avenue, Suite 3300 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

manner that "preserves homeownership." 12 U.S.C. § 5201. Specifically, the statute grants the Treasury Secretary authority to use credit enhancements and loan guarantees to "facilitate loan modifications and to prevent avoidable foreclosures." 12 USC § 5219; *see also* ¶¶ 23-28.

### 1. The Servicer Participation Agreement into which Bank of America entered

The Treasury Department, in turn, used the Federal National Mortgage Association (Fannie Mae) as its agent to enter into SPA contracts with mortgage servicers to facilitate loan modifications to homeowners. The SPA contract BoA signed opens with recitations noting that the contract is made as part of HAMP, which includes "loan modification and other foreclosure prevention services." *See* Ex. 1 at p. 1.

The Agreement obligates the Servicer (*i.e.*, BoA, or its subsidiary) to perform a number of actions with, and for the benefit of homeowners whose mortgage loans it holds. The Agreement also refers to, and recognizes "rights, duties and obligations" of mortgage borrowers under the Agreement. Specific contractual provisions include the following:

- "Servicer shall perform the loan modification and other foreclosure prevention services" described in (i) the Financial instrument attached; (ii) the Program guidelines and procedures issued by the Treasury; and (iii) any Supplemental Directives and Program Documentation. *Id*. at ¶ 1.A.

- "Servicer shall perform the Services for all mortgage loans it services.… Servicer shall use reasonable efforts to remove all prohibitions or impediments to its authority … in order to effectuate any modification of a mortgage loan under the Program." *Id*. at ¶ 2.A.

- Fannie Mae shall "(ii) remit incentive payments to Servicer for the account of Servicer *and for the credit of borrowers under their respective mortgage loan obligations*; … all payments remitted to Servicer for the credit of borrowers or for the account of Investors under the Program Documentation *shall be applied by Servicer to the borrowers' respective loan obligations*, or remitted by Servicer to Investors, as required by the Program Documentation." *Id*. at ¶ 4.B (emphasis added).

- "Servicer shall maintain complete and accurate records of, and supporting documentation for, the borrower payment, including but not limited to, PITIA (principal, interest, taxes, insurance … and homeowner's association and/or condo fees), and delinquency information and data provided to Fannie Mae



regarding each agreement relating to a trial modification period and each loan modification agreement executed under the Program ….” *Id.* at ¶ 4.E; *see also* Financial Instrument (exhibit A to SPA) ¶ 3(b) (obligating servicer to collect, record, retain, and provide to Treasury all documentation relating to the Program and borrowers).

- “[A]ny modification to the Program Documentation that materially impact the borrower eligibility requirements … or the rights, duties, or obligations of Participating Servicers, Investors, ***or borrowers*** in connection with the Program … shall be effective only on a prospective basis ….” *Id.* at ¶ 10.C (emphasis added).

### 2. Obligations under Supplemental Directives incorporated into the SPA

The SPA incorporates all Supplemental Directives and Program Documentation issued by the Treasury Department. Ex. 1 at ¶ 1.A. These Directives spell out a detailed process to help “at-risk homeowners – both those who are in default and those who are at imminent risk of default – by reducing monthly payments to sustainable levels.” Ex. 2 at p. 1. The Directives state that a servicer, like BoA, “***will use*** a uniform loan modification process to provide a borrower with sustainable monthly payments.” *Id.* (emphasis added).

BoA must identify potentially eligible homeowners and complete a process that is to culminate in qualified homeowners receiving a permanently modified loan that demands no more than 31% of their monthly income. The loan modification protocol is summarized in the complaint (¶¶ 36-47) and more fully detailed in the supplemental directives attached to the complaint. Broadly stated, the HAMP program obligates BoA to do the following:

### a. Identify eligible homeowners for HAMP loan modifications

Bank of America must consider all eligible mortgage loans for a HAMP modification. On its own, BoA must evaluate all loans in its servicing portfolio that are more than 60 days delinquent. SD 09-01, Ex. 2 at p. 4. In addition, if a borrower contacts BoA and asks for a modification and claims to have a financial hardship, BoA must evaluate that borrower's eligibility under HAMP. *Id.* at pp. 3-4. Loans are considered eligible for modification if they satisfy several requirements, the most salient of which are: (1) the mortgage is secured by the



borrower's primary residence; (2) the amount owed on the first mortgage is less than or equal to $729,750; (3) the borrower has a financial hardship that renders her in danger of defaulting on the mortgage; (4) the mortgage was originated before January 1, 2009; and (5) the total monthly payment on the borrower's first mortgage (including principal, interest, taxes, and insurance) is more than 31% of the borrower's current monthly income.  ¶ 38, Ex. 2 at pp. 2-3; *see also Making Home Affordable Questionnaire* (attached hereto as Appendix A).

### b.   Evaluate the loan and offer a trial period plan

Once BoA identifies a mortgage as potentially eligible for a modification, either because it is more than 60 days delinquent or because a homeowner initiated contact, BoA must gather information to calculate the modified payment and to verify that the borrower is indeed eligible. This includes gathering information regarding the outstanding mortgage and monthly payments, regarding the homeowner's income, and having the homeowner certify that the loan presents a significant financial hardship.  ¶ 36, Ex. 2 at 3-4.  Once verified, BoA must offer the homeowner a Trial Period Plan at a reduced monthly payment.  ¶ 41, Ex. 2 at 17-18.  The Trial Plan consists of a three-month period in which the homeowner makes reduced mortgage payments.  BoA must determine the amount of the payment using the steps enumerated in Supplemental Directive 09-01 in the stated order, "until the borrower's monthly payment ratio is reduced as close as possible to 31 percent" of their monthly income.  ¶ 42, Ex. 2 at 8.  This process includes capitalizing unpaid interest and escrow fees, waiving late fees, reducing the interest rate as low as 2 percent, and, if necessary to reach the 31 percent target, extending the term of the loan and providing a principal forbearance.  *Id.* at pp. 8-10; *see also* Ex. 3 at p. 2.

During this process, BoA must provide borrowers "with clear and understandable written information about the material terms, costs, and risks of the modified mortgage loan in a timely manner to enable borrowers to make informed decisions."  ¶ 39, Ex. 2 at p. 13.  BoA must also send Notice to every borrower that has been evaluated for HAMP but is not offered a Trial



1  Period Plan, is not offered an official HAMP modification, or is at risk of losing eligibility for

2  HAMP because they have failed to provide required financial documentation.  ¶ 44, Ex. 5 at p. 1.

### c.   Bank of America must offer a permanent modification

4  If the homeowner executes the trial plan agreement, complies with documentation

5  requirements and makes three timely trial payments, BoA must convert the Trial Plan to a

6  permanent modification.  ¶ 42.  The Directives state that the permanent modification "will

7  become effective on the first day of the month following the trial period."  Ex. 2 at p. 18.  The

8  payment amount and interest rate in the modified loan are to be fixed for five years, after which

9  the rate may escalate annually by up to one percent until it reaches a cap.  *Id*. at p. 9.

10  In the first months after HAMP was created, the Treasury Department found that

11  servicers were not promptly offering permanent modifications.  The Treasury Department issued

12  a Supplemental Directive that servicers should offer permanent modifications upon completion

13  of the trial plan and that failure to immediately make a modification was in error.  For eligible

14  homeowners who successfully completed the trial plan, "the servicer must offer the borrower a

15  permanent HAMP modification as soon as possible, but in no event later than sixty days after

16  discovering the error.  ¶ 45 Ex. 8 at Q1222-01.

### d.   HAMP prohibitions and additional covenants

18  The incorporated Supplemental Directives prohibit BoA from taking certain actions.

19  Prohibited actions include requiring a homeowner applying for a modification to make an initial

20  contribution payment before the trial plan starts (¶ 43, Ex. 4 at Q. 83), and soliciting borrowers to

21  opt out of consideration for a HAMP modification.  *Id*., Ex. 8 at Q1230-02.  The Directives also

22  prohibit BoA from reporting homeowners who are in the process of a HAMP modification to

23  credit reporting bureaus as delinquent without explanation.  Instead, the directives specify the

24  reports BoA may make to credit reporting agencies.  For homeowners who are current when they

25  enter a trial period, BoA should report the borrower current but on modified payment.  For

26



borrowers who are delinquent when they enter the trial period, BoA should report in such a manner that accurately reflects the borrower's current workout status.  *Id.*, Ex. 2 at p. 22.

BoA covenanted that it would perform all mortgage modification services in compliance with all applicable laws including state laws designed to prevent unfair or predatory lending practices.  ¶ 46, Ex. 1 at Ex. A (Financial Instrument), ¶ 5(b).  BoA also covenanted to perform the services required under the SPA in accordance with the practices, high professional standards of care, and no less than that which BoA exercises for itself under similar circumstances.  BoA promised to use qualified individuals with suitable training, education, experience and skills to perform the Services.  *Id.* at ¶ 5(d).

**B.      Plaintiffs' Effort to Obtain a Loan Modification Under HAMP**

Plaintiffs Daniel and Kamie Kahlo have been living in their home since 1999, have made their monthly mortgage payments of $1,460 to BoA for several years, and remained current on their mortgage until 2008.  ¶ 51.  The Kahlos' household income dropped with the economic downturn.  In late 2008, the Kahlos were taking home less than $2,000 per month and were having difficulty meeting their mortgage payments.  ¶ 52.  Plaintiffs contacted BoA to inform them of their difficulty and to inquire as to a possible workout arrangement.  BoA said it would not consider any arrangement unless the Kahlos were delinquent on their mortgage and advised Plaintiffs to become delinquent.  *Id.*  The Kahlos followed their bank's advice and spent the early part of 2009 futilely trying to get some form of mortgage relief from BoA.  ¶¶ 53-54.

On July 15, 2009, Plaintiffs sent BoA a letter requesting to be considered for a HAMP loan modification.  When Plaintiffs followed up by telephone a week later,  BoA claimed not to have received the letter. ¶ 55.  Plaintiffs requested and received instructions as to the information and documents BoA required to consider Plaintiffs for a HAMP loan modification.  *Id.*  Plaintiffs sent BoA all the information it requested including a signed HAMP Hardship Affidavit, bank statements, tax returns, and property tax account and homeowner's insurance policy statements.  ¶ 56.  BoA acknowledged receipt of Plaintiffs' documents and demanded one full-month



1   payment in order to be considered for a HAMP loan modification.  *Id.*  The Kahlo's sent BoA the

2   payment it demanded.  ¶ 57.  BoA then demanded an additional late payment fee of $289.12,

3   which the Kahlos sent as well.  ¶¶ 58, 61.

4         On August 30, 2009, the Kahlos received a Terms and Conditions Agreement from BoA

5   stating the modified terms.  The Agreement was accompanied by a cover letter dated August 21,

6   2009 stating, "[t]his letter constitutes our offer to modify the Mortgage identified above, subject

7   to the terms and conditions agreement.  When signed by you, this letter will also constitute your

8   acceptance and agreement to these terms and conditions."  ¶ 59, *see also* Ex. 9.  The Agreement

9   called for monthly principal and interest payments of $781.79 beginning November 1, 2009,

10   which roughly corresponded to 31% of the Kahlos' monthly income at the time.  ¶ 60.  The

11   Kahlos signed the Terms and Conditions Agreement the day they received it and returned it to

12   BoA the following day.  ¶ 61.  BoA acknowledged receiving the Agreement and the late fee

13   payment it demanded and stated that the Kahlos were "good to go."  *Id.*  The BoA representative

14   further wrote to the Kahlos to tell them that they would receive "final" modification documents

15   at the time their first payment would be due.  *Id.*  The Kahlos tendered their first payment of

16   $781.79 to BoA on October 30, 2009 and made at least two more timely payments the following

17   months.  BoA accepted these payments without qualification.  ¶¶ 62, 64.

18         By February 2010, Plaintiffs still had not received the final modification documents they

19   were told to expect.  After several inquiries, hours on the phone, and a request that they re-send

20   the Terms and Conditions Agreement because part of it had been "lost," BoA informed the

21   Kahlos that it was not honoring the modification agreement.  ¶ 66.  BoA instead claimed that its

22   Terms and Conditions Agreement was merely an "offer" and that it had not actually approved

23   the modification.  BoA claimed that Plaintiffs' loan had not been permanently modified.  *Id.*

24   BoA is therefore treating Plaintiffs' mortgage as being in default.

25

26

1

## IV.    ARGUMENT

2

**A.    Bank of America is Liable to Homeowners like Plaintiffs for its Failure to Meet Its Obligations Under the Servicer Participation Agreement**

3

4

Defendants claim that HAMP-eligible homeowners cannot enforce the obligations BoA

5

undertook to modify their mortgages because such homeowners cannot be treated as third-party

6

beneficiaries to the SPA contract.  Defendants' argument begins and ends with the proposition

7

that parties that benefit from a government contract are generally assumed to be incidental

8

beneficiaries absent a clear intent to the contrary, and a more stringent test applies to establish

9

that a government contract confers third party beneficiary status.  *See* Defs' Mtn. at 9 (citing

10

*Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1211 (9th Cir. 2000)).

11

The inquiry, however, cannot simply end there.  A review of cases that apply this test

12

shows that HAMP-eligible homeowners like the Kahlos are intended beneficiaries of the SPA

13

contracts and the HAMP program under any standard.  The SPA contract and incorporated

14

Treasury Directives show a clear intent to directly benefit eligible homeowners by directing BoA

15

to take specific actions towards those homeowners and for their benefit.  The statutes that enable

16

the SPA contract were explicitly enacted to benefit homeowners like the Kahlos and further

17

support a finding that certain homeowners are intended beneficiaries of the SPA contracts.

18

Indeed, courts throughout the country are increasingly recognizing that homeowners have the

19

right to require servicers like BoA to live up to their contractual requirements under HAMP.

20

**1.    Eligible homeowners are intended beneficiaries of the Servicer Participation Agreement**

21

A third party can sue under a contract that was intended for his benefit.  While an

22

incidental beneficiary acquires no rights against a contracting party, "[a] promisor owes a duty of

23

performance to any intended beneficiary of the promise, and 'the intended beneficiary may

24

enforce the duty' by suing as a third party beneficiary of the contract."  *County of Santa Clara v.*

25

*Astra*, 588 F.3d 1237, 1244 (9th Cir. 2009) (quoting Restatement (Second) of Contracts §§ 304,

26

315 (1979)); *see also Klamath*, 204 F.3d at 1211.  "To qualify as an intended beneficiary, the



third party 'must show that the contract reflects the express or implied intention of the parties to the contract to benefit the third party.'" *Santa Clara*, 588 F.3d at 1244 (quoting *Klamath*, 204 F.3d at 1211).  In determining the parties' intent, the Ninth Circuit directs courts to examine the contract as a whole in light of its text and purpose, and to "weigh the circumstances of the transaction." *Id.* at 1245 (citing *Far West Fed. Bank, S.B. v. Office of Thrift Supervision*, 119 F.3d 1358, 1364 (9th Cir. 1997)).  When a contract is mandated by a federal statute, circumstances to be weighed include the "governing statute and its purpose." *Id.*

*Santa Clara* involved a drug discounting program the government implemented using pricing agreements with private pharmaceutical manufacturers.  Each agreement, known as a "PPA," limited the prices manufacturers could charge federally funded clinics for certain drugs.  Some clinics brought suit alleging the manufacturers overcharged them and that this breached the PPA contract between the manufacturers and the government.  *Santa Clara*, 588 F.3d at 1241.  The District Court dismissed, finding that private entities could not bring suit as third-party beneficiaries to a government contract.  Upon examining the PPA, the Ninth Circuit reversed.  The court found that the PPA contract required manufacturers to take specific actions toward the plaintiff clinics.  The manufacturers agreed to charge clinics a reduced price for certain drugs, not to exceed a ceiling price.  Other provisions explained how to calculate that ceiling price, how to identify who is eligible for the discount, and required the parties to maintain records relevant to those matters.  *Id.* at 1246.  In light of these provisions, the Ninth Circuit held

> we are unable to discern any substantial purpose of the PPA [contract] *other* than to grant eligible covered entities a discount on covered drugs. We are therefore persuaded that the PPA, on its face, was clearly intended to benefit the covered entities directly.

*Id.* (emphasis in original).

Other circuits have used a similar analysis to find that government public housing contracts confer rights on third-party tenants.  In *Holbrook v. Pitt*, 643 F.2d 1261 (7th Cir. 1981), tenants brought suit to enforce rent subsidies in agreements between HUD and private owners of multifamily developments as part of a federal low income housing program.  The trial court



dismissed, finding that the tenants were merely incidental beneficiaries. *Id*. at 1264-66. The Seventh Circuit reversed after it found that several contract provisions directly involved tenants and operated to their benefit. For example, provisions requiring owners to maintain units so as to provide decent, safe and sanitary housing, provisions prescribing methods of selecting families, and provisions restricting discretion in collection of deposits and in eviction, all operated to the direct benefit of tenants. *Id*. at 1271-72. The Seventh Circuit found these provisions to indicate that the contracts between HUD and the development owners were primarily for the tenants' benefit and that tenants were therefore intended beneficiaries. *Id*. at 1272; *see also German v. Fed. Home Loan Mortg. Corp*., 885 F. Supp. 537, 578 (S.D.N.Y. 1995), as clarified, 896 F. Supp. 1385 (S.D.N.Y. 1995) (holding public housing tenants were intended beneficiaries of contracts between landlords and a public housing authority); *Davis by Davis v. Philadelphia Hous. Auth*., 121 F.3d 92, 100 (3d Cir. 1997) (finding that tenants in federally subsidized residences may possess cognizable rights as intended beneficiaries); *Ashton v. Pierce*, 716 F.2d 56, 66 (D.C. Cir. 1983) (finding tenants to be intended beneficiaries of government contracts and noting "it is difficult to imagine any purpose for the Contract other than to benefit the tenants of public housing").

The SPA contains provisions that obligate BoA to take specific actions and to act in the direct benefit of homeowners like the Kahlos. BoA agreed to modify eligible homeowners' mortgages to a reduced payment according to the detailed formula in the Program Directives. *See* Ex. 1 at ¶ 1.A. The SPA states that BoA "shall perform the Services for all mortgage loans it services." *Id*. at ¶ 2.A. It obligates BoA to maintain records and supporting documentation regarding borrower payments and delinquency information for each loan put into a trial modification. *Id*. at ¶ 4.E. It directs BoA to credit incentive payments it receives from Fannie Mae to the borrowers' respective loan obligations. *Id*. at ¶ 4.B. In fact, the SPA specifically refers to rights borrowers have under the Program Directives. In the section regarding the effect of contractual modifications, the SPA states that the "rights, duties, or obligations of



1   Participating Servicers, Investors, *or borrowers* in connection with the Program … shall be

2   effective only on a prospective basis." *Id.* ¶ 10.C (emphasis added).  Thus the SPA explicitly

3   recognizes that it confers rights and obligations not only to the parties, but to borrowers and

4   investors as well.[2]

5          The Directives incorporated into the contract, in turn, identify which homeowners are

6   eligible to receive loan modifications (Ex. 2 at pp. 2-3), require BoA to provide specific notices

7   to eligible homeowners (Ex. 2 at p. 13, Ex. 5 at p. 1), and regulate the credit reporting BoA can

8   make regarding eligible homeowners (Ex. 2 at p. 22).  These directives also protect homeowners

9   by prohibiting BoA from charging upfront fees, requiring initial contributions (Ex. 4 at Q.83), or

10  from soliciting borrowers to opt out of consideration for a HAMP modification (Ex. 8 at Q1230-

11  02).  Most importantly, the incorporated directives explain precisely how BoA is to calculate the

12  reduced payments homeowners are to make under HAMP.  *See* Ex. 2 at pp. 3-10.  The directives

13  prescribe an entire process that takes place between the mortgage servicer and eligible

14  homeowners.  All of these provisions operate for the benefit of eligible homeowners.  As with

15  the agreement in *Santa Clara*, it is difficult to discern any purpose of the agreement between

16  BoA and the Treasury Department other than to grant eligible homeowners the right to receive

17  modified mortgage loans on specified terms and within a specified time.

        **2.      The statutes authorizing and enabling the SPA statutes were enacted to
                  benefit homeowners**

18

19

20         When a contract is mandated by a federal statute, determining whether a third party is an

21  intended beneficiary includes examining the governing statute and its purpose.  *Santa Clara*, 588

22  F.3d at 1245; *see also Rendleman v. Bowen*, 860 F.2d 1537, 1542 (9th Cir. 1988).  In *Holbrook*,

23  the Seventh Circuit also examined the federal HUD program enabling the housing contracts at

24  issue, and found that the purpose of HUD's housing program was "aiding lower-income families

25  in obtaining a decent place to live."  643 F.2d at 1271.  Recognizing the tenants' right to enforce

26         ---
        [2] *See also* Ex. 1 at ¶¶ 4.D, 6.C and Ex. 1 at Ex. A (Financial Instrument) ¶¶ 3(b), 5(c), 5(j) for additional
        provisions directly contemplating effects on mortgage borrowers, their loans and their records.



the contracts used to implement HUD's program was therefore consistent, and indeed, necessary to effectuate the program itself. "If the tenants are not the primary beneficiaries of a program designed to provide housing assistance payments to low income families, the legitimacy of the multi-billion dollar Section 8 program is placed in grave doubt." *Id.*

The HAMP program that the SPA contracts serve to implement was explicitly enacted to benefit eligible homeowners. The stated purpose of the enabling statute is to "facilitate loan modifications and … prevent avoidable foreclosures." 12 U.S.C. § 5219. The observation the Seventh Circuit made regarding HUD's Section 8 housing program in *Holbrook* applies here. If eligible homeowners in danger of falling into default, and who are seeking to modify their mortgages to make their homes affordable, are not the primary beneficiaries of a "Home Affordable Modification Program," the legitimacy of this program is placed in grave doubt.

### 3. Intended beneficiaries need not be specifically identified in the contract

BoA's main argument that plaintiffs are not the intended beneficiaries of its Agreement to modify eligible mortgages proceeds from the fact that the SPA states that it shall "inure to the benefit of the parties to the Agreement" without explicitly stating that homeowners are beneficiaries or that they have rights to enforce the Agreement. *See* Defs' Mtn. at 9. The Ninth Circuit has explicitly rejected this argument.

> [W]e reject the suggestion that the availability of a third party contract claim is conditioned on the contract's inclusion of a provision expressly granting the third party the ***right to sue***…. [T]he right to sue inheres in one's status as an intended beneficiary…. To require additionally of intended beneficiaries that the contract by its terms provide for third party enforcement would read the distinction between incidental and intended beneficiaries out of the federal common law of contracts.

*Santa Clara*, 588 F.3d at 1244-45 (emphasis in original). When intent to benefit the third party is not expressly stated in the contract, evidence of that intent may be adduced from the context. *Roedler v. Dep't of Energy*, 255 F.3d 1347, 1352 (Fed. Cir. 2001); *see also Montana v. United States*, 124 F.3d 1269, 1273 (Fed. Cir. 1997). When the contract implements a statutory enactment, it is appropriate to inquire into the purpose of the governing statute. *See American*



*Hosp. Ass'n v. Schweiker*, 721 F.2d 170, 183 (7th Cir. 1983).  Courts have rejected the argument that boilerplate language stating that an agreement is to inure to the benefit of the parties overrides other provisions or a context showing an intent to benefit third parties.  *See Caldwell Trucking PRP v. Rexon Tech. Corp.*, 421 F.3d 234, 245 (3d Cir. 2005); *Ashton*, 716 F.2d at 66 (finding specific language purporting to disclaim third-party rights not effective in light of agreement's purpose to benefit tenants); *McNeill v. New York City Housing Auth.*, 719 F. Supp. 233, 249 n.13 (S.D.N.Y. 1989) (finding language purporting to disclaim third-party beneficiary rights to be insufficiently clear).

As discussed above, specific SPA terms, obligations detailed in the incorporated Directives, and the stated purpose of the statute SPA contracts implement, all show intent to benefit homeowners by reducing their mortgage payments to affordable levels.  The intent to assist eligible homeowners by reducing their mortgage payments is more than sufficient to override the general boilerplate language on which BoA relies.

**4.      Courts have found HAMP to provide legal rights to homeowners**

BoA claims the notion that HAMP-eligible borrowers are intended third-party beneficiaries of the SPA contracts has been "soundly rejected."  Defs' Mtn. at 8.  This is far from true.  HAMP has been in place for less than a year and requires a loan modification process that takes several months to complete.  It is therefore not surprising that no reported decisions have analyzed the SPA contract, including the incorporated directives, to determine whether eligible borrowers as defined under HAMP are intended beneficiaries of the contract.  For the most part, the issue has not been ripe for decision.

Nevertheless, several unreported opinions have recognized that borrowers have rights that proceed from the contract that BoA signed.  The federal district court for the Southern District of California sustained a plaintiff's contract claim that was based on his status as a third-party beneficiary to the SPA contract.  The court found that the plaintiff had alleged sufficient facts to support his third-party beneficiary theory and noted that "[a]rguably, one of the purposes



of the contract is to assist homeowners, like Plaintiff, who are facing foreclosure. These facts are sufficient to state a plausible claim for breach of contract under a third party beneficiary theory." *Reyes v. Saxon Mortg. Servs., Inc.*, 2009 U.S. Dist. Lexis 125235, *6 (S.D. Cal. Nov. 5, 2009).

Homeowners' rights under HAMP have mostly been litigated in state court cases involving foreclosure. Courts throughout the country are increasingly ruling that homeowners have cognizable interests and have denied servicers the right to foreclose without first showing that they complied with HAMP requirements. A Michigan circuit court set aside a foreclosure order when, on appeal from a district court order, the homeowners alleged that the servicer had not complied with several HAMP requirements.[3] The court examined the servicer's SPA contract in detail, including the incorporated directives, and determined that the homeowners had rights under this contract. *Id*. at pp. 4-9.

Other courts have found a foreclosing servicer's compliance with HAMP to be a prerequisite to foreclosing against the homeowner. In Iowa, for example, several courts have denied summary judgment to foreclosing lenders based on allegations that homeowners had not been correctly reviewed for, or offered, a loan modification.[4] An Ohio court denied Bank of America's effort to foreclose because the homeowner was "entitled to be evaluated under the HAMP eligibility criteria" and had "clearly not been evaluated, provided a loan modification

---

[3] *See Deutsche Bank Nat'l Trust Co. v. Hass*, No. 2009-2627-AV (Michigan Cir. Ct., Macomb County, Sept. 30, 2009). Copies of all unreported state-court opinions are attached hereto as Appendix B.

[4] *See Deutsche Bank Nat'l Trust Co. v. Kane*, No. EQCV067273 (Iowa Dist. Ct., Linn County, Mar. 31, 2010) (denying summary judgment to servicer upon finding a genuine issue of material fact as to whether servicer complied with HAMP requirements); *U.S. Bank N.A. v. Peterman*, No. EQCV067378 (Iowa Dist. Ct., Linn County, Apr. 21, 2010) (denying summary judgment to servicer because "there is no information in the file regarding what steps Plaintiff [servicer] took to determine Defendants' [homeowners'] eligibility for the Making Home Affordable Program"); *Waterfall Victoria Master Fund Ltd. v. Hansen*, No. EQCV007412 (Iowa Dist. Ct., Benton County, Mar. 31, 2010) (denying summary judgment and noting that an affidavit generally asserting HAMP compliance was insufficient to resolve factual dispute as to whether servicer properly evaluated homeowner for a loan modification); *HSBC Bank, U.S.A. N.A. v. Garcia*, No. EQCV027408 (Iowa Dist. Ct., Buena Vista County, Nov. 12, 2009) (denying summary judgment because the homeowners "contend their loan is subject to the Home Affordable Modification Program [and] that [the servicer] is contractually bound to the United States Treasury to fulfill all requirements of the … Program[, which] may also be an issue of fact for trial.").

RESPONSE TO MOTION TO DISMISS - 15
No.  2:10-cv-00488 JLR
010176-11  376109 V1



1918 Eighth Avenue, Suite 3300 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594

plan, or provided a trial period."[5]  In the course of dismissing a foreclosure action without prejudice, a Vermont court held that upon refiling, the foreclosing lender "will be required to demonstrate its efforts to comply with its HAMP obligations."[6]

In New York, courts have begun requiring proof that a lender complied with HAMP before a case can be positively reported out of required pre-foreclosure mediation.[7]  The Kings' County Supreme Court rules now require a participating servicer that is seeking to foreclose to produce a HAMP "status report" in all cases involving a HAMP, which must include a "specific written justification with supporting details" if the homeowner has been denied a HAMP modification.  *See* Kings County Sup. Ct. Civ. R. G(6).  Such impediments to foreclosure would not be available to homeowners if these courts believed homeowners have no cognizable rights under the contracts used to implement HAMP.

BoA relies on two unpublished decisions to portray the notion of homeowners as intended beneficiaries of SPA contracts as having been "soundly rejected."  *Escobedo v. Countrywide Home Loans, Inc.*, 2009 U.S. Dist. Lexis 117017 (S.D. Cal. Dec. 15, 2009) dismissed a complaint that was filed in June 2009 – two months after the servicer first entered into the SPA contract.  The mortgage borrower could not have alleged, much less demonstrated, that he was both eligible for a HAMP modification and had completed a three-month trial plan.

The court in *Escobedo* rejected the plaintiff's third-party beneficiary claim without discussion of any of the affirmative duties in the SPA or the Supplemental Directives.  In dismissing the claim, the court relied on the presumption the Ninth Circuit stated in *Klamath*, that individual members of the public are treated as incidental beneficiaries unless a different intention is manifested.  *See Escobedo*, 2009 U.S. Dist. Lexis 117017, at *5 (citing *Klamath*, 204

---

[5] *BAC Home Loans Servicing, L.P. v. Bates*, No. CV2009 06 2801 (Ohio Ct. of Common Pleas, Butler County, Mar. 8, 2010).

[6] *GMAC Mortg., LLC, v. Riley*, No. 500-09 Fc (Vermont Superior Ct., Franklin County, Mar. 5, 2010).

[7] *See, e.g.*, *Wells Fargo Bank N.A. v. Lewis*, No. 130421/2009 (N.Y. Sup. Ct., Richmond County, Feb. 25, 2010) (ordering foreclosing lender to produce "documentation of efforts it has taken, pursuant to HAMP, to remove any restrictions or impediments to modification); *Wells Fargo Bank N.A. v. Gonzalez*, No. 100982/08 (N.Y. Sup. Ct., Richmond County, May 6, 2009).



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

F.3d at 1211).[8]  Unlike the Michigan court in *Deutsche v. Hass* (*see* note 3 above), the court went no further and did not examine the SPA or the directives to determine whether a different intention was, in fact, manifested.  *See id.*  The difference between the contracts, along with the class claiming to be intended beneficiaries of those contracts in *Klamath*, and the SPA relation to homeowners here, highlights the extent to which finding eligible homeowners are intended beneficiaries of the SPA contracts is consistent with the standard the Ninth Circuit articulated.  In *Klamath,* irrigators in the Klamath Basin claimed they were intended beneficiaries to a contract formed more than forty years earlier between the U.S. Bureau of Reclamation and the California Oregon Power Company.  *Klamath*, 204 F.3d at 1211.  The contract did not direct either party to engage the irrigators in transactions, to perform any actions directly involving the irrigators, and contained no mention of the irrigators or any comparable class.  *Id*. at 1211-12.  The court found that, while the irrigators may have benefitted from the contract, they were incidental rather than intended beneficiaries.  *Id*. at 1212.

   In contrast, the SPA contract directs BoA to take specific actions for the benefit of a specific group of eligible homeowners.  BoA must identify homeowners who are in danger of default and otherwise potentially eligible under HAMP's guidelines.  It must collect financial information from these homeowners and calculate a reduced monthly payment using a specifically prescribed method.  The contract directs BoA to then offer each eligible homeowner a trial payment plan for a three-month period, and as to homeowners who successfully make three timely payments under this trial plan, the contract directs BoA to offer them permanent modifications.  These are qualitatively different obligations than at issue in *Klamath*.  The obligations are directed at an identifiable and discrete class of people – namely homeowners in danger of becoming delinquent on their BoA mortgages and who are otherwise eligible.  Such homeowners are intended beneficiaries of the SPA contract.

---

[8] *Villa v. Wells Fargo Bank, N.A.*, 2010 U.S. Dist. Lexis 23741 (S.D. Cal. Mar. 15, 2010) is the second decision on which BoA relies.  The analysis of the third-party beneficiary argument in this decision goes no further than to state that "the court finds Escobedo persuasive and adopts its reasoning."  *Id.* at *7.



HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

### 5.    BoA violated obligations to the Kahlos under HAMP

The Kahlos are eligible homeowners under the HAMP guidelines.  Their primary residence secures their mortgage; the outstanding loan amount is less than $729,750; they demonstrated a financial hardship that renders them in danger of default; the mortgage was originated before 2009; and their mortgage payment exceeds 31% of their income.  *See* ¶¶ 51, 52, 56, Ex. 9.  The Kahlos approached BoA, requested a modification, and demonstrated their eligibility.  ¶¶ 55, 56.  BoA was obligated to provide the Kahlos with a Trial Period Plan, and that was what the Kahlos were told they had received.  ¶ 61.  The Kahlos had no reason to think otherwise, having no way to know the difference between a HAMP and a non-HAMP modification.  If BoA's claim that the modification it sent was a "non-HAMP" modification is correct, it essentially admits that it did not comply with the terms of the SPA contract.  The directives prohibit BoA from soliciting borrowers to opt out of consideration for HAMP during the temporary review period.  *See* Ex. 8 at Q1230-02.  To the extent BoA now seeks advantage by the form of the agreement it sent the Kahlos, it is seeking to benefit from its own violation.

The Kahlos made three timely payments in the amount stated on the modified mortgage agreement; they provided all information requested of them, and fulfilled all other requirements.  BoA was obligated to make this plan permanent.  Instead, after collecting payments for months, BoA informed the Kahlos that it had not, and would not, permanently modify their mortgage.  ¶ 66.  At least once, BoA claimed that the Kahlos are back in default and that they owe an increased principal balance.  ¶ 65.  Moreover, BoA violated the specific prohibition against demanding up-front payments to be considered for the HAMP program when it demanded that the Kahlos first send a full, unmodified, monthly payment along with a $289 late fee.  *Compare* ¶¶ 56, 58 with Ex. 4 at Q. 83.  Finally, Plaintiffs allege, and will show, that BoA's performance of its obligations under the SPA have been designed to frustrate homeowners like the Kahlos.  BoA therefore violated the duty of good faith and fair dealing that is implied in this contract.  *See Badgett v. Security State Bank*, 116 Wn.2d 563, 569, 807 P.2d 356 (1991).



**B.   Bank of America Breached a Direct Contract with the Kahlos**

Regardless of the duties under its SPA contract, BoA entered into a contract directly with the Kahlos.  To prevail on a contract claim, the plaintiff must show an agreement between the parties, a parties' duty under the agreement, and a breach of that duty.  *Lehrer v. DSHS*, 101 Wn. App. 509, 516, 5 P.3d 722 (2000).  Plaintiffs allege each of these elements and will prove them at trial.  BoA sent the Kahlos a Terms and Conditions Agreement it described as constituting "our offer to modify the Mortgage identified above, subject to the terms and conditions agreement.  When signed by you, this letter will also constitute your acceptance and agreement to the terms and conditions."  ¶ 59.  The Kahlos signed BoA's agreement on the day they received it and returned it the following day along with a $289 payment that BoA had demanded. ¶ 61.  BoA acknowledged receipt of the agreement and the payment, described them as being "good to go," and accepted, without qualification, each of the Kahlos' payments.  ¶¶ 61, 62, 64. After collecting payments for three months, BoA claimed that it was not bound by its Agreement and informed the Kahlos that it had not, in fact, modified their loan.  ¶ 66.

**1.   Returning the Terms and Conditions Agreement within seven days was not a condition to form a contract**

BoA now claims a contract was never formed because the Agreement was not returned within seven days of the letter dated August 21, 2009.  This argument fails for the simple reason that the condition that the Agreement be returned within seven days is not part of the Agreement itself, but appears only in the accompanying letter.  *See* Ex. 9.  Moreover, the request that the Agreement be returned within seven days is not phrased as a condition precedent.  The letter asks that the Kahlos sign and return the Agreement within seven days.  It then states that the offer will expire "[i]f we do not receive this signed acceptance letter."  *Id.*  The only condition, therefore, is that the Agreement be signed and returned, not that it be returned within seven days.  The Kahlos returned a signed Agreement, BoA acknowledged receiving it, and the parties began performing under its terms.  *See* ¶¶ 61, 62, 64.  BoA's belated claim that no contract was formed because the



Agreement was not returned (or likely even sent to the Kahlos) before August 28, 2009, is not supported by the language in the Agreement or in the accompanying letter.

### 2. Bank of America waived any requirement that the Agreement be returned within 7 days

Even if the requirement that the Agreement be returned within seven days can be considered part of the contract, BoA waived this condition by accepting the agreement and by accepting the Kahlos' monthly payments under the Agreement. A party to a contract may waive a contract provision, which is meant for its benefit, and may imply waiver through its conduct. *Reynolds Metal Co. v. Elec. Smith Constr. & Equip. Co.*, 4 Wn. App. 695, 699-700, 483 P.2d 880 (1971). "[W]hen a contract not fully performed on either side is continued in spite of a known excuse, the right to rely upon the known excuse is waived." *Id.* (citing 5 S. Williston, A Treatise on the LAW OF CONTRACTS § 678 (3d ed. W. Jaeger 1961)). A waiver may be either expressly declared by a party or it may be implied from its conduct. *Id.*

The Kahlos first received BoA's offer to enter into a Terms and Conditions Agreement on August 30. *See* ¶ 58. It was accompanied by a letter dated August 21 asking that it be signed and returned within seven days. If BoA ever really considered the request that the Agreement be returned within seven days to be a condition precedent to the contract, it waived this condition. BoA expressly waived the condition when its representative acknowledged receipt of the Agreement and accompanying payment and declared, in writing, that the Kahlos were "good to go." *See* ¶ 61. BoA also waived any condition to forming the contract through its conduct over the next several months when it accepted the Kahlos' payments in the amounts stated in the Terms and Conditions Agreement without comment or qualification.

### 3. BoA and the Kahlos formed a contract by estoppel

Absent waiver, BoA created a contract with the Kahlos by estoppel under the terms set out in the Terms and Conditions Agreement. A contract formed by estoppel requires: (1) a promise which, (2) the promisor should reasonably expect to cause the promisee to change his position, (3) which does cause the promisee to change his position, (4) justifiably relying upon



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1   the promise, in such a manner that (5) injustice can be avoided only by enforcement of the

2   promise.  *Klinke v. Famous Recipe Fried Chicken, Inc.*, 94 Wn.2d 255, 259 n.2, 616 P.2d 644

3   (1980) (quoting *Corbit v. J.I. Case Co.*, 70 Wn.2d 522, 539, 424 P.2d 290 (1967)).

4        The Kahlos have adequately alleged each of the above elements.  The promise was set

5   out in the Terms and Conditions Agreement BoA sent.  This promise to modify the Kahlos'

6   mortgage was calculated to and, in fact, did cause the Kahlos to change their position as they

7   began sending payments under the terms in the Agreement.  The Kahlos' reliance on that

8   promise was justified, particularly when BoA informed them that all was in order.  The injustice

9   of allowing BoA to repudiate its promise can only be avoided by holding BoA to its Agreement.

10       **4.    BoA breached the Terms and Conditions Agreement**

11       Plaintiffs allege that BoA has refused to honor the Terms and Conditions Agreement and

12   claimed it was merely an "offer" that was never approved.  ¶ 66.  In response to being sued, BoA

13   now claims it actually does intend to honor the Agreement so long as the Kahlos perform as

14   required.  *See* Defs' Mtn. at 14.  While BoA's recent reversal rings hollow, the debate need not

15   be taken up now as this contradiction of allegations in the Complaint has no place in a motion to

16   dismiss.  *See Parks Sch. of Business*, 51 F.3d at 1484 (9th Cir. 1995) (factual allegations set forth

17   in the complaint are taken as true).  Similarly, BoA's claim that Plaintiffs suffered no damages

18   because they have not been foreclosed on and because they are free to declare bankruptcy shows

19   a marked lack of understanding of the plight of homeowners facing default and foreclosure.  The

20   Kahlos have been damaged by paying their dwindling funds to BoA based on a promise that their

21   loan was modified.  ¶¶ 62, 64.  The lack of a permanent modification leaves them without the

22   assurance that they will not lose their home at the whim of the bank and deprives them of the

23   predictability required for basic financial and day-to-day planning.  ¶ 68.

24   **C.   Bank of America Violated the Consumer Protection Act**

25       To establish a violation of the CPA, a plaintiff must demonstrate:  "(1) [an] unfair or

26   deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact;



1 (4) injury to plaintiff in his or her business or property; (5) causation." *Hangman Ridge Training*

2 *Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 780, 719 P.2d 531 (1986). Plaintiffs have

3 alleged each of these elements. *See* ¶¶ 105-08.

4 BoA claims Plaintiffs cannot show it did anything unfair or deceptive. This is incorrect.

5 Plaintiffs have alleged, and will show, that BoA acted unfairly and deceptively in a number of

6 ways. Both in its public pronouncements and in individual representations, BoA led

7 homeowners to believe it was participating in a widely publicized government program to

8 modify distressed mortgages in its portfolio and that it would comply with the government's

9 program in good faith. In fact, BoA has actively sought to frustrate that program. It has forced

10 the Kahlos and thousands of homeowners to endure countless hours on the phone, has claimed to

11 lose documents, delayed the modification process, and regularly provided misinformation

12 regarding the status of their application. *See* ¶¶ 8, 48, 49, 55, 64-66. It was also unfair for BoA

13 to lead the Kahlos and other homeowners to believe they would receive a permanently modified

14 loan upon successful completion of a trial period plan, and to use that promise to lure

15 homeowners to make additional up-front payments. *See* ¶¶ 56, 57, 105. Finally, BoA violated

16 state and federal statutes regarding information it must provide borrowers in the course of

17 extending or modifying home mortgage loans. *See* RCW 31.04.102 (requiring advanced

18 disclosures as required under the Truth in Lending Act, 15 U.S.C. § 1601); RCW 19.146.030

19 (same). BoA provided no advanced disclosure of the terms of the loan modification it offered

20 the Kahlos. Instead, it stated the new terms for the first time in a loan modification that the

21 Kahlos were required to accept immediately. *See* ¶ 59.

22 BoA next claims that Plaintiffs will not be able to show that BoA's actions affect the

23 public interest. "[W]hether the public has an interest in any given action is to be determined by

24 the trier of fact from several factors, depending upon the context in which the alleged acts were

25 committed." *Hangman Ridge*, 105 Wn.2d at 789-90. Plaintiffs can establish effect on the public

26 interest by showing that additional plaintiffs have been or will be injured in the same fashion.



1   Non-dispositive factors indicating public interest in this context include showing the alleged acts

2   were committed in the course of defendant's business; that defendant advertised to the public in

3   general; and that plaintiff and defendant occupy unequal bargaining positions. *Id.* at 791.

4   Again, establishing that acts affect the public interest involves questions of fact not

5   properly taken up on a 12(b)(6) motion. Plaintiffs have alleged that BoA has over a million

6   eligible loans in its portfolio and that it has engaged in similar conduct in dealing with thousands

7   of homeowners in danger of defaulting on their mortgages and who were led to believe that

8   BoA's participation in HAMP would serve as a lifeline. *See* ¶¶ 48, 49. Plaintiffs have alleged,

9   and will show, that BoA's refusal to act honestly and in accordance with HAMP is not unique to

10   the Kahlos but part of a concerted effort to avoid its obligation to modify mortgages. Plaintiffs

11   have alleged that BoA conducted these practices in the course of its business, pursuant to a

12   unified course of conduct that it engaged in both before and after the Plaintiffs in this case, that

13   its acts have been repeated thousands of times, and that many consumers were affected. *See*

14   ¶¶ 5, 8, 10, 48-49. In short, Plaintiffs adequately alleged that BoA's conduct violates the CPA.

15   **D.   Unjust Enrichment**

16   Plaintiffs do not oppose dismissal of the claim for unjust enrichment that was raised in

17   the alternative to their claims for breach of contract.

### V.   CONCLUSION

19   For the reasons stated above, Plaintiffs respectfully request that the Court deny

20   Defendant's motion to dismiss. To the extent the Court dismisses any claim other than unjust

21   enrichment, Plaintiffs request the opportunity to amend the Complaint to cure the deficiency.



1    DATED:  June 14, 2010

2                                         HAGENS BERMAN SOBOL SHAPIRO LLP

3
                                          By:    s/ Steve W. Berman
4                                                Steve W. Berman, WSBA #12536
                                                 Ari Y. Brown, WSBA #29570
5                                         HAGENS BERMAN SOBOL SHAPIRO LLP
                                          1918 Eighth Avenue, Suite 3300
6                                         Seattle, Washington 98101
                                          (206) 623-7292
7                                         steve@hbsslaw.com
                                          ari@hbsslaw.com
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26



## <u>CERTIFICATE OF SERVICE</u>

On June 14, 2010, I caused to be electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following attorneys of record:

- **Steve W. Berman**
  steve@hbsslaw.com, heatherw@hbsslaw.com
- **Ari Y. Brown**
  ari@hbsslaw.com, dawn@hbsslaw.com
- **John S. Devlin , III**
  devlinj@lanepowell.com, Docketing-SEA@LanePowell.com, burrusl@lanepowell.com
- **Mark Tyler Knights**
  mknights@goodwinprocter.com
- **James W. McGarry**
  jmcgarry@goodwinprocter.com
- **Andrew Gordon Yates**
  yatesa@lanepowell.com, docketing-sea@lanepowell.com, strayerd@lanepowell.com

Executed this 14th day of June, 2010, in Seattle, Washington.

HAGENS BERMAN SOBOL SHAPIRO LLP

By:  _s/ Steve W. Berman_____
    Steve W. Berman, WSBA #12536



RESPONSE TO MOTION TO DISMISS - 25
No.  2:10-cv-00488 JLR
010176-11  376019 V1

1918 Eighth Avenue, Suite 3300 • Seattle, WA 98101
(206) 623-7292 • FAX (206) 623-0594